# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

BRANDON ROBERT PETERSON,

        Plaintiff,

v.

WASHINGTON COUNTY,
MINNESOTA; WASHINGTON
COUNTY SHERIFF DAN STARRY, in
his official and individual capacity;
COMMANDER ROGER HEINEN, in his
individual capacity; ASSISTANT JAIL
ADMINISTRATOR JOHN WARNEKE,
in his individual capacity; SERGEANT
BRANDON OLSON, in his individual
capacity; SERGEANT NICHOLAS
KLINKNER, in his individual capacity;
SERGEANT TROY JORGENSON, in his
individual capacity; OFFICER KCEE
CAHILL, in his individual capacity;
SERGEANT FRANK CAPRA, in his
individual capacity; OFFICER DAN
REIN, in his individual capacity;
SERGEANT DAVID FRANTSI, in his
individual capacity; OFFICER JENNIFER
GLASSMAKER, in her individual
capacity; CORPORAL REBECCA
DYCK, in her individual capacity;
NURSE MELINDA "MINDY" LEIBEL,
in her individual capacity; OFFICER
CHAD GAIKOWSKI, in his individual
capacity; OFFICER JOHN ROBERTO, in
his individual capacity; OFFICER
VINCENT SCHEELE, in his individual
capacity; OFFICER GARRETT
KLEINENDORST, in his individual
capacity; OFFICER DE LA ROSA, in his
individual capacity; STEPHANIE

Case No. 18-cv-02640-DWF-ECW

**SECOND AMENDED
COMPLAINT**

| KAPHING, in her individual capacity; and JOHN DOES 1-10, in their individual capacities. | |
| --- | --- |
| Defendants. | |

## SECOND AMENDED COMPLAINT

### Preliminary Statement

1.       In April 2016, Washington County petitioned the Washington County District Court to civilly commit Plaintiff Brandon Robert Peterson due to manifestations of his mental illness, including obvious risks of serious harm resulting therefrom.

2.       Around the same time, Peterson was incarcerated at the Washington County Jail, located at 15015 62nd St. N., Stillwater, Minnesota 55082. The Washington County District Court issued an order to have Peterson civilly committed on April 28, 2016. Peterson's civil commitment was continued by Court order on October 12, 2016. Peterson was eventually discharged and his commitment proceeding was dismissed on September 15, 2017.

3.       In January 2018, Washington County charged Peterson with aiding and abetting theft. A warrant issued and he was arrested on February 4, 2018, and taken to the Washington County Jail where he was detained until May 23, 2018.

4.       Peterson was not charged with a violent crime, nor was he violent when he arrived at the Washington County Jail on February 4, 2018.

5.       From February 4 through March 7, 2018, Peterson was detained at the Washington County Jail as a pretrial detainee or pre-judgment detainee, as he was not

serving a sentence for any conviction during this period of incarceration, but rather was awaiting trial for the charges he was detained for.

6.      On March 7, 2018, Peterson was held in contempt and sentenced to 90 days in the Washington County Jail, a sentence he served until May 23, 2018.

7.      Also on March 7, the Washington County District Court presiding over the January 2018 criminal charges issued an Order for the evaluation of Peterson's competency to proceed to trial.

8.      On May 8, 2018, Peterson was found incompetent by the Washington County District Court.

9.      On May 10, 2018, Washington County moved for a second time in just over two years to have Peterson civilly committed due to mental illness, including obvious risks of serious harm resulting therefrom.

10.      On May 23, 2018, Peterson was transferred from the Washington County Jail to Anoka Regional Treatment Center.

11.      The individual Defendants were all correction officers, Sheriff's Office employees, other Washington County personnel, or their supervisors, acting under color of state law at all relevant times.

12.      Peterson has been bipolar disorder, including both Bipolar I and unspecified bipolar disorder, since before he was incarcerated in February 2018.

13.      Washington County was aware of Peterson's bipolar disorder prior to his February 2018 incarceration.

14.     Commander Heinen was aware of Peterson's bipolar disorder prior to his February 2018 incarceration.

15.     Sergeant Olson was aware of Peterson's mental illness prior to his February 2018 incarceration.

16.     Sergeant Capra was aware of Peterson's mental illness prior to his February 2018 incarceration.

17.     The Doe Defendants were aware of Peterson's bipolar disorder prior to his February 2018 incarceration.

18.     Bipolar disorder is a serious medical condition.

19.     According to the National Institute of Mental Health, "Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks."

20.     Individuals with bipolar disorder can experience decompensation when the disorder goes untreated, medication is denied or inadequately administered, or when exposed to stress, particularly for extended periods of time. Decompensation results in manic, pressured, hyperactive, or destructive (to self, others, and property) behavior.

21.     Peterson was placed in segregation within two weeks of his initial booking in the Washington County Jail on February 4, 2018.

22.     Segregation has a deleterious effect on individuals with bipolar disorder, which grows worse the longer the segregation lasts.

23.     Segregation results in decompensation in individuals with bipolar disorder, which poses a risk of serious harm to that individual.

24.     Beginning February 14, 2018, Peterson spent almost the entirety of the next three months in segregation—over or around 90 days. A large portion of Peterson's segregation included extended periods where Peterson was given no time outside his cell, other than extractions or shakedowns.

25.     While incarcerated, Defendant Washington County, through its policies and customs, acts or ratification of acts by its final policy maker(s) with respect to inmate care and jail policies (Sheriff Starry, Assistant Jail Administrator Warneke, or Commander Heinen), was deliberately indifferent to a risk of harm to Peterson due to his serious medical needs when they failed to provide and/or to continue Peterson's medications or provide them in appropriate form; failed to conduct an adequate and timely medical and mental-health screening; and subjected Peterson to prolonged segregation and punitive prison conditions.

26.     Similarly, the individual Defendants were deliberately indifferent to a risk of harm to Peterson due to his serious medical needs when they failed to provide and/or to continue Peterson's medications or provide them in appropriate form; failed to conduct an adequate and timely medical and mental-health screening; and subjected Peterson to prolonged segregation and punitive prison conditions.

27.     Defendants' actions resulted in a series of prolonged decompensation for Peterson.

28.     In addition to Defendants' deliberate indifference to Peterson's serious medical needs, Defendants also violated his due process rights when they deprived him repeatedly of basic necessities, sleep, clothing, adequate nutrition, and sanitation (e.g.,

showers, toilet paper or other means of cleaning himself following a bowel movement or blowing his nose), and decontamination within a reasonable time following exposure to a chemical spray.

29.     Peterson was also denied his rights to due process when he was punished through the use of excessive force, including multiple unjustified uses of chemical sprays and non-lethal projective weapons (FN-303 semi-automatic "non-lethal" rifle).

30.     Defendants failed Peterson from the very outset when he was arrested and his serious medical condition was deliberately disregarded, despite the following: Washington County and the personnel of the Washington County Jail were familiar with Peterson and his mental-health condition (including the diagnosis of bipolar disorder) because Peterson had been incarcerated there previously, during which time he was evaluated and found incompetent upon the reports of Doe Defendants; Peterson was on anti-psychotic medications during the course of incarcerations at the Washington County Jail in periods during 2016, 2017, and 2018; Peterson manifested signs of mental illness that each individual Defendant had actual knowledge of and which demonstrated the obviousness of Peterson's mental illness, as well as the risks it posed to his health.

31.     Washington County and the individual Defendants who were running the Washington County Jail failed to respond to Peterson's mental-health conditions, or responded with undue delay or gross inadequacy.

32.     Defendants' actions led to a "snowball" effect of mental decompensation where Peterson repeatedly spiraled out of control and, due to his known serious mental condition, was at serious risk of harm.

33.     Instead of responding in a timely manner to Peterson's deteriorating psychiatric condition, Defendants failed to respond at all, or responded with shows of force, uses of force, and restrictions and punishments that were not only grossly inadequate responses to the risk of harm Peterson faced as a result of his serious medical condition, but in many instances amounted to the objectively unreasonable use of force. The uses of force were not justified by or proportionate to the need to serve any legitimate penological or other governmental purpose.

34.     To the extent the individual Defendants ignored Peterson's bipolar disorder (and any other mental illness of which they were aware), Defendants were deliberately indifferent to Peterson's serious medical needs.

35.     Around thirty percent of the inmates in the Washington County Jail are mentally ill.

36.     Even so, Washington County had a custom, practice, or pattern of failing to respond to known risks of harm from mental illness, or responding with undue delay or gross inadequacy, using force, segregation, and grossly inadequate treatment timetables and methods for responding to such conditions.

37.     Defendant Washington County had a policy, custom, or practice of responding to mentally ill inmates in this manner. Individuals other than Peterson that have been incarcerated in the Washington County Jail for years leading up to Peterson's 2018 incarceration also suffered similarly inadequate treatment.

38.     Washington County collects data regarding mentally ill inmates at the time of booking, but fails to respond in light of data showing that there are inmates with

serious—but untreated, untimely treated, or treated in a grossly incompetent manner—medical needs, including mental illness.

39.     Defendants were aware of inmates', including but not limited to Peterson, whose behavior and serious medical conditions and mental-health conditions were made known through the provision of inmate profiles, medical assessments, records, or other information that gave Defendants actual knowledge of the serious medical and mental-health conditions.

40.     Defendants' responses to Peterson's known serious medical condition evince Washington County's policy, custom, or practice of failing to adequately train its employees in both the proper use of force and how to respond appropriately to the serious medical and mental-health needs of inmates, such as Peterson.

41.     Had Defendants responded appropriately to or been adequately trained to respond to Peterson's mental-health condition, the injuries arising from Defendants' unlawful and unconstitutional treatment of Peterson giving rise to this Second Amended Complaint could have been avoided.

42.     As a result of Defendants' actions, Peterson brings this Second Amended Complaint for violations of his rights under the Fourteenth and Eighth Amendments to the United States Constitution under 42 U.S.C. § 1983, federal law, as well as related causes of action under Minnesota state law.

43.     Peterson seeks compensatory damages and reasonable attorneys' fees and costs, as authorized by 42 U.S.C. §§ 1983 and 1988, as well as the Americans with

Disabilities Act, 42 U.S.C. § 12132 *et seq.*, and the Rehabilitation Act, 29 U.S.C. 701 *et seq.*

## JURISDICTION

44.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights) as this case arises under the U.S. Constitution and the laws of the United States, namely 42 U.S.C. §§ 1981, 1983, and 1988.

45.     Supplemental jurisdiction over the pendent state-law claims is appropriate pursuant to 28 U.S.C. § 1367.

46.     Defendants had actual notice of Peterson's state-law claim as of the filing of this lawsuit.

## VENUE

47.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b), as the acts or occurrences giving rise to these claims took place in substantial part within the District of Minnesota.

## PARTIES

48.     Plaintiff Brandon Peterson is a resident of Minnesota.

49.     Defendant Washington County, Minnesota, is a political subdivision of the State of Minnesota that can be sued in its own name. Defendant Washington County operates and is responsible for the Washington County Sheriff's Office and the Washington County Jail, located in Stillwater, Minnesota.

50.     Washington County is a recipient of federal funding.

51.     The individual Defendants are all employees of Washington County and/or the Washington County Sheriff's Office.

52.     Washington County Sheriff Dan Starry was at all relevant times and is currently the Sheriff of Washington County, Minnesota, acting under color of Minnesota state law. Upon information and belief Sheriff Dan Starry is a resident of Minnesota.

53.     Commander Roger Heinen is and was at all relevant times a corrections officer at the Washington County Jail. In his capacity as Commander he was the Administrator of the Washington County Jail and at all relevant times acting under color of Minnesota state law. Upon information and belief, Commander Heinen is a resident of Minnesota.

54.     Commander Heinen is and was at all relevant times a final policymaker for Defendant Washington County as it relates to the administration of the Washington County Jail.

55.     Assistant Jail Administrator John Warneke was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Administrator Warneke is a resident of Minnesota.

56.     Sergeant Brandon Olson was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Sergeant Olson is a resident of Minnesota.

57.     Sergeant Nicholas Klinkner was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant

times. Upon information and belief, Sergeant Klinkner is a resident of Minnesota.

Sergeant Klinkner has already waived service of process and submitted to the personal

jurisdiction of this Court.

58.     Sergeant Troy Jorgenson was a Washington County corrections officer at

the Washington County Jail acting under color of Minnesota state law at all relevant

times. Upon information and belief, Sergeant Jorgenson is a resident of Minnesota.

Sergeant Jorgenson has already waived service of process and submitted to the personal

jurisdiction of this Court

59.     Officer KCee Cahill was a Washington County corrections officer at the

Washington County Jail acting under color of Minnesota state law at all relevant times.

Upon information and belief, Officer Cahill is a resident of Minnesota.

60.     Sergeant Frank Capra was a Washington County corrections officer at the

Washington County Jail acting under color of Minnesota state law at all relevant times.

Upon information and belief, Sergeant Frank Capra is a resident of Minnesota.

61.     Officer Dan Rein was a Washington County corrections officer at the

Washington County Jail acting under color of Minnesota state law at all relevant times.

Upon information and belief, Officer Rein is a resident of Minnesota.

62.     Sergeant David Frantsi was a Washington County corrections officer at the

Washington County Jail acting under color of Minnesota state law at all relevant times.

Sergeant Frantsi is a resident of Minnesota.

63.     Officer Glassmaker was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Officer Glassmaker is a resident of Minnesota.

64.     Corporal Dyck was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Officer Glassmaker is a resident of Minnesota.

65.     Nurse Mindy Leibel was a nurse at the Washington County Jail acting under color of state law at all relevant times. Upon information and belief, Nurse Leibel is a resident of Minnesota.

66.     Officer Gaikowski was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Officer Gaikowski is a resident of Minnesota.

67.     Officer Roberto was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Officer Roberto is a resident of Minnesota.

68.     Officer Scheele was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Officer Scheele is a resident of Minnesota.

69.     Officer Kleinendorst was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Officer Kleinendorst is a resident of Minnesota.

70.     Officer De La Rosa was a Washington County corrections officer at the Washington County Jail acting under color of Minnesota state law at all relevant times. Upon information and belief, Officer Kleinendorst is a resident of Minnesota.

71.     Stephanie Kaphing was employed at the Washington County Jail by the Washington County Sheriff's Office and was acting under color of Minnesota state law at all relevant times. Upon information and belief, Stephanie Kaphing is a resident of Minnesota.

72.     John Does 1–10 are presently unknown correctional personnel at the Washington County Jail who: were responsible for Peterson's booking and intake when he was arrested; ordered, facilitated, or ratified Peterson's mental-health evaluation(s); ordered, facilitated, or ratified Peterson's placement in segregation; ordered, facilitated, or ratified Peterson's sanctions or the procedures pursuant to which Peterson was sanctioned, including placement in segregation or other restrictions of his rights; or participated in, or failed to intervene to prevent, the use of objectively unreasonable force against Peterson.

73.     John Does 1-10 are real persons whose identities are presently unknown, including an unknown correctional officer bearing Badge No. 704, but whose identities may be discovered through reasonable discovery of information within the possession, custody, and control of Defendants.

## FACTS

### Peterson's Background

74.     Peterson is a 39-year-old man with a history of psychiatric conditions, including bipolar disorder, depression, and suicidal ideations.

75.     Defendants knew about these conditions.

76.     Within one year prior to the events giving rise to this lawsuit, Peterson had been diagnosed, treated, or medicated for some or all of his mental-health conditions by multiple personnel working for the County. He also had manifested obvious symptoms of serious mental illness and risks to his own health and welfare resulting therefrom, including decompensation resulting from segregation, suicidal ideations, depression, anxiety, and mania, to name a few.

77.      Most recently, Peterson was detained at the Washington County Jail from February 4, 2018 through May 23, 2018. While incarcerated, Defendants took no action regarding the risks of serious harm resulting from Peterson's known serious medical condition, unduly delayed responding to the risks of serious harm resulting from Peterson's known serious medical condition, or responded to the risk of serious harm resulting from Peterson's known serious medical condition in a manner that was obviously inadequate or grossly incompetent.

78.     For example, despite the known risks of serious harm to Peterson resulting from his serious medical and mental-health condition (including bipolar disorder), Peterson was continuously placed in segregation in violation of constitutional law and universally recognized correctional policy; experienced severe decompensation as a

result of Defendants' treatment, including harassment, humiliation, assault, punishment through restrictions on movement, nutrition, toilet access, sanitation, clothing, and sleep; was continually threatened with and subjected to objectively unreasonable uses of force while he was clearly at risk of serious harm resulting from his medical condition, including being sprayed on his face, back, chest, and genitals with chemical sprays (including while naked), being shot with plastic bullets while confined in a cell, and threatened with tasing, bullyish yelling, ordering, and un-filtered contempt from a number of the Defendants who took their frustration with Peterson's mental-health issues out on Peterson rather than providing him the treatment he obviously needed.

79.     Defendants' actions increased, rather than decreased the risk of serious harm to Peterson resulting from his known serious mental-health condition.

80.     In addition to Defendants' failure to respond adequately to the risks posed by Peterson's serious medical needs, Defendants also deprived him of several due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, including his right of access to the Courts and contact with an attorney.

81.     In addition to violations of the United States Constitution, Defendants also violated the Americans with Disability Act and the Rehabilitation Act by discriminating against him on the basis of his mental disability while he was incarcerated because they placed him in administrative segregation and isolated him solely on the basis of his mental disability.

82.     Further, Defendants had programs and services available but denied to provide these to Peterson on the basis of his disability, e.g., bipolar disorder.

83.     Defendants' conduct further violated the Constitution and laws of the State of Minnesota.

**Defendants' Knowledge of Peterson's Mental Illness Prior to His February 4, 2018 Incarceration**

84.     Peterson was incarcerated at the Washington County Jail in 2016 and 2018.

85.     Personnel, including Defendants, at the Washington County Jail knew Peterson from previous incarcerations, including in 2016 and 2017, and for his prior manic and disruptive behavior as a result of his mental condition.

86.     In April 2016, Washington County initiated probate proceedings to have Peterson civilly committed or declared incompetent.

87.     Doe Defendants were aware of Peterson's serious medical condition due in part to Washington County's initiation of the 2016 probate proceedings (civil commitment), as well as reports received regarding Peterson's behavior while incarcerated.

88.     On April 28, 2016, the Washington County District Court adjudged Peterson mentally ill based on Washington County's petition for civil commitment.

89.     On October 12, 2016, Peterson's civil commitment was continued, based at least in part on Washington County Attorney's continued prosecution of the commitment proceedings .

90.     On September 15, 2017, Peterson was discharged pursuant to a Washington County Court Order.

91.     Peterson's mental-health background was known to each Defendant by the time they encountered him at the Washington County Jail and committed the acts described herein while he was incarcerated beginning February 4, 2018.

92.     Upon information and belief, Defendant Starry knew of Peterson's objectively serious medical needs during the February 2018 incarceration in his capacity as Sheriff due to his being informed of Peterson's obviously serious medical condition.

93.     Commander Roger Heinen knew of Peterson's objectively serious medical needs due to his prior experience with Peterson and his condition and behavior during 2016 and 2017 incarcerations, his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated in February 2018.

94.     Assistant Jail Administrator John Warneke knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

95.     Sergeant Brandon Olson knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

96.     Sergeant Nicholas Klinkner knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his

observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

97.     Sergeant Troy Jorgenson knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

98.     Officer KCee Cahill knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

99.     Officer Dan Rein knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

100.    Sergeant David Frantsi knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

101.    Nurse Mindy Leibel knew of Peterson's objectively serious medical condition due to her knowledge of Peterson's medical and inmate record, and her observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

102.    Officer Glassmaker knew of Peterson's objectively serious medical condition due to her knowledge of Peterson's medical and inmate record, and her observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

103.    Corporal Dyck knew of Peterson's objectively serious medical condition due to her knowledge of Peterson's medical and inmate record, and her observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

104.    Officer Gaikowski knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

105.    Officer Roberto knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

106.    Officer Scheele knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

107.    Officer Kleinendorst knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his

observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

108.    Sergeant Frank Capra knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

109.    Officer De La Rosa knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and his observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

110.    Stephanie Kaphing knew of Peterson's objectively serious medical condition due to his knowledge of Peterson's medical and inmate record, and her observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

111.    John Does 1-10 knew of Peterson's objectively serious medical condition due to their knowledge of Peterson's medical and inmate record, and their observations and reports of Peterson's obviously serious medical condition while incarcerated beginning in February 2018.

112.    By mid-February 2018, Peterson manifested obvious signs that he suffered from a serious mental illness, including the following: reporting a history of mental illness; taking anti-psychotic medication; suicidal ideations; irrational yelling; banging his head, hands, feet, or other body parts against the wall; and public exposure and

urination. As a result of these and other behaviors, Peterson's objectively serious medical condition was known to all Defendants no later than February 14, 2018.

113.     In May 2018, Washington County again initiated probate proceedings to have Peterson civilly committed or declared incompetent, while Peterson was incarcerated at the Washington County Jail.

114.     The 2018 civil commitment proceeding was initiated based on the reports of Defendants regarding Peterson's behavior while incarcerated.

### Peterson's Intake at the Washington County Jail

115.     On February 4, 2018, Peterson was arrested pursuant to a warrant.

116.     After his arrest, Peterson was taken to the Washington County Jail and booked.

117.     At the time of his February 4 arrest, Peterson was at risk of serious harm as a result of his bipolar disorder, history of suicidal ideations, history of depression, history of anxiety, and manic breakdowns.

118.     Peterson was on medication for his bipolar disorder and other psychiatric conditions (including anxiety, depression, and suicidal ideations) prior to his arrest, which should have continued throughout his 2018 incarceration.

119.     When Peterson arrived at the jail, the booking staff noted that Peterson was behaving strangely by unintelligible muttering, was unable to stand, and was described as "high." These behaviors are consistent with manifestations of an objectively serious medical condition, particularly one related to mental illness.

120.     On February 6, 2019, Defendants recorded that Peterson had past "behavioral" issues based upon their knowledge of Peterson's medical and inmate records with the Washington County Jail. This information was transmitted to the individual Defendants as Washington County Sheriff's Office employees.

121.     Peterson's medical record kept by the prison informed Doe Defendants as well as other of the individual Defendants, including Nurse Leibel, Commander Heinen, and the rest of the Defendants, that he was in need of medication for his psychiatric condition.

122.     Defendants knew of Peterson's serious medical condition and the risk of harm posed therefrom because this information was transmitted to them either through Peterson's reputation at the Jail from his prior incarcerations (including times where he was diagnosed and committed due to his known mental-health condition); relevant background information provided by the Washington County Sheriff's Office to Defendants as correctional officers in charge of his custody and care; through informal transmission of information; and due to the obvious signs that Peterson exhibited regarding his mental-health condition.

123.     In any event, in fewer than two weeks of his booking, incarceration Peterson's mental-health condition was so obvious that Defendants were aware of the serious risks it posed.

124.     Despite knowledge of past mental-health and behavioral issues known to Defendants, Peterson was not assessed for his medical and mental-health condition until February 7, 2018.

125.     On February 7, 2018, Stephanie Kaphing conducted an intake evaluation of Peterson's mental and medical condition.

126.     Kaphing was the same Washington County Jail employee that conducted Peterson's intake at the Washington County Jail in November 2017. During the November 2017 intake, Peterson informed Washington County personnel that he was on anti-depressant and anti-psychotic medications including Quetiapine and Olanzapine, both described as anti-psychotic medications and known to be used, *inter alia*, to treat bipolar disorder.

127.     When Kaphing conducted Peterson's February 7 intake she failed to include answers to any question regarding Peterson's mental-health. Had she conducted an appropriate evaluation, she would have been aware of Peterson's serious medical need for psychiatric treatment, including but not limited to alternate housing, immediate assessment and treatment by a psychiatric professional, and medication to treat his psychiatric conditions.

128.     To the extent that Peterson's intake evaluations and other pertinent mental-health and medical records are not shared with the correctional officers and other personnel that interacted with Peterson, Washington County had a policy, custom, or practice of failing to provide such information, despite the known and serious risks resulting from Peterson's medical conditions and the need to provide prompt and appropriate treatment.

129.     To the extent Washington County had a policy, practice, or custom of failing to share inmates' known serious medical and mental-health conditions with

correctional officers or other personnel that are in charge of such persons' (like Peterson) custody and care, this constitutes deliberate indifference to the risks of harm that result from failure, delay, or grossly incompetent response and treatment of Peterson's known.

130.     Notwithstanding this information, Defendants failed to implement appropriate procedures at this time for dealing with persons with a serious medical condition, such as Peterson's bipolar disorder.

131.     On multiple occasions during Peterson's 2018 incarceration he was noted to be a suicide risk, yet the protocol for dealing with an individual with a suicide risk was not followed.

132.     The foregoing overview of Peterson's admission to the Washington County Jail in February 2018 establishes that the risk of harm posed by Peterson's serious medical condition was known to Defendants, through either their receiving directly reports of his mental-health condition and risks of harm it posed, or obvious signs of such risk. And yet, it was repeatedly, and either intentionally or recklessly, disregarded.

### The Conditions of Peterson's Confinement Leading to Episodes of Sustained Decompensation

133.     When Peterson was booked on February 4, he asked that he be awakened the next morning and permitted to attend his February 5 court appearance.

134.     He also requested and was unable to conduct a phone call to his bail bondsman. As a result, Peterson was unable to obtain bail.

135.     Peterson was scheduled to appear in the Washington District Court on February 5, 2018.

136.     On February 5, Peterson was not taken to his February 5 court appearance.

137.     Peterson missed his February 5 court appearance because Defendants refused to transport him from Washington County Jail to the Washington County District Court.

138.     Peterson was not given an adequate explanation for why he could not contact his bail bondsman or was not taken to his initial appearance.

139.     Doe Defendants repeatedly denied Peterson effective access to the phone to call his bondsman, attorney, or otherwise use the phone. At times when he would try to use the phone, Defendants would turn it off or deny him access to the phones on the pretext of misbehavior. This occurred on several occasions during the course of his 2018 incarceration.

140.     Peterson maintained that he should not be detained in Washington County Jail. Had he been permitted to contact a bail bondsman, he believes he would have been released; but he was not permitted to do so. This caused him anxiety and frustration, beginning the mental decompensation process at a time his mental-health condition was known to Defendants.

141.     Defendants observed these early decompensations within two weeks of his booking on February 4.

**Peterson Is Moved to Segregation for the First Time**

142.     Around February 13, Peterson was moved to a segregation cell on order of Sergeant Frantsi (No. 703) for being "mouthy" to a correctional officer.

143.     However, when given the opportunity, Peterson complied with a request by Correctional Officer Johnson to voluntarily (i.e., without the use of force—not based on his assent to being placed there) relocate.

144.     Cell C203 where Peterson was moved is a pre-segregation holding cell for inmates, informally referred to as "Pre-Seg."

145.     While inmates are placed in segregation status they are allowed one morning half hour out of the cell, and one half hour in the evening out of the cell. They are otherwise confirmed for twenty-three hours of the day.

146.     Peterson was often denied one or both of his daily half-hours out.

147.     While in Pre-Seg, inmates are treated as if they are in segregation, being placed in a single cell with a small interior window and a "tray pass" for twenty-three hours.

148.     In any event, when in segregation Peterson was held in conditions tantamount to "solitary confinement" in that he was denied any meaningful social interaction with others, regular exercise or recreation, and often, was denied any opportunity to leave his cell for days at a time. When in segregation, Peterson and other inmates would often referred to this treatment as being in "the Hole."

149.     When Correctional Officer Johnson took the time, using crisis intervention training ("CIT"), Peterson was compliant and moved cells voluntarily.

150.     In fact, Peterson responded positively when CIT was used throughout his 2018 incarceration, rather than threats of force, force, or yelling.

151.　During the course of his time in segregation, Peterson was repeatedly denied toilet paper, soap, and pencil and paper.

152.　In addition to several instances of such deprivations, Peterson was also on an occasion denied access to a toilet or adequate toilet paper, or access to a shower.

153.　At times, Peterson had no means of cleaning himself following a bowel movement.

154.　On February 13, Peterson was offered recreation time, but initially refused. He changed his mind, and spent time in recreation with inmates from both the D200 cell block and C200.

155.　While in recreation, Peterson was not bothering anyone and generally copasetic. He playfully roughhoused with a friend in the prison, which annoyed with the correctional officers, included Defendants.

156.　Peterson became upset when Correctional Officer Troendle told him to stop talking to other inmates, to which Correctional Officer Troendle responded with repeated orders not to talk to the other inmates.

157.　Peterson began yelling and became upset as a result of his being singled out for discipline and isolated from his fellow inmates. This exacerbated the already-growing decompensation that began with his being in and out of segregation (only at this point, February 13).

158.　Correctional Officer Troendle did not use CIT techniques to deal with Peterson.

159.     In fact, Officer Troendle did nothing to attempt to calm Peterson down, listen to Peterson, or explain what was going on. Instead, he simply repeated his orders to stop talking.

160.     Peterson was upset and acted out due to his decompensating condition.

161.     Peterson eventually returned to his cell.

162.     After Peterson returned to his cell, Correctional Officer Troendle noted that a "sanction" was forthcoming for Peterson's conduct. This conduct was solely the result of Peterson's mental illness, namely his bipolar disorder.

163.     As he returned to his cell, Peterson exhibited early signs of decompensation due to his being placed in administrative segregation, including constant yelling, banging, inconsolable demands, and irrational speech.

164.     Also on or around February 13, 2018, Peterson had begun to wash his own clothing with the hand soap in his cell because the laundry detergent in the jail facility irritated his skin.

165.     Peterson requested, but was denied, alternate soap or an evaluation of his skin irritation.

166.     This physical irritation added to the already-compounding circumstances triggering decompensation.

167.     Peterson's self-laundering would sometimes result in pooled water that would seep under his cell door.

168.     Peterson would also use water from the sink on the floor in attempts to wash the cell floor.

**First Significant Episode of Major Decompensation, Defendants' Deliberate Indifference and Use of Unreasonable Force**

169.     As of February 14, 2018, Peterson was in segregation for at least three straight days.

170.     Around 12:30 am on February 14, 2018, Peterson still had received no medication or adequate mental-health treatment in response to his serious medical condition. He had been placed in segregation or pre-segregation for no fewer than 36 hours. Even this initial period of segregation can have substantial decompensation-inducing effects on someone with untreated serious mental conditions such as bipolar disorder. As a result, Peterson began to decompensate as evidenced by his fits of screaming, cursing, banging on walls, doors, and other surfaces, and kicking—to the point that he was visibly inflicting harm upon himself.

171.     Instead of recognizing clear manifestations of mental illness and decompensation, and then responding with appropriate intervention, medication, or proper psychiatric assessment or treatment, Defendants responded by yelling at Peterson and demanding that he stop. When he did not stop, they threatened to write him up for his behavior.

172.     Around this time, Peterson also exhibited symptoms of self-harm, including banging so hard on a door that he fractured his hand.

173.     In the days that followed, Defendants repeatedly ignored Peterson's requests for basic items, wrote him up for minor, and often, baseless infractions ostensibly to justify further detention, segregation, isolation, and punishment. This

created a deteriorative cycle in which the risk of harm from Peterson's serious medical condition was systematically and deliberately disregarded—the inadequate and flawed intake screening, the unjustified chemical sprayings, shows of force, being shot with semi-automatic rifles loaded with plastic bullets, among many others—were compounded with numerous other minor deprivations. It was constitutional death by a thousand paper cuts.

174. Just one example of this was the denial of any paper or pencil for Peterson to use to make his young daughter a card for Valentine's Day.

175. When Peterson was moved to the Intake Cell on February 14, he asked Sergeant Olson for paper and pencil in the event he wanted to compose a card or inmate grievance or request.

176. Sergeant Olson refused Peterson's request.

177. No legitimate governmental purpose other than punishment explains the refusal to grant Peterson's requests.

178. Several hours after he was put into the Intake Cell, Peterson continued to ask for items, including paper, pencil, and toilet paper, but was denied such items.

179. Such denials of comparatively "trivial" requests further compounded Peterson's already-taxed mental endurance, resulting in further decompensation. Peterson saw it as petty, targeted at him, inexplicable, and explained only with gruff "deal with it" attitude from the correctional officers, including Defendants.

180.     Defendants ignored Peterson's mental issues, and instead responded as if he was acting rationally, rather than treating him as a person with a serious medical condition.

181.     Correctional Officer Morrissey noted that Peterson was working himself up "more and more" as his condition declined, yet in spite of Officer Morrissey's notes and personal observations of Peterson's condition, Defendants continuously failed to respond to the risks of harm to Peterson, or responded with undue delay or in a manner that was grossly incompetent with respect to Peterson's condition.

182.     For days, Peterson's serious medical need remained untreated while he was continuously held in segregation.

183.      The lack of response to his serious medical need and maintaining Peterson in segregation conditions caused Peterson to decompensate further.

184.     Peterson remained locked in his cell and he further decompensated from Defendants' treatment. Peterson's decompensation manifested in mania, anxiety, hyperverbosity, and self-harm.

185.     On February 14, and in a fit of manic frustration, Peterson jumped off of the sink in his cell and landed on his face. Mindy Leibel, Washington County Jail's Public Health Nurse ("PHN") was called to assess Peterson's condition.

186.     Peterson injured his face as a result of the fall from the sink.

187.     Sergeant Frantsi ordered that the facility be locked down to make Peterson available for examination by Nurse Leibel.

188.    Sergeant Frantsi instructed the correctional officer not to use a chemical agent when removing Peterson from his cell because it would interfere with Peterson's health.

189.    Sergeant Frantsi knew that chemical agents would have adverse effects on Peterson's health when used on him.

190.    In addition to the obvious abnormality of climbing on fixtures, breaking a hand on a wall, jumping from a sink and landing on his face, Sergeant Frantsi, Nurse Leibel, Correctional Officer Roberto, and Doe Defendants noted these and other symptoms of serious medical needs posing risks of serious harm, all resulting from mental-health infirmities, in their entries contained in a jail-incident report.[1]

191.    Also according to the officers' logs and reports, Peterson was unable to focus well on his surroundings, or respond cohesively to questions.

192.    Peterson was naked by the time Nurse Leibel arrived to assess him, as he had been ordered to strip down (and threatened—again—with chemical agent if he did not).

193.    Peterson once again reminded Nurse Leibel of his medication needs and history, including his bipolar disorder and other mental-health history.

---

[1] By referring to Defendant-produced documents, including but not limited to jail incident reports, Peterson does not admit the authenticity or reliability of such documents. In fact, in many instances, Peterson disputes the accuracy of the documents with respect to how the events recorded therein actually transpired due to contradictions, self-serving phrasing and statements, and omissions of material facts found (or not found) therein. Peterson references them only to the extent that they demonstrate that Peterson's allegations are consistent with some of Defendants' records. As a result, to the extent Defendants attempt incorporate these documents into this Second Amended Complaint due to Peterson's reference, he specifically objects on the grounds that these documents are disputed and therefore, not "necessarily embraced by the pleadings." *Coleman v. Northland Grp., Inc.*, No. 4:13CV2459 HEA, 2014 WL 4205584, at *2 (E.D. Mo. Aug. 21, 2014) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)).

194.    Not one of the Defendants witnessing this episode, including Nurse Leibel or Sergeant Frantsi, responded with adequate medical treatment. Instead, they deliberately disregarded the risks of serious harm resulting from Peterson's serious medical needs by failing to order or to provide adequate medication, by failing to remove Peterson from segregation, and by failing to have him evaluated by competent psychiatric professionals.

195.    Instead, Peterson was written up for a "formal major" for his decompensating behavior, which resulted not in treatment, but further segregation.

196.    To facilitate Peterson's further segregation, Sergeant Olson moved Peterson to the Intake Cell. Peterson cooperated.

197.    By the early afternoon of February 14, 2018, Peterson had also repeatedly been denied paper, pencil, toilet paper, and other items he requested. This includes items that various officers informed him he would receive, but were never delivered. He also had no opportunity to exit the cell because he was denied his one-half hours out of the cell.

198.    Also around that time,  Peterson had been ripping his clothes, yelling, and talking non-stop.

199.    Sergeant Frantsi threatened Peterson with chemical spray even though he was complying with orders to hand over some ripped clothing.

200.    Peterson did not understand why he was being deprived of the basic items he was requesting, including soap for his laundry, toilet paper, and paper and pencil to compose a letter, write grievances, and draw or write notes.

201.    Peterson was denied these items because his behavior annoyed Defendants, rather than because he was a safety concern to the jail, inmates, or officers.

202.    Peterson was moved another cell.

203.    Peterson was at times moved from cell to cell without clothing on.

204.    Peterson was not always given a blanket or any other means of covering himself inside his cell and was therefore left naked and exposed.

205.    The removal of Peterson's clothing was not reasonably related to a legitimate government purpose as Peterson was being compliant with the officer's requests when he was moved.

206.    Later in the evening on February 14, 2018, after being without clothing, blanket, adequate toilet paper, or other items for seven hours, Peterson predictably began to decompensate further.

207.    On February 14, 2018, Washington County personnel also noted that Peterson was unable to focus well enough to listen to or accept service of paperwork, such as a notice of violation.

208.    Instead of responding to Peterson's legitimate needs, not one of the Defendants responded to Peterson's needs or requests.

209.    On or around February 14, Peterson was left for an extended period of time without any clothing or blanket in cell B202. His clothing was eventually returned.

210.    While in this cell, naked, decompensating, Peterson also had a fractured hand, for which he was only given a simple compression bandage on February 16—two days after the injury was caused.

211.    When he was evaluated several weeks later, he was told he would get no further treatment here because the fracture would heal on its own. During that time, he suffered from severe pain without adequate access to treatment or medication.

212.    Around 3:30 pm on February 17, 2018, Corporal Dyck and other Washington County employees were performing "shakedowns" of the segregation block, including B202 where Peterson was being held for the fourth day in a row.

213.    During the February 17 shakedowns, Corporal Dyck and other correctional officers noted that Peterson was not acting normal, describing him as "very manic, can[']t track conversations."

214.    Corporal Dyck observed that Peterson had socks tied around his head and a laundry bag around his neck. Peterson complied with Corporal Dyck's requests for him to remove the socks and the bag. After this, Corporal Dyck further observed that Peterson was continually ranting about disconnected topics and that she was unable to track Peterson's conversations.

215.    Once again, Defendants observed these obvious signs of Peterson's serious medical need and chose to ignore them.

216.    Peterson had law books and other papers that were important to him in his cell, which he was afraid Defendants would damage, destroy, or dispose of after a shakedown.

217.    Peterson hid some of these items in his pants, and initially refused to give them up. But, he eventually complied after a pat-down search.

218.     During this pat down search, Defendant Gaikowski lingered on Peterson's groin area and groped his genitals under the pretext of a search.

219.     Peterson again was refused his half hours out of segregation on February 17.

220.     The removal of his February 17 one-half hours out-of-cell was not reasonably related to any security or safety concerns but was instead a "sanction" (i.e., punishment) solely for a violation of a rule against hoarding items in the jail.

221.     Sometime between February 14 and February 24, Peterson was asleep in his cell when he was abruptly awoken by spray from MK-9S vapor from Sergeant Olson. Sergeant Olson gave Peterson no warning, nor was Peterson violating any rules at the time so that Sergeant Olson could check Peterson's cell.

222.     Doe Defendant bearing Badge No. 704 was notified of this punishment and ratified it.

**Second Significant Episode of Major Decompensation and Defendants' Deliberate Indifference and Use of Unreasonable Force**

223.     On February 18, 2018, Peterson had been in his cell without a break for more than twenty-four hours. He continued to be visibly agitated, manic, and hyperactive.

224.     On the morning of February 18, Peterson used the intercom in continuation of his request for items such as more toilet paper, paper, pencils, etc.

225.     On February 18, 2018, Officer Roberto refused Peterson both of his half hours out of his cell.

226.    Washington County, through its Hearing Board and/or Commander Heinen or Assistant Administrator Warneke, approved this and other instances where Peterson's half-hours was denied, or such decisions went otherwise unreviewed and therefore, became final.

227.    As of February 18, 2018, Peterson had spent five of his fourteen days of incarceration in segregation, including forty-eight straight hours without being permitted to leave his cell.

228.    Around 9 am on February 18, Peterson was being harassed by another inmate, Norgaard, in the same cell block who yelled and screamed at Peterson because Peterson had been yelling about his unfair treatment and Defendants' refusal to heed his requests.

229.    Norgaard harassed Peterson, yelling at him, screaming at him, threatening him, and kicking and throwing items.

230.    The interaction with Norgaard agitated Peterson's already deteriorating mental-health.

231.    Around 9:30 am on February 18, Peterson had lost both of his one-half hour breaks.

232.    Peterson continued to decompensate in response to the numerous deprivations of socialization, nutrition, privileges, movement, sleep, medication, clothing, and the items that he had requested but never received.

233.    Peterson's decompensation reached new levels and he was placed on suicide watch. This was based on Peterson's suicidal statements, changes in his

medication, and the reports of correctional staff (including a number of Defendants) regarding Peterson's behavior while incarcerated.

234.    Around 4 pm on February 18, 2018, Peterson's cell was shaken down. No contraband was reported. Peterson was in a state of decompensation from his treatment and deprivations of various necessities and requests.

235.    In an attempt to get Defendants' attention, Peterson threw objects at the camera later in the evening.

236.    The camera was located close to a sprinkler head in Peterson's cell.

237.    In the late evening, Peterson accidentally hit and broke the sprinkler head, causing an enormous flow of water from the cell and out into the cell block.

238.    Defendants prioritized cleaning up and shutting off the water, and did not attempt to check on or remove Peterson from his cell before shutting the water off. It took around 2 ½ hours for Defendants to remove a drenched, manic, and decompensating Peterson from his segregation cell.

239.    Once the water was shut off, Sergeant Klinkner led a team of seven correction officers and mobilized an Emergency Response Team ("ERT") armed with a canister of MK-9S vapor and an FN-303 riot gun for purposes of removing Peterson from his cell.

240.    Correctional Officer KCee Cahill carried the canister of MK-9S vapor and was instructed by Sergeant Klinkner to use it on Peterson if necessary.

241.   Peterson immediately complied with the officers' instructions to crawl out of his cell and place his hands to his sides. Peterson complied with all officer directives upon exiting his cell in the early morning of February 19.

242.   Peterson did not resist.

243.   Peterson also informed Defendants that his hand was broken and asked them not to touch it.

244.   Peterson informed Correctional Officer Bolen and the other officers at the time that breaking the sprinkler head was an accident.

245.   Without provocation, Cahill climbed on top of Peterson with a riot shield with his full weight on Peterson's back while he was splayed out on the ground and bound by his arms and ankles.

246.   Peterson was then bound and forcibly placed in a restraint chair, even though Peterson was not resisting when he was commanded to leave his cell.

247.   The whole ordeal of being soaked through, crawling out of his cell, being crushed under an officer with a riot shield, and being bound hand and foot caused Peterson further stress and decompensation.

248.   Defendants used objectively unreasonable force in removing Peterson from his cell, despite Peterson's obvious and, at that point, well-known mental-health condition.

249.   Defendants did not use tactics appropriate for someone with Peterson's serious medical needs.

250.    While in the restraint chair, Corporal Dyck used pressure points causing Peterson severe pain and discomfort, exacerbating his mental decompensation.

251.    Correctional Officer Glassmaker also applied pressure to Peterson's neck, exacerbating his mental decompensation.

252.    Corporal Dyck's use of the pressure point and Officer Glassmaker's pressure on his neck caused Peterson incredible pain. This caused Peterson to buck against the use of force, triggering further force used by the other Defendants to restrain him.

253.    In response to Peterson's head shaking, Sergeant Klinkner sprayed Peterson directly in the face with chemical spray.

254.    Sergeant Klinkner spraying Peterson was unnecessary as Peterson was restrained in the chair and only moving due to Corporal Dyck's use of a pressure point on his head.

255.    The chemical spray caused Peterson to spit continually to try to get the burning chemical out of his mouth.

256.    Defendants placed a mask over Peterson's face to prevent him from spitting.

257.    This only increased the pain and burning from the chemical spray, as Peterson could not spit out the vapor from his mouth, nose, and throat.

258.    While he was in the restraint chair, his face, mouth, and lungs continued to burn from the chemical spray.

259.    The exposure to chemical spray caused Peterson difficulty breathing.

260.   Peterson was first moved to intake before Defendants attempted to clean off the chemical by dumping cold water over his head.

261.   After more than an hour Defendants finally unrestrained Peterson and allowed him to shower so he could decontaminate.

262.   After Peterson showered, Defendants refused to allow him a towel to dry off with no legitimate governmental purpose other than to punish him.

263.   Peterson was then locked in an Intake Cell.

264.   Commander Heinen observed these events and approved or authorized the officers' actions.

265.   Specifically, Commander Heinen authorized Correctional Officer De La Rosa to carry the FN 303 riot gun.

266.   Sergeant De La Rosa tested the gun by firing two bullets into a target, which he saved in the event that "court evidence" was needed.

267.   By February 21, Peterson was reportedly behaving well and complied when negotiation—rather than orders, force, and intimidation—were used.

268.   On the evening of February 21, Officer Cahill led an Emergency Response Team ("ERT") team to extract Peterson from his cell (I117) and move him to another cell, I110.

269.   Officer Gaikowski told Peterson that he would be subjected to a strip search.

270.   Peterson resisted saying that he did not want to do a strip search.

271.     Officer Gaikowski then threatened Peterson with chemical spray to get him to remove his clothing.

272.     In the morning of February 22, 2019, for the first time, Peterson met with a psychiatric professional, Christine Dresel, along with Nurse Leibel.

273.     Peterson's mental condition was extensively noted, including a significant history of mental-health issues (including bipolar disorder, mania, meth-use disorders, and other psychotic features) as well as a history of various treatments and medications for mental-health conditions.

274.     Once again, Peterson's mental-health history and conditions, were actually known to Defendants because jail personnel were made aware of Peterson's mental-health assessment.

275.     Peterson made a claim under Minnesota's Prison Rape Elimination Act ("PREA") claiming that he had been sexually assaulted by Officer Gaikowski due to his touching Peterson's genitals and forcing him into a strip search on threat of chemical spray.

276.     The PREA report was sent to Brandon Hoffman, a state investigator.

277.     Investigator Hoffman rejected Peterson's claim as "unsubstantiated."

**Third Significant Episode of Major Decompensation and Defendants' Deliberate Indifference and Use of Unreasonable Force**

278.     As of February 23, 2018, Peterson had spent at least nine days in segregation. That is over two-hundred hours of segregation, during which Peterson was known to be bipolar but was not psychiatrically assessed until the previous day.

279.     Around noon on February 23, 2018, Peterson had removed a metal bar and a brick from the wall of his cell. Officer Scheele was on duty at this time.

280.     Peterson had begun to inflict self-harm upon himself at this time using the brick. Nurse Leibel noted this fact and informed Sergeant Frantsi and Correctional Officer Scheele.

281.     Officer Scheele ordered Peterson a single time to hand over the brick and metal bar.

282.     Officer Scheele made no further attempts to reason with Peterson. Instead, without warning he sprayed Peterson, who was not entirely clothed.

283.     Peterson then gave up the brick, but not the metal bar.

284.     Officer Scheele again ordered Peterson to give up the metal bar.

285.     Peterson was locked in his cell and presented no immediate threat to anyone while inside his cell.

286.     Instead of reasoning with Peterson, using de-escalation or Crisis Intervention Training ("CIT"), Officer Scheele obtained a canister of MK-9S vapor.

287.     CIT had worked on Peterson before and was an effective and less-restrictive means of responding to Peterson's mental condition.

288.      Officer Scheele then sprayed MK-9S vapor three separate times under Peterson's cell door and into Peterson's closed cell.

289.     Once again, the MK-9S caused Peterson severe pain and burning all over his naked body. It also caused him difficulty breathing. Peterson's skin was already

severely irritated from the previous uses of chemical on him, as well as his allergic reaction to the jail laundry detergent.

290.     While Officer Scheele deployed the MK-9S on Peterson, he and the other correctional officers wore protective clothing, including a chemical masks due to the potency of the chemical.

291.     Sergeant Frantsi observed this conduct and did nothing to intervene or prevent Officer Scheele from spraying Peterson with the MK-9S vapor.

292.     Peterson was taken from his cell by force and strip searched prior to being allowed to decontaminate.

293.     Eventually, after at least an hour, he was transported to cell B200 to shower.

294.     Around 3 pm on February 23, Peterson—wearing only shorts—requested a blanket. Without explanation, Officer Glassmaker refused his request.

295.     Officer Glassmaker's refusal of this request was made for the purpose of punishing Peterson, and was not reasonably related to a legitimate governmental interest.

296.     Peterson also asked for a phone call to his attorney. Without explanation, Officer Glassmaker refused this request as well.

297.     Officer Glassmaker's refusal of this request was made for the purpose of punishing Peterson, and was not reasonably related to a legitimate governmental interest.

298.     Peterson also requested toilet paper because he was out. Without explanation, Officer Glassmaker also refused this request.

299.    This refusal was done for the purpose of punishing Peterson, and was not reasonably related to a legitimate governmental interest.

300.    At this time, Peterson's hand was still broken.

301.    Peterson was in severe pain due to his broken hand and requested ibuprofen. Without explanation, Officer Glassmaker refused this request.

302.    This refusal was made to punish Peterson and was not reasonably related to a legitimate government interest.

303.    Officer Glassmaker's repeated refusals caused Peterson severe distress and frustration, further triggering his mania and bipolar disorder.

304.    Officer Glassmaker knew the risk of serious harm to Peterson if she deliberately disregarded the effects of his actions on persons like Peterson who were mentally ill and suffering from bipolar disorder.

305.    In response to how he was being treated, Peterson again began to become frustrated and manic, covering his cell windows with his cell mattress. He threatened to put his shorts in his toilet as an attempt to get Officer Glassmaker's attention. In response, Officer Glassmaker shut off the water to Peterson's cell.

306.    Peterson had to use the toilet, but with the water off he was unable to do so.

307.    He requested the ability to use the toilet but, without explanation, Officer Glassmaker refused. This refusal was made for the purpose of punishing Peterson and was not reasonably related to or proportionate to any legitimate governmental purpose.

308.    Peterson was eventually allowed to obtain pain medication for his broken hand.

309.    When the medication was brought to him, it was in crushed pill form. Peterson informed the officer who brought it to him that he could not take it in that form because it badly irritated his throat.

310.    Instead of providing him whole pills, which were available, Officer Glassmaker reported that he had refused his medication.

311.    This occurred on a number of occasions during late February, March, April, and May, where Peterson's medications (including for pain and mental illness) were denied him as a punishment for his not complying with correctional officers, such as Officer Glassmaker's, orders.

312.    Peterson's pain in his hand became so severe that he was willing to endure the pain of the crushed medicine to treat the pain in his hand, so he requested the crushed medication.

313.    Officer Glassmaker refused his request.

314.    Nurse Leibel ordered or approved denial of Peterson's medications.

315.    Peterson complained that he did not understand why he was being punished.

316.    Officer Glassmaker did not deny that Peterson was being punished.

317.    Officer Glassmaker explained that Peterson was being punished for his behavior and that he would have to "earn" the right to the items he requested, which included basic necessities such as medicine for his fractured hand and mental condition, a blanket for warmth, and toilet paper for personal hygiene.

318.    This refusal was unreasonable, made for the purpose of punishing Peterson and was not reasonably related or proportional to any legitimate governmental purpose.

319.    Peterson continued to ask for pain medication, but Officer Glassmaker repeatedly refused his request without explanation and told him to wait until morning.

320.    Peterson also continued to ask for a blanket because he was cold and uncomfortable.

321.    Officer Glassmaker refused this request.

322.    Peterson continued to pace his cell until other officers came on duty. Officer Cahill gave Peterson a blanket at which point Peterson quietly went to bed.

323.    Officer Cahill also turned on the water for him to use the bathroom, gave him some small amounts of toilet paper, and allowed him to drink from the sink. As a result, Peterson remained compliant throughout the evening.

324.    The next morning, Peterson was allowed to use the toilet and given a limited amount of toilet paper. He had asked for a whole roll but was refused. He also asked for clothes, but was told that was not part of his "care plan."

325.    Around 3 am on February 25, 2018, Peterson was in his cell when Officer Cahill accused him of having contraband in his cell.

326.    Peterson did not have contraband in his cell.

327.    Officer Cahill informed Officer Olson that Peterson had contraband. He and Olson decided to extract Peterson from his cell.

328.     Around 3 am, Officers Cahill and Olson went to Peterson's cell and asked him to submit to wrist restraints. Peterson did not immediately comply as he did not believe he had done anything wrong.

329.     Peterson was not presenting a threat to the officers, and confused by an order he did not understand and that was not related to the safety or security of the jail.

330.     Without any further attempts to get Peterson to comply, on Officer Olson's order, Officer Cahill sprayed MK-9S vapor into Peterson's cell. The vapor burned Peterson.

331.     When Officer Cahill sprayed Peterson with the MK-9S vapor, he was aware of its potency and the increased risk of harm to Peterson as an inmate with a known serious medical condition.

332.     The officers "shook down" Peterson's cell and found no contraband.

333.     Peterson was eventually allowed to decontaminate from the chemical after it was on his skin long enough to cause a irritate a severe rash that had developed all over his body.

334.     Around 12:40 pm, Peterson was seen by a nurse. Despite the fact that Peterson's fractured hand and other conditions were well-known to the nurse, Defendants, and Washington County, the nurse conditioned Peterson's pain medication on his compliance with orders, rather than his medical needs.

335.     Later that afternoon, around 3:30 pm on February 25, Peterson once again asked for medication and was given crushed pills. When he refused to take them, Officer

Troendle said he would be sprayed with chemical if he refused and that the medicine would then be disposed of. On this threat, Peterson took the medicine.

336.     Later that same day Peterson demonstrated the vacillations in his mood characteristic of his mental illness, but was ultimately compliant when treated well. He asked for and was given toilet paper. Even when he was told he could not have paper and a pencil so he could write a request for over-the-counter medication, the officers worked with Peterson and he requested that they fill out a request for him.

337.     For the next couple of nights, Peterson had no incidents. Though he did inform jail personnel that his ibuprofen and hydroxyzine (anti-anxiety medication) were removed from the medical cart. Peterson's request was never addressed.

338.     On February 26, 2018, Peterson once again questioned the administration of his medication in crushed form. Correctional Officer Mandell ordered him to take his medication and threatened to spray him with his canister of Freeze Plus P if Peterson did not. Peterson complied upon being threatened.

339.     Around 3 pm on February 26, 2018, Peterson explained that he was in grave pain and needed ibuprofen for his hand, complained of a rash that had developed due to the constant exposure to chemical sprays (including MK-9S and Freeze Plus P, among others).

340.     The officers, including Doe Defendants, ignored these requests

341.     Peterson was eventually examined for the injuries and skin rash, but only after too long of a delay and with grossly inadequate responses as his conditions went periodically untreated.

342.    On March 1, 2019, Peterson continued to exhibit symptoms of mental instability, including yelling and talking about his family members in the mob, and a danger to his family.

343.    On March 7, 2019, Peterson was taken to Court for his initial appearance in another criminal matter.

344.    At the March 7 hearing the Washington County District Judge ordered that Peterson's competency to proceed be professionally evaluated due to the Court's observations of Peterson and the arguments of his counsel.

345.    As this was known in the Washington County Jail, this court determination reinforced Defendants' notice of Peterson's serious medical needs, *inter alia*, bipolar disorder.

346.    On March 15, 2018, Peterson was engaging in self-harm.

347.    Peterson was also smearing blood in his cell and had handled, smeared, or used feces on the wall.

348.    In response, Nurse Leibel and another Washington County Jail officer threatened to force him to wear a rough gown and increase his punishment by taking away certain rights or privileges if he did not stop.

349.    Several days later, around March 21, Defendants were aware that Peterson was not taking his medications. Predictably, Peterson's mentally unstable behavior worsened.

350.    Instead of receiving appropriate mental-health treatment for Peterson, he was punished by further administrative segregation.

351.     Peterson was given 120 more days of segregation.

352.     The Washington County Jail Hearing Board determined Peterson's sanction of segregation.

353.     The Washington County Hearing Board's decision constitutes an official policy of Washington County.

**Fourth Significant Episode of Major Decompensation and Defendants' Deliberate Indifference and Use of Unreasonable Force**

354.     As of March 24, 2018, Peterson had been in segregation for over thirty-seven days, during which time he was repeatedly denied his half-hours out of his cell. That is over 850 hours of segregation time.

355.     On March 24, 2018, while in segregation Peterson became agitated with an inmate in the unit next to him.

356.     Peterson asked Defendants, including Sergeant Olson, and Officers Cahill, and Rein, at least once to separate him from the other inmate, either by moving him or the inmate to a different cell.

357.     Defendants did not respond to Peterson's request.

358.     At this point, Peterson had been in segregation continuously since February 14, had repeatedly been sprayed with chemical agents, was confused and frustrated by how Defendants treated him and the conditions of his confinement. These circumstances triggered severe anxiety and manic responses.

359. Defendants would agitate Peterson's decompensated condition. For example, Officer Kleinendorst gave Peterson a "one-fingered salute" while making his rounds and then denied it when Peterson complained

360. Peterson responded in a manner demonstrating his mental instability, that is, by taking fecal matter in his cell and placed it under his door.

361. In response to Peterson's growing agitation, Sergeants Olson, Cahill, and Rein initiated a cell extraction to remove Peterson from his cell.

362. Before Officer Rein approached Peterson's cell for the extraction, Peterson was not yelling.

363. One of the correctional officers told Peterson to hand over the belongings in his cell. Peterson did not immediately comply, but handed some things through the tray pass of his cell door.

364. Peterson was concerned that Defendants would not take care of his belongings in his cell, including artwork and other papers.

365. Peterson told Sergeant Olson, and Officers Cahill and Rein multiple times that these papers were important to him. He also told them they were "sentimental."

366. While Peterson was complying, Officer Rein set up with the FN-303 semi-automatic in anticipation that he would use it against Peterson.

367. Commander Heinen authorized the use of the FN-303 on Peterson.

368. Peterson was intermittently compliant with the officers' requests for him to hand over items from his cell.

369. Despite Peterson's compliance and incarceration, Officer Olson told Officer Rein to "shoot him, shoot him" at Peterson over and over. Initially, Officer Rein did not obey this order because Peterson was complying with the officers' orders.

370. This demonstrated Sergeant Olson's evil or malicious intent regarding his treatment of Peterson.

371. When Peterson did not hand over the items from his cell fast enough, Officer Rein shot Peterson with the FN-303 multiple times.

372. Peterson stepped back from the door of the cell and was complying with the officers' orders, yet Peterson was shot for the second time, at least four or more rounds were fired after was sitting down, putting his hands up, and curling up on his bed.

373. This confused Peterson, injured him, and caused him intense pain, so he retreated to the back of his cell.

374. Instead of giving Peterson time to recover or attempting to de-escalate the situation, Officer Cahill continued demanding that Peterson hand over items from his cell and prepare for an extraction.

375. Peterson was concerned about what was about to happen to him and his belongings, so he did not immediately comply with an order to "cuff up." As Peterson was talking to the officers about the command, he was shot for the third time with the FN-303.

376. At all times relevant to this incident, Peterson was locked inside his cell and unable to get out. Other than his verbal threats and profanities, Peterson was not a threat to Defendants because he was locked in his cell.

377.     Defendants, including Sergeant Olson and Officer Cahill, repeatedly used profanity during the attempted extraction of Peterson from his cell.

378.     Peterson's voice was shaky and he repeatedly asked Defendants to leave him alone while he was curled up in a corner of his cell and could not understand what was going on around him.

379.     Officer Rein shot Peterson for the fourth time, with multiple shots.

380.     Sergeant Olson also sprayed Peterson with MK-9S vapor during the extraction.

381.     Eventually, Peterson was dragged out of his cell.

382.     Peterson was not given a meaningful opportunity to shower following his exposure to the chemical spray.

383.     After his extraction, Peterson was manic and frantically asking Defendants to confirm that they would not destroy the things that meant so much to him, including his papers and drawings.

384.     Defendants culled Peterson's belongings—including Peterson's drawings and letters—calling them "shit" and threw Peterson's belongings in the trash.

385.     Peterson was then moved to the B200 block following his extraction.

386.     The day after his extraction, March 25, 2019, Peterson was deprived of his half-hours out of his cell and continued to deteriorate mentally.

387.     Peterson refused to take his medicine, and was threatened with chemical spray if he did not. Peterson was clearly mentally decompensating because he was again making threats with fecal matter.

388.    On March 27, 2018, Peterson complained that the medications Defendants attempted to give him were not the correct ones.

389.    On March 29, 2018, all of Peterson's medication, including treatments for his mental illness were discontinued by nurse's order. The nurse's order stated that Peterson could continue to purchase over-the-counter medication. Peterson's medications for his mental conditions, anxiety, depression, skin, and other issues were not available over the counter.

390.    Nor did Peterson have the money to purchase such medications.

391.    Peterson went for more than four weeks at the Washington County Jail without any non-over-the-counter medications. He was in segregation for all four of these weeks.

392.    At that point, Peterson was at long last transported to a mental-health treatment facility.

393.    On April 6, 2018, Peterson complained about a rash that he had been suffering with from the multiple exposures to chemical spray, and was given hydrocortisone cream. Eventually, he ran out and the cream was not timely restocked.

394.    On April 7, 2018, Peterson was given 45 days of administrative segregation by official policy of Washington County through the actions of the Hearing Board despite his serious medical condition.

395.    On April 8, 2018, Peterson requested a phone call to his attorney. Sergeant Capra denied that request.

396.     On April 9, 2018, Peterson was given 75 days of administrative segregation.

397.     On April 10, Peterson's medical evaluation was cancelled due to his behavior, and he was not permitted medical care even though he was exhibiting clear symptoms of mental decompensation, as well as physical conditions including rash from chemical spray on his chest, back, and genitals and chest pains from stress and exhaustion.

398.     Peterson continued to complain of similar symptoms for several days after, in addition to bruising on his body and rash.

399.     Peterson was finally seen on April 15 for his medical issues. He was also seen for his rash and blood in his stool on April 17.

400.     Peterson's manic and decompensating behavior continued while he remained in segregation, including yelling, throwing things, threatening, hallucinating, paranoia, and hyperactivity.

401.     On April 26, Peterson had decompensated to the point that he was taken to Regions Hospital for emergency treatment, where he was diagnosed with antisocial personality disorder, mania, bipolar disorder and noted to still be suffering from a closed fracture to his hand.

402.     While at the hospital, the staff noted that he had not received medication since March 29—i.e., four weeks. Peterson then was returned to the Washington County Jail.

403.     Peterson's manic condition continued throughout the month of May,
including irrational drawings and writings, threats of violence to himself and others,
complaints about his conditions, irascibility, destroying items, delusional symptoms,
hallucinations.

**Fifth Significant Episode of Major Decompensation and Defendants' Deliberate
Indifference and Use of Unreasonable Force**

404.     As of May 18, 2018, Peterson had spent around 85 days in segregation,
including prolonged periods (sometimes, up to or more than a week) without being able
to leave his cell, even for a half hour out. This amounts to around 1,950 hours in
segregation.

405.     After three months of near-total segregation, deprivations of medication,
sleep, socialization, mental-health services, clothing, numerous exposures to chemical
sprays and vapors, restraints, legal contact, hearings, fractured hand, nutritional
deprivations, and a number of other highly stressful events brought about by the
coordinated efforts of Defendants, Peterson was in a state of severe breakdown. But
Washington County was not finished.

406.     On May 18, a manic and decompensated Peterson had urinated out of his
tray pass. A group of correctional officers including Doe officers, Sergeant Klinkner, and
Sergeant Olson responded by ordering Peterson to crawl out of his cell—through his own
urine.

407.     Sergeant Olson ordered Peterson to give up some of his items, an order
with which Peterson managed to reluctantly comply.

408.    Peterson was not moving fast enough for Olson, who sprayed Peterson with MK-9S vapor for his slow compliance.

409.    Peterson was not allowed to be decontaminated following this exposure to MK-9S for more than twenty-four hours.

410.    Sergeant Klinkner and the Doe officers observed and materially participated in this treatment of Peterson, and failed to intervene in any way.

411.    On May 23, after nearly four months of segregation and torture, a finding by the Washington County District Court that Peterson was incompetent to stand trial, and a separate order that he should be civilly committed due to mental illness, Peterson was finally transferred to Anoka Regional Treatment Center.

**Washington County's Policy, Practice, or Customs of Deliberate Indifference to Peterson's Serious Medical Needs: The "Care" Plans**

412.    The above averments all evidence Peterson's serious medical needs, Defendants' actual knowledge of those needs, and their deliberate indifference to them.

413.    Peterson's treatment for the nearly four months he was incarcerated shows that Defendants used on a number of occasions objectively unreasonable force against Peterson throughout the course of his incarceration.

414.    Upon information and belief, other inmates at the Washington County jail have experienced similar mistreatment when presenting with symptoms of serious mental illness.

415.     This is evidence that Washington County had a policy, custom, or practice of deliberate indifference to Peterson's serious medical needs and of inflicting objectively unreasonable force upon a mentally ill inmate.

416.     At all times, Washington County was aware of the serious medical needs of Peterson and other mentally ill inmates, yet failed to appropriately respond.

417.     In addition to this evidence of an unwritten policy, practice, or custom of Washington County there existed several written policies that were created by Commander Heinen, a final policymaker with respect to jail and inmate policy for Washington County.

418.     The Washington County Hearing Board's decisions regarding inmate segregation and other sanctions also serve as a source of official policies of Washington County.

419.     On or around February 23, 2018, Commander Heinen instituted a "care plan" for Peterson effective through February 27, a true and correct copy of which is attached as Exhibit A. Peterson refers to this as the "First Care Plan." Another care plan identical in all relevant respects to the First Care plan was in effect from February 27, 2018 through March 6, 2018.

420.     The First Care Plan was not the least restrictive way for Commander Heinen to respond to Peterson's behavior or to adequately treat his serious medical needs, or respond to his disability.

421.     The First Care Plan was punitive, *inter alia*, because: it placed Peterson in a cell with no bathroom access, so Peterson was allowed to use the bathroom only at the

discretion of the Sergeant on duty; eliminated his social visits; eliminated social calls unless Peterson had "good behavior" for a *week*; took away his half hours out of the cell for a week straight, with it being returned only if Peterson followed jail rules; eliminated Peterson's access to paper, grievance forms, and medical or other request slips unless Peterson had 48 hours of "good behavior"; disallowed outgoing attorney calls and limited incoming attorney calls to once per week; limited Peterson's toilet-paper access; limited his ability to call an attorney to once per week; limited his ability to request additional items or report grievances unless he showed "non-destructive behavior" for forty-eight hours; limited contact with Peterson, thus institutionalizing ignoring his requests and further isolating him as a result of his mental illness.

422.    The First Care Plan also required that if Peterson used "threats" or caused property damage that he would be further sanctioned through segregation.

423.    The First Care Plan explicitly stated that "Shouting or demanding behavior will result in sanctions and loss of out of cell time." This instituted an official policy, practice, or custom for Washington County of punishing Peterson for manifestations or behavior symptomatic of his mental illness.

424.    The First Care Plan failed to provide for any response, evaluation, or treatment whatsoever regarding Peterson's mental-health even though Peterson's serious medical needs and the risk of serious harm resulting therefrom was known to Commander Heinen and other Defendants due to Peterson's known medical history, Peterson's February 7 intake assessment, Peterson's February 22 assessment by a psychiatric nurse, and behavior during the course of his incarceration.

425.    Institutionalizing punishment for Peterson's mental illness constitutes deliberate indifference to his objectively serious medical needs.

426.    Washington County's unconstitutional policy, practice, or custom violated standards of care for prison officials recognized, *inter alia*, by the Minnesota Department of Corrections, the American Correctional Association, and American Psychiatric Association, including, but not limited to: failing to timely provide a mental-health assessment of a person with serious medical needs and using segregation on an individual with bipolar disorder or other objectively serious medical conditions.

427.    The First Care Plan approved official sanctions against Peterson solely at the officer's discretion for violations of any provision of the care plan.

428.    The First Care Plan was grossly incompetent to respond to the risks of serious harm resulting from Peterson's serious medical condition.

429.    While the Care Plan recommended that Crisis Intervention Training ("CIT") be used rather than methods that "incite" Peterson, Washington County failed to adequately train its jail personnel, including Defendants, in CIT because fewer than half of its employees were trained in CIT.

430.    The First Care Plan did not consider or utilize the least restrictive means of dealing with Peterson's mental condition. For example, it arbitrarily required "full" restraint for Peterson when taken out of his cell by three officers, but only "normal" restraints when he was taken to Court or medical evaluations.

431.    Commander Heinen served as the Jail Administrator for Washington County, and was therefore a final policymaker for Washington County, with final and

unreviewed policymaking authority with respect to inmate Peterson and the general inmate population at the Washington County Jail.

432.    Upon information and belief, the First Care Plan was never reviewed by Washington County or Commander Hienen's supervisors (including Sheriff Starry). To the extent it was, these Defendants ratified both the action and the basis for the action for the same reasons and with the same response as Commander Heinen.

433.    The First Care Plan was essentially extended through March 7, 2018, though Peterson remained in segregation indefinitely.

434.    On March 14, 2018, Peterson's mother called the Washington County Jail and informed Washington County Jail personnel of what it already knew: her son was mentally ill with an objectively serious medical condition (including bipolar disorder).

435.    This information was logged in Peterson's official inmate file or record, and was provided to Defendants.

436.    An unknown Doe officer informed Peterson's mother of a Washington County Jail policy that if an inmate was mentally ill that he had to affirmatively request treatment.

437.    The unknown Doe officer informed that she would have to write the judge in Peterson's case if she wanted a mental evaluation.

438.    Upon information and belief, Washington County Jail did not change its policies or directives with respect to Peterson following Peterson's mother's call.

439.    On March 27, 2018, while still in segregation Peterson was put on another care plan (the "Second Care Plan"). A true and correct copy of the Second Care Plan is

attached as Exhibit B. The Second Care Plan was substantially the same as the First Care Plan, effective through April 2, 2018. After April 2, Peterson still remained in segregation.

440.    Even though Peterson's mother explicitly informed the jail that her son was mentally ill, Peterson's Second Care Plan once again made no provision for his mental-health treatment.

441.    On April 17, 2018, Peterson was put on another care plan (the "Third Care Plan"), which increased the sanctions beyond those provided in the First and Second Care Plans.

442.    For example, the Third Care Plan disregarded Peterson's mental condition, instead stating that Peterson was able to "act rational" when he wanted to.

443.    The Third Care Plan, a true and correct copy of which is attached as Exhibit C, continued the restrictions previously imposed by the First and Second Care Plans and restricted Peterson to once-a-week showers; eliminated his outgoing attorney calls; took away his normal prison clothing, leaving him only with a rough blanket and gown; limited access to hygiene items, including toothbrush, toothpaste, toilet paper, and other necessities; eliminated his half-hours out of his cell.  One of the effects of the Third Care Plan was that Peterson was confined for 72 or more hours straight with no clothes, limited hygiene, no shower, no social or other interaction, no ability to contact an attorney, little-to-no sleep, and no ability to seek redress for his condition.

444. Many of the events giving rise to Peterson's claims were recorded by either internal surveillance cameras, Body Wearable Cameras, or other video and/or audio recording devices.

445. Defendants have produced all videos recording any part of Peterson's 2018 incarceration at the Washington County Jail in 2018.

446. Finally, the foregoing allegations resulted in significant damages to Peterson, including physical injury from plastic bullets; long-term skin rash and scarring all over his body from chemical burns; severe and sustained psychiatric decompensation; anxiety stemming from constant segregation, abuse, and neglect; embarrassment; pain and suffering both at the time of the events as well as ongoing to the present day; and severe depression.

447. Peterson lost over or around 70 pounds during the course of his 2018 incarceration.

448. This severe weight loss resulted from the constellation of mistreatment at the hands of Defendants, including malnutrition, severe stress and anxiety, undue delay or grossly inadequate treatment of, response to, and medication for his bipolar condition, among other mistreatments.

449. Defendants' conduct demonstrated evil intent or motive, or reckless or callous disregard of Peterson's federally protected rights, to wit: continually putting a inmate known to be suffering from severe mental illness and decompensation in sustained segregation for extended periods of time, failing to respond to his known serious medical condition, or when a response was provided, unduly delaying with treatment or

responding with treatment that was grossly incompetent to respond to the risk of serious harm.

450.     Further, in addition to facilitating a continued saga of decompensating circumstances and driving Peterson further and further into mania, Defendants constantly denied requests for care, antagonized (including by rude gestures, cursing, yelling, and ignoring the obvious signs of his mental deterioration), left him isolated in his cell with no time out of the cell for reasons other than shakedowns or transfers, and otherwise letting his condition severely deteriorate on their watch.

### COUNT I: 42 U.S.C. § 1983 – Due Process (XIV Amendment)
(Unconstitutional Punishment and Excessive Force)
Against Sheriff Starry, Commander Heinen (individually), Sergeant Nicholas Klinkner, Sergeant Frantsi, Assistant Administrator Warneke, Officer Jorgenson, Officer Gaikowski, Officer Roberto, Sergeant Frank Capra, Officer Glassmaker, Officer De La Rosa, Officer Scheele, Officer Rein, Officer Kleinendorst, Officer Brandon Olson, Officer KCee Cahill, Corporal Dyck, and the Doe Officers (collectively, "Count I Defendants")

451.     Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

452.     At all relevant times, the Count I Defendants were acting under color of Minnesota state law by virtue of their official positions as Sherriff, Sheriff's deputies or employees of the Sheriff's Office, jail administrators or employees, or correctional officers working for Washington County, Minnesota. While incarcerated from February 4, 2018 to March 07, 2018, Peterson had the right under the Fourteenth Amendment Due Process Clause to be free from punishment as an individual detained prior to trial and conviction in the Washington County Jail.

453.    The Count I Defendants violated Peterson's Fourteenth Amendment rights by, *inter alia*, spraying Peterson with or ordering that he be sprayed with chemical agents including Freeze Plus P or MK-9S in a manner not reasonably related to or disproportionate to any legitimate governmental interest; shooting him or ordering that he be shot repeatedly with non-lethal projectiles fired from an FN-303 riot gun; and denying Peterson's requests for basic necessities including medication and medical treatment, toilet paper, blankets, clothing, and other necessities; denying his phone calls to attorneys and bail bondsmen; providing no alternative means of cleaning himself following a bowel movement; using force to restrain or otherwise interact with Peterson in a manner not reasonably related to or disproportionate to any legitimate governmental purposes; and other conduct as set forth in this Second Amended Complaint and incorporated herein.

454.    The Count I Defendants' actions were the direct and proximate cause of significant physical and emotional injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and mental suffering (including triggered and exacerbated mental trauma resulting from decompensation), and substantial embarrassment, as well as self-inflicted harm.

### COUNT II: 42 U.S.C. § 1983 – Due Process (XIV Amendment)
(Failure to Intervene or Protect)
Against Sheriff Starry, Commander Heinen (individually), Sergeant Nicholas Klinkner, Sergeant Frantsi, Assistant Administrator Warneke, Officer Gaikowski, Officer Jorgenson, Officer Roberto, Officer Rein, Sergeant Frank Capra, Officer Glassmaker, Officer De La Rosa, Officer Scheele, Officer Kleinendorst, Officer Brandon Olson, Officer KCee Cahill, Corporal Dyck, Stephanie Kaphing, and the Doe Officers
(collectively, "Count II Defendants")

455.     Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

456.     During the course of Peterson's incarceration at the Washington County Jail in 2018, the Count II Defendants were aware of Peterson's being subjected to unconstitutional punishment or objectively unreasonable force, and yet failed to intervene to prevent such acts.

457.     During the course of Peterson's incarceration at the Washington County Jail in 2018, the Count II Defendants were aware of risk of serious harm to Peterson resulting from his objectively serious medical needs, of which they were actually aware, and yet failed to intervene to prevent such acts.

458.     The Count II Defendants' actions were the direct and proximate cause of significant physical and emotional injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and mental suffering (including triggered and exacerbated mental trauma resulting from decompensation), and substantial embarrassment, as well as self-inflicted harm.

### COUNT III: 42 U.S.C. § 1983 – Due Process Clause of the XIV Amendment
(Deliberate Indifference to Serious Medical Needs)
Against Sheriff Starry, Commander Heinen (individually), Sergeant Nicholas Klinkner, Sergeant Frantsi, Assistant Administrator Warneke, Officer Gaikowski, Officer Jorgenson, Officer Roberto, Officer Rein, Sergeant Frank Capra, Officer Glassmaker, Officer De La Rosa, Officer Scheele, Officer Kleinendorst, Officer Brandon Olson, Officer KCee Cahill, Corporal Dyck, Nurse Mindy Leibel, Stephanie Kaphing, and the Doe Officers (collectively, "Count III Defendants")

459.     Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

460.     The Count III Defendants knew that Peterson had a history of mental illness when he arrived at the Washington County Jail.

461.     Count III Defendants knew that Peterson had a history of being on anti-psychotic medications and was being denied those medications.

462.     Further, Count III Defendants knew that Peterson had a serious medical need due at least in part to a mental illness because of at least one or a combination of more than one of the following facts: (a) Peterson was incoherent and incapable of basic functions upon his arrest on February 4; Peterson would yell and scream without reason or justification, or upon the slightest provocation; Peterson would say or do things that were uncharacteristic of a person in their right mind throughout his incarceration, but at least as early as February 4; Peterson would bang his head on the wall, smash his fist on the wall, door, or other surfaces to the point of inflicting serious injury on himself; Peterson would not respond rationally to requests or attempts to restore order; Peterson's elevated mood and temper were uncharacteristic of a sane person; Peterson experienced extreme fluctuations of mood; Peterson exhibited obviously manic behavior, including pacing, removing his clothing, pressured speech, destroying his clothing, babbling, fecal fascination, exposure, and body language characteristic of mental illness such as bipolar disorder.

463.     The Count III Defendants' deliberate disregard of Peterson's serious

medical needs resulted in significant physical and emotional injury, including long-term

chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds,

past and future pain and suffering, past and future emotional and mental suffering

(including triggered and exacerbated mental trauma resulting from decompensation),

embarrassment, self-inflicted harm, as well injuries from use of force that would have

been prevented but for the Count III Defendants' unlawful conduct.

### COUNT IV: 42 U.S.C. § 1983 – Due Process (XIV Amendment)
*Monell* claim – Unconstitutional Policy or Custom
(Washington County, Minnesota)

464.     Peterson repeats and reavers each and every of the foregoing paragraphs as

if fully set forth herein.

465.     Defendant Washington County, Minnesota was repeatedly made aware of

Peterson's and other inmates' serious medical conditions, including bipolar disorder,

antisocial personality disorder, mania, and others.

466.     Washington County had actual knowledge of or were deliberately

indifferent to Peterson's and other inmates' serious medical needs and the risks of serious

harm posed thereby by having an official policy, practice, or custom of failing to continue

necessary mental-health medication, failing to provide timely mental-health and other

medical screening or assessment, and by placing inmates in segregation (or "solitary

confinement") for extended periods of time.

467.     Washington County, being aware that on numerous occasions that Peterson

and other mentally ill detainees and inmates being held in the Washington County Jail

were not being provided proper mental-health treatment, had a policy or custom of not providing adequate mental-health treatment for inmates or detainees who exhibited obvious signs of mental illness.

468.     Washington County failed to provide adequate training in the recognition of and response to individuals like Peterson with serious mental-health needs such as bipolar disorder.

469.     Moreover, at all relevant times, Commander Heinen served as a final policymaker for Washington County in his capacity as the Administrator of the Washington County Jail.

470.     Commander Heinen created three written policies that resulted in both unconstitutional punishment of Peterson while a pretrial detainee, and exhibited deliberate disregard to Peterson's serious medical needs and the risks of serious harm resulting therefrom; deprivation of various rights and privileges, including medication and medical treatment, phone calls to an attorney, toilet paper, hygiene, socialization, all in a manner not reasonably related to or disproportionate to any legitimate governmental purpose.

471.     Commander Heinen ratified the unconstitutional actions of his inferiors, including each and every one of the Count I and Count II Defendants, adopting both their actions and the reason motivating their actions.

472.     Commander Heinen's actions as a final policymaker were not reviewed by Washington County or any of his superiors.

473.    The actions of Washington County, through Commander Heinen, were the moving force that caused Peterson to be subjected to significant physical and emotional injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and mental suffering, and substantial embarrassment, as well as self-inflicted harm.

**COUNT V: 42 U.S.C. § 1983 – Violation of the VI and XIV Amendments: Denial of Right to Counsel and Access to the Courts**
(Against Officer Glassmaker, Commander Heinen (individually), and Doe Defendants)

474.    Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

475.    Officer Glassmaker refused to allow Peterson to call his attorney on at least one occasion.

476.    Commander Heinen implemented a "care plan" that specifically restricted Peterson from making outgoing calls to his attorney.

477.    The actions of Officer Glassmaker and Commander Heinen, whether or not related, caused Peterson to suffer a violation of his Sixth Amendment Right to Counsel and Fourteenth Amendment right to access the courts by unreasonably restricting his ability to consult with and obtain the advice of an attorney.

478.    Peterson's deprivations caused him damage both in the inherent damage resulting from a deprivation of his civil rights protected by the Constitution and several Amendments thereto, but also by preventing him from adequately challenging both the

fact and condition of his confinement in a reasonably timely manner. This resulted in direct and foreseen consequences, including further punishment, constitutional deprivations, and injuries as a result of the denial of adequate mental-health treatment.

### COUNT VI: 42 U.S.C. § 1983 – Violation of the VI and XIV Amendments: Denial of Right to Counsel and Access to the Courts
(*Monell* Violation – Against Washington County)

479.     Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

480.     Commander Heinen was an official policymaker for Washington County with respect to the operations of the Washington County Jail.

481.     Commander Heinen was an official policymaker for Washington County with respect to inmate regulation at the Washington County Jail.

482.     Commander Heinen implemented and ratified a number of policies that restricted Peterson's access to an attorney, including policies of preventing him from making outgoing calls to an attorney.

483.     These policies were official policies of Washington County.

484.     The three care plans instituted by Heinen caused a direct and substantial violation of Peterson's Sixth Amendment right to counsel and his Fourteenth Amendment right of access to the courts by denying him the reasonable opportunity to consult an attorney.

485.     The three care plans caused Peterson damage both in the inherent damage resulting from a deprivation of his civil rights protected by the Constitution and several Amendments thereto, but also by preventing him from adequately challenging both the

fact and condition of his confinement in a reasonably timely manner. This resulted in direct and foreseen consequences, including further punishment, constitutional deprivations, and injuries as a result of the denial of adequate mental-health treatment

### Count VII: Americans With Disability Act, 42 U.S.C. § 12132 *et seq.*– Disability Discrimination
(Against Defendant Washington County)

486.    Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

487.    Peterson was a qualified individual with a disability due, *inter alia*, to his diagnosis with bipolar disorder.

488.    Peterson was denied medication, services, programs, or activities or otherwise subjected to discrimination due to his disability.

489.    Further, Peterson was subjected to prolonged segregation or other isolation solely on the basis of his disability.

490.    Washington County is a public entity.

491.    Peterson's discrimination was a consequence of his disability, including his mentally ill state and bipolar disorder.

### Count VIII: Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*– Disability Discrimination
(Against Defendant Washington County)

492.    Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

493.    Peterson was a qualified individual with a disability due, *inter alia*, to his diagnosis with bipolar disorder.

494.    Peterson was denied medication, services, programs, or activities or otherwise subjected to discrimination due to his disability.

495.    Further, Peterson was subjected to prolonged segregation or other isolation solely on the basis of his disability.

496.    Washington County is a public entity.

497.    Washington County is a recipient of federal funding.

498.    Some or all of the federal funding received by Washington County pays for programs, services, or operations at the Washington County Jail.

499.    Peterson's discrimination was a consequence of his disability, including his mentally ill state and bipolar disorder.

## Count IX: 42 U.S.C. § 1988 – Attorneys' Fees
(Against All Defendants)

500.    Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

501.    Upon finding that Defendants have violated Peterson's one or more of his constitutional rights, Peterson is entitled to reasonably attorneys' fees and litigation expenses in accordance with 42 U.S.C. § 1988, the ADA, the Rehabilitation Act, and other applicable law.

502.    Upon a finding of liability, Peterson should have the right to present through motion the amount of attorneys' fees and litigation expenses reasonably incurred in the prosecution of this action.

## Count X: Assault
(Against All Defendants)

503.    Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

504.    Defendants acted with the intent to cause Peterson apprehension or fear of immediate harm or offensive contact with Peterson.

505.    Defendants had the apparent ability to cause the harm or offensive contact.

506.    Peterson had a reasonable apprehension or fear that immediate harm or offensive contact would occur.

507.    Defendants caused Peterson significant physical and emotional injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and mental suffering (including triggered and exacerbated mental trauma resulting from decompensation), and substantial embarrassment, as well as self-inflicted harm.

## Count XI: Battery
(Against All Defendants)

508.    Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

509.    Defendants intentionally caused—directly or indirectly—offensive contact with Peterson.

510.    Defendants caused Peterson significant physical and emotional injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and

mental suffering (including triggered and exacerbated mental trauma resulting from decompensation), and substantial embarrassment, as well as self-inflicted harm.

## Count XII: Unauthorized Use of Force
(Against All Defendants)

511. Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

512. Defendants used force that was unreasonable under the circumstances to subdue, move, control, or treat Peterson while incarcerated in the Washington County Jail.

513. Defendants caused Peterson significant physical and emotional injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and mental suffering (including triggered and exacerbated mental trauma resulting from decompensation), and substantial embarrassment, as well as self-inflicted harm.

## Count XIII: Negligence
(Against All Defendants)

514. Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

515. Defendants owed Peterson a duty of care as well as a heightened duty of care, including a duty to protect and provide affirmative care, due to their special relationship arising from Peterson's incarceration.

516. Defendants breached their duties owed to Peterson by failing to provide care consistent with said duty or duties.

517.    Defendants' failure to provide ordinary care resulted in injury to Peterson.

518.    Defendants failure to fulfill their duty was the proximate cause of significant physical and emotional injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and mental suffering (including triggered and exacerbated mental trauma resulting from decompensation), and substantial embarrassment, as well as self-inflicted harm.

## Count XIV: Intentional Infliction of Emotional Distress
(Against All Defendants)

519.    Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

520.    Defendants' conduct during the course of Peterson's 2018 incarceration was extreme and outrageous.

521.    Defendants' conduct was intentional or reckless with respect to Peterson.

522.    Defendants' conduct caused Peterson severe emotional distress and significant physical and emotional injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and mental suffering (including triggered and exacerbated mental trauma resulting from decompensation), and substantial embarrassment, as well as self-inflicted harm.

## **Count XV: Intentional Infliction of Emotional Distress**
(Against All Defendants)

523.     Peterson repeats and reavers each and every of the foregoing paragraphs as if fully set forth herein.

524.     Peterson was within a zone of danger of physical impact or was physically impacted by Defendants' extreme and outrageous conduct.

525.     Peterson was in multiple instances in reasonable fear for his own safety.

526.     Peterson suffered severe emotional distress with a resultant physical injury, including long-term chemical scarring, extreme physical deprivation, including weight loss of over 70 pounds, past and future pain and suffering, past and future emotional and mental suffering (including triggered and exacerbated mental trauma resulting from decompensation), and substantial embarrassment, as well as self-inflicted harm.

Wherefore, Plaintiff Brandon Peterson prays the Court order:

a)     That Defendants be found liable for each of the Counts alleged herein and ordered to pay an amount in damages to be determined at trial sufficient to compensate him for the injuries sustained as a result of Defendants' conduct.

b)     Punitive damages for Defendants' evil intent or motives behind their actions, as well as their callous disregard of Peterson's federally protected rights, in an amount to be established at trial.

c)  That Plaintiff Brandon Peterson be awarded the costs of this suit and

reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C.

§ 1988, the ADA, the Rehabilitation Act, and other applicable law.

d)  Such other and further relief as the Court deems just and proper.


Dated: November 15, 2019[2]                    */s Stephen Morrison*
_____
Annamarie A. Daley (MN No. 158112)
Stephen D. Morrison, III (*pro hac vice*)
JONES DAY
90 South 7th Street, Suite 4950
Minneapolis, MN 55402
Telephone: (612) 217-8913
Fax: (844) 345-3178
smorrison@jonesday.com
adaley@jonesday.com

***Pro Bono Counsel for Plaintiff Brandon R.
Peterson***

---

[2] Revised November 21, 2019 by stipulation of the parties following meet and confer.