# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brandon Robert Peterson,

               Plaintiff,

v.

Commander Roger Heinen, *in his individual capacity*; Sergeant Brandon Olson, *in his individual capacity*; Sergeant Nicholas Klinkner, *in his individual capacity*; Sergeant Troy Jorgenson, *in his individual capacity*;  Washington County, MN; Sheriff Dan Starry; John Warneke, *Assistant Jail Administrator in his individual capacity*; Officer Kcee Cahill, *in his individual capacity*; Sergeant Frank Capra, *in his individual capacity*; Officer Dan Rein, *in his individual capacity*; Sergeant David Frantsi, *in his individual capacity*; Officer Jennifer Glassmaker, *in her individual capacity*; Corporal Rebecca Dyck, *in her individual capacity*; Nurse Melinda Leibel, *"Mindy" in her individual capacity*; Officer Chad Gaikowski, *in his individual capacity*; Officer John Roberto, *in his individual capacity*; Officer Vincent Scheele, *in his individual capacity*; Officer Garrett Kleinendorst, *in his individual capacity*; Officer De La Rosa, *in his individual capacity*; Stephanie Kaphing, *in her individual capacity*; John Does 1-10, *in their individual capacities*,

               Defendants.

Civil No. 18-2640 (DWF/ECW)

**REDACTED
MEMORANDUM
OPINION AND
ORDER REGARDING
DOCKET ENTRY 220**

Annamarie A. Daley, Esq., Carly J.T. Daley, Esq., Chelsea Bunge-Bollman, Esq., and Stephen D. Morrison, III, Esq., Jones Day, counsel for Plaintiff.

Jason M. Hiveley, Esq., Stephanie A. Angolkar, Esq., and Andrew A. Wolf, Esq., Iverson Reuvers Condon, counsel for Defendants.

## INTRODUCTION

This matter is before the Court on Defendants' Motion to Dismiss and for Summary Judgment (Doc. No. 158) and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 174). For the reasons set forth below, the Court grants in part and denies in part the motions.

## BACKGROUND

Plaintiff Brandon Robert Peterson ("Plaintiff" or "Peterson") suffers from Bipolar Disorder.[1] Relevant to this case, Plaintiff was incarcerated at the Washington County Jail (the "Jail") from February 4, 2018 to May 24, 2018, after being arrested for aiding and abetting a theft in December 2017.[2]

---

[1] Bipolar Disorder is a lifelong illness that is treated with medications, psychotherapy, and other psychiatric interventions. (Doc. No. 177-7 ("Stewart Report") ¶¶ 2.1-2.11.)

[2] On January 12, 2018, Washington County issued a warrant for the arrest of Plaintiff for aiding and abetting a theft from a Wal-Mart and obstructing legal process on or about December 29, 2017. (Doc. No. 162 ("Kelly Decl.") ¶ 2, Ex. 1.) On February 1, 2018, a Pine County court issued a body-only warrant for Plaintiff (the "Pine County Warrant") for a probation violation related to an October 2017 disorderly conduct offense, for which Plaintiff was sentenced on November 8, 2017. (Id. ¶ 5, Ex. 4; ¶ 26, Ex. 25.) On February 4, 2018, Washington County deputies arrested Plaintiff on a felony

Plaintiff contends that he suffered from a serious mental illness ("SMI") before his arrest and throughout his admission to the Jail. (*See, e.g.*, Doc. No. 183-10[3] ("Helfland Report") at 30; Stewart Report ¶¶ 2.1-2.11.) In addition, Plaintiff had been incarcerated at the Jail previously and Plaintiff asserts that Jail staff had provided Plaintiff with medication, including antipsychotics, mood stabilizers and anxiety medication.[4] (Doc. No. 177-8; Doc. No. 177-9 ("Kaphing Dep." at 47-48).) Plaintiff has pointed to evidence that some Defendants remembered Plaintiff. (*See, e.g.*, Doc. No. 175-3 ("Cahill Dep.") at 85-86.) Further, Plaintiff had been civilly committed before his incarceration.

On February 4, 2018, Plaintiff arrived at the Jail. Defendant Officer Rebecca Dyck ("Officer Dyck") recalled that Plaintiff was stumbling, not able to stand on his own, and appeared to be on some kind of illicit drug. (Doc. No. 163 ("Dyck Dep.") at 65, 106,

---

warrant related to the Wal-Mart theft case. (Doc. No. 165 ("Heinen Decl.") ¶ 2, Ex. 1.) When Plaintiff was booked, it was noted that Plaintiff had an "Active Hold from Other Jurisdiction" and was also "here on Warrants, Pine Co." (Kelly Decl. ¶ 13, Ex. 12.) Plaintiff's First Appearance for his Wal-Mart theft case occurred on February 7, 2018, at which time the court set an omnibus hearing for March 7, 2018 and issued conditions of release. (Kelly Decl. ¶¶ 7, 8, Exs. 6, 7.)

[3]     Because of the complicated nature of the electronic filings of voluminous materials, many under seal and submitted separately, the Court will use various record citations (some unconventional) in an attempt to make it easier to locate the documents in the record. In addition, the Court may refer only to one party's submission of evidence that both parties have submitted. The record also contains video footage from the Jail's CCTV, body cameras, and handheld video recorders. (*See, e.g.*, Doc. No. 165 ("Heinen Decl.") ¶¶ 4-9, 12, 14-20, 22, 26-29, Exs. 3-8, 11, 13-19, 21, 25-28 (generally referred to as "Video Footage").)

[4]     Plaintiff claims that he has been subjected to a multi-year pattern of unjustified force and unconstitutional conditions of confinement during periods of incarceration in 2016, 2017, and again in 2018.

108.)  In addition, Plaintiff was placed in a cell without receiving a mental health screening.  (*Id*. at 94-95.)

On February 7, 2018, Defendant Nurse Stephanie Kaphing ("Kaphing") performed an "Intake" evaluation.  (Doc. No. 177-10.)  Kaphing confirmed Plaintiff's self-reported mental health diagnoses and prior suicide attempts.  (*Id*.)  Plaintiff denied taking medications, but reported a history of depression, anxiety, bipolar disorder, and "███████",  which Kaphing interpreted as "█████████" (Kaphing Dep. at 43-44.)  Kaphing noted that Peterson admitted to recently using "dope".  (Doc. No. 177-10.)  Kaphing did not review Plaintiff's medical records or refer Plaintiff to a Qualified Mental Health Provider ("QMHP"), and instead documented that Plaintiff was "aware of how to contact medical."  (*Id*.; Kaphing Dep. at 47-49.)

On February 12, 2018, Plaintiff was reprimanded by a corrections officer and Plaintiff grew agitated, yelled, and exposed his genitalia.  (Doc. No. 193-6; Stewart Rep. ¶ 2.8 (citations omitted).)  Plaintiff was placed in a segregation unit.  (*Id*.; Doc. Nos. 178-182 (Exs. 20-23) (Shift Summary Reports).)

On February 14, 2018, Plaintiff fractured his hand by slamming it into the walls and door of his cell, and he injured his face while jumping from the top of his cell sink.  (Doc. No. 182-1.)  That day, Jail nursing supervisor Defendant Melinda Leibel ("Leibel"), who had conducted a mental health assessment earlier that day, prescribed 100mg of Hydroxyzine, an anti-anxiety medication.  (Doc. No. 175-11 (Ex. 24); Doc. No. 182-1 (Ex. 25); Doc. No. 163-23 (Ex. 39) ("Leibel Dep.") at 186-87.)  The next day, Plaintiff was prescribed sertraline, a drug commonly used to treat depressive disorders.

(Doc. No. 182-2; Stewart Report ¶ 3.45.)[5]  On February 16, 2018, Plaintiff requested and

was prescribed ████████ an antipsychotic.  (Stewart Report ¶ 3.46; Doc. No. 209 at

Washington at 0639.)  Then on February 19, 2018, Plaintiff was placed on high

observation or special close watch based on behavior, including homicidal statements,

belligerent self-harm, and weapon procurement.  (Leibel Dep. at 254-61.)

On February 20, 2018, Defendant Commander Roger Heinen ("Commander

Heinen") contacted a Washington County Attorney to determine whether civil

commitment proceedings had been initiated for Peterson.  (Kelly Decl. ¶ 16, Ex. 15

("Zulegar Dep.") at 37-39; Doc. No. 182-3.)  In that same email chain, Leibel indicated

that the medical unit at the Jail has "done all we can do to help him" and that [h]e won't

take the meds he needs."  (Doc. No. 182-3.)  Commander Heinen and Leibel did not

move Plaintiff to a higher level of care at this time.  (Leibel Dep. at 240-41.)

On February 22, 2018, Christine Dresel ("Dresel"), an Advanced Practice

Registered Nurse and the Jail's only QMHP, conducted a psychiatric diagnostic

evaluation on Plaintiff.  (Doc. No. 182-4; 182-5 ("Dresel Dep.") at 96.)[6]  Nurse Dresel

---

[5]     Also on February 14, 2018, Officer Brian Land reported in an "Inmate Notice of
Violation" that Plaintiff "is currently in a mental state which makes serving paperwork
not possible.  Unable to focus enough to listen to or understand service of process."
(Doc. No. 193-1.)

[6]     Dresel, along with Doctors Mike Adams ("Adams") and Joel Jensen ("Jensen"),
none of whom are named as Defendants, were contract medical providers at the Jail.  The
Jail contracts with Nystrom & Associates to provide mental health care for inmates.
Dresel is a practitioner at Nystrom & Associates.  (Doc. No. 175-29 (Ex. 70).)  She is
responsible for psychiatric evaluations, medical management, and treatment of mental
health concerns at the Jail.  (Dresel Dep. at 35, 68-69.)  The Jail also contracts with

recorded Plaintiff's mental health status and history of mental illness, prescribed medications, including antipsychotics, and scheduled a follow-up. (Leibel Dep. at 258-59; Dresel Dep. at 96; Doc. No. 182-6.) Dresel prescribed trazadone, and either ██████ or an increased dosage of ██████ (Doc. No. 182-4.)

On March 2, 2018, the County Attorney charged Peterson with criminal damage to property related to acts of destruction at the Jail on or about February 19-22, 2018 and contempt of court. (Kelly Decl. ¶ 9, Ex. 8.) That same day, Plaintiff was convicted of contempt of court and sentenced to 90 days in Jail. (Kelly Decl. ¶¶ 25, 51 Ex. 24, 50.)

On March 7, 2018, Plaintiff appeared in court on the property-damage charge, during which the Court ordered a Rule 20 psychological evaluation. (Kelly Decl. ¶ 10, Ex. 9 (observing "there is reason to doubt Defendant's competency").) On March 29, Dresel and Dr. Jensen discontinued Plaintiff's medications after Plaintiff reportedly snorted his pills. (Doc. No. 182-9 (Ex. 33); Leibel Dep. at 269-270.)

On March 30, 2018, the Pine County court quashed its warrant on Peterson's probation violation, accepting his time in the Jail as time served. (Kelly Decl. ¶ 11, Ex. 10.)

A Court-appointed forensic psychologist, Dr. Jill Rogstad, conducted a court-ordered competency evaluation. In a report dated April 11, 2018, Dr. Rogstad reported a

---

Stillwater Medical Group for medical services. (Doc. No. 175-31 (Ex. 73).) Drs. Adams and Jensen are two medical providers who fulfill that contract. Dr. Adams is the medical director at the Jail and oversees healthcare services. (*Id.*)

diagnosis of "Unspecified Bipolar Disorder" and recommended civil commitment for mental illness and chemical dependence.  (Doc. No. 182-8 (Ex. 32.).)

On April 26, 2018, Plaintiff was transported to Regions Hospital for a "crisis evaluation."  (Leibel Dep. at 279.)  Leibel testified that Plaintiff was sent to the hospital to "see if they could do anything else that we had not done yet, and also to give staff a break."  (*Id.*)  Leibel also testified that Commander Heinen made the decision to send Plaintiff to Regions.  (*Id.*)  At Regions, Plaintiff was diagnosed with antisocial personality disorder, manic behavior, and a fracture in his left hand.  (Doc. No. 163-5.)  In addition, substance abuse disorders were noted.  (Doc. No. 183 (Ex. 38) (Regions Medical Records) at Washington 5000-11.)  The Hospital Records note:

████████████████████████████████████

(*Id.* at Washington 5000-11.)  In addition, Plaintiff refused ████ an antipsychotic medication.  (*Id.*)  The Hospital Records also contain information provided by Jail staff, including Leibel.  Leibel told hospital staff that Plaintiff did not always take his medication and because Plaintiff once snorted his medication, he was no longer receiving it in Jail.  (*Id.*)  In addition, it was noted that medical staff at the Jail were not in favor of sending Plaintiff to the hospital and dismissed Plaintiff as manipulative.  (*Id.*)  Upon discharge from Regions Hospital, Plaintiff was prescribed ██████ and ████████ (*Id.*)  Plaintiff returned to Jail and to segregation.  (Doc. No. 175-16.)

On May 8, 2018, Washington County petitioned for Plaintiff to be civilly committed due to mental illness.  (Doc. No. 183-2; Zulegar Dep. at 33-36.)  The court determined that Peterson was incompetent and suspended all ongoing criminal proceedings until Peterson completed civil commitment.  (*Id*.; Zulegar Dep. at 34-36; Kelly Decl. ¶ 20, Ex. 19.)

On May 24, Plaintiff was transferred to Anoka Metro Regional Treatment Center ("AMRTC") and committed due to mental illness by court order.  (Doc. Nos. 183-3, 183-4; Kelly Decl. ¶ 24, Ex. 23.)  The treating physician at AMRTC, Dr. Matthew Kruse, noted that Plaintiff had an extensive history of hospitalization for mental health and a criminal history, and that while Plaintiff was in jail, he was "disinhibited and aggressive," non-adherent with medication, engaged in self-harm and expressed delusional beliefs. (Doc. No. 183-5 ("Kruse Decl.") ¶¶ 7, 10.)  Dr. Kruse diagnosed Plaintiff with Bipolar I Disorder with manic features and noted that he was unable to perform a comprehensive evaluation upon admission because of Plaintiff's "severely decompensated mental condition."  (*Id*. ¶¶ 10, 14.)  While at AMRTC, Plaintiff was prescribed additional medications, and at the time of discharge was on two anti-psychotics.  Plaintiff remained at AMRTC until August 16, 2018, when he was transferred to a Competency Restoration Program at the Minnesota Security Hospital.  (Doc. No. 183-8.)  Plaintiff was treated at St. Peter Regional Treatment Center until January 23, 2019.  (Doc. No. 163-12 (Ex. 23).)

Plaintiff submits that he was inappropriately placed in segregation for more than 80% of his time at the Jail, despite evidence of an obvious impairment due to his SMI. Further, during the four-month period that Plaintiff was incarcerated at the Jail, Plaintiff

described a deteriorating mental condition and increasingly erratic behavior, which was often met with discipline, restraint, use of force, and deprivation of necessities.  Plaintiff argues that he was placed on "care plans"[7] that tied privileges, such us access to toilet paper and phone usage, with good behavior, such that he was penalized for behavior caused by his SMI.  During this time, Defendants issued numerous "Use of Force" reports, several of which Plaintiff challenges as uses of excessive force, which the Court briefly summarizes below.

*February 19, 2018*

On February 18, 2018, Plaintiff covered up the camera in his cell with toilet paper. (Doc. No. 163-15 ("Peterson Dep.") at 72-73; Doc. Nos. 166-1 (CCTV), 166-2 (CCTV).) The camera was close to a sprinkler head.  Around 10:30 p.m. that night, Plaintiff threw a plastic cup towards the camera in an effort to un-obstruct the camera, but the cup hit the sprinkler head.  (Peterson Dep. at 70-74; CCTV Video).)  His cell unit flooded with water that smelled sewage-like.  (Doc. No.193-7 (Ex. 29) ("Klinkner Dep") at 64, 70.)  Plaintiff remained in his cell for approximately three hours as officers relocated other inmates and

---

[7]     A "care plan" is document that outlines a specific plan for inmates for whom the general rules are not sufficient, for example when an inmate engages in challenging or disruptive behavior.  (Heinen Dep. at 120.)  The plan is intended to manage an inmate's behavior and provide care.  The more difficult an inmate's behavior, the stricter the care plan.  (*Id*.)   Care plans are often generated by an operations sergeant or Commander Heinen and discussed and reviewed by other Jail officials.  When completed, the care plan is sent to correctional officers and jail nurses.  (Heinen Dep. at 65.)  Plaintiff had a care plan in 2018.  (*Id*. at 114.)  Plaintiff's care plan was created by Commander Heinen and others including Leibel, Assistant Jail Administrator John Warneke ("Warneke"), and others.  (*Id*. at 117.)

removed the water.  (Klinkner Dep. at 70-71; Doc. No. 193-8 (Ex. 30) ("Cahill Dep.")
at 94, 101-102.)  In the early hours of February 19, 2018, Defendant Sergeant Nicholas
Klinkner ("Sergeant Klinkner") organized the Emergency Response Team ("ERT").
Sergeant Klinkner testified that officers believed that Peterson had a metal foreign object
from the damaged sprinkler and that they had to remove him because of the poor
conditions of his cell.  (Klinkner Dep. at 69-70.)  Sergeant Klinkner instructed Defendant
Officer De La Rosa ("Officer De La Rosa") to bring in an FN-303[8] as a show of force.
Commander Heinen authorized having the FN-303 out.  (Klinkner Dep. at 62-63; Doc.
No. 193-6 (Ex. 28) at Washington000162.)

Plaintiff asserts that he repeatedly told the officers that damaging the sprinkler was
accidental and that he had a broken hand.  (Peterson Dep. at 73-74.)  When the ERT
arrived, Plaintiff was face-down on the ground, said he would come out, and complied
with orders to crawl out of his cell.  (Doc. No. 193-6 (Ex. 28) at Washington000158;
Klinkner Dep. at 75, 78.)  Plaintiff was lying on the floor, face down, with his arms
stretched out wide with his palms visible.  (Doc. No. 166 (CCTV).)  Defendant Officer
Kcee Cahill ("Officer Cahill") applied his bodyweight and a shield to Plaintiff's back
while other officers applied restraints to Plaintiff's arms and legs.  Plaintiff was not
resisting, but when explaining the incident with the camera, he became agitated and
argumentative.  He cursed at and threatened the officers while fully restrained.  He

---

[8]      An FN-303 is a "less lethal" projectile weapon that looks like a rifle and fires
plastic projectiles using compressed air.  (Doc. No. 197-12 ("Olson Dep.") at 150-151.)

complained that the handcuffs were painful and that he had a broken left hand.

Defendant Officers Dyck and Officer Jennifer Glassmaker ("Officer Glassmaker")

applied pressure points to secure Plaintiff in a restraint chair (Doc. No. 193-6 (Ex. 28) at

Washington000159-162).  The officers were able to search Plaintiff and restrain

Plaintiff's arms and legs in the chair.  The officers removed Plaintiff's handcuffs to

secure him in the restraint chair and Plaintiff continued to complain that he was in pain.

The officers secured his arms in the chair restraints and when the officers attempted to

tighten the shoulder straps, Plaintiff complained that he was already strapped in and he

threatened, cursed, and spit at the officers.  (*Id.*; Doc. No. 166 (CCTV).)  Sergeant

Klinkner chemically sprayed Plaintiff and a spit mask was placed on Plaintiff's head.

(*Id.*; Klinkner Dep. at 85; Cahill Dep. at 136-137; Doc. No. 193-6 (Ex. 28) at

Washington000160.)  Plaintiff was eventually moved to a new cell, where Officer

Glassmaker removed the spit mask and flushed Plaintiff's face with water and Plaintiff

was taken to shower.

*February 23, 2018*

On February 23, 2018, Plaintiff removed a metal bar from the floor grate and a

brick from the wall of his cell.  (Peterson Dep. at 96-98.)  Plaintiff claims that the brick

and the metal bar were already loose, and that he removed the bar because it was one of

several bars of a grate that covered a drain in the floor that he was to use as a toilet.  (*Id.*)

Defendants submit that Defendant Officer Vincent Scheele ("Officer Scheele") saw

Plaintiff slip something into his beltline, and asked Plaintiff to bring it to him.  (Doc.

No, 163-18 (Ex. 34).)  Plaintiff refused and instead began to pull a brick out of the wall.

11

(*Id*.)  After Officer Scheele asked Plaintiff to stop, Plaintiff refused, and Officer Scheele used a chemical agent.  (*Id*. at Washington000144.)  Plaintiff gave up the brick but refused to turn over the piece of metal and told Officer Scheele that he would have to come and get it from him and began to hit the glass window on his cell door.  (*Id*.)  Officer Scheele ran to the ERT room to get a can of a stronger chemical agent (MK-9S), returned and asked Plaintiff to slide the metal under the door.  (*Id*.)  When Plaintiff refused, Officer Scheele sprayed the chemical agent under the door.  (*Id*.)  Plaintiff then turned over the metal piece, was handcuffed, searched and taken to the shower. ( *Id*.)  This incident was captured on video.  (Doc. No. 166.)  Defendant Sergeant David Frantsi ("Sergeant Frantsi") was present and testified that Plaintiff was given numerous opportunities to surrender the metal bar, but refused, and when he remained noncompliant, Sergeant Frantsi approved the use of the chemical spray.  (Doc. No. 163-16 ("Frantsi Dep.") at 162-65.)

*February 25, 2018*

On this occasion, Officer Cahill observed Plaintiff with pills in his cell and putting what appeared to be pills in his mouth.  (Doc. No. 193-6 at Washington000132-33.)  Jail staff decided that they would search his cell.  (*Id*.)  Officer Cahill and Defendant Sergeant Brandon Olson ("Sergeant Olson") approached Plaintiff's cell at 3:15 a.m. and asked Plaintiff if he would "cuff up," but they assert that they were met with non-response or non-compliance.  (*Id*.; Doc. No. 166-7 (video).)  Plaintiff told the officers "I'm sleeping." Officer Cahill then sprayed a burst of a chemical agent inside Plaintiff's cell.  (*Id*.)  The officers contend that Plaintiff reached under his mattress and then lifted his hand to his

12

face and grabbed some "white objects" and put them in the toilet.  (*Id*.)  Plaintiff then allowed himself to be cuffed and removed from his cell.  (*Id*.)

*March 24, 2018*

On March 24, Plaintiff was kicking, angry, yelling, attempting to rip his mattress, and generally causing a disturbance.  (Doc. No. 193-13 (Ex. 37) at Washington000263.) Sergeant Olson sprayed a burst of chemical spray (MK-9S) through the tray pass opening.  (*Id.* at Washington000224-228.)  Officer Cahill indicated that Plaintiff was continuing to cause a disturbance and had partially covered his cell window with toilet paper.  (*Id.* at Washington000224-228, 263.)  Officers also noticed what appeared to be a sharpened toothbrush and that the cell floor was wet.  (*Id*. at Washington0000226.) Officer Cahill instructed Plaintiff to clear the window or force would be used.  (*Id*. at Washington0000224-228.)  Plaintiff partially removed what was covering the window. (Doc. No. 166.)  Plaintiff was instructed to pass items from his cell so that he could be removed and officers could check his cell.  Officer Cahill testified that Plaintiff initially did not comply with directives to pass items through the tray, but that Plaintiff began to slowly comply by passing one item before arguing about it again.  (Cahill Dep. at 197-98.)  Sergeant Olson repeatedly instructed Cahill to shoot Plaintiff with an FN-303.  (Cahill Dep. at 199-201; Video ("Shoot him. Shoot him.").)  Officer Cahill did not initially fire the FN-303 because he did not have a clear shot.  (Cahill Dep. at 199-201.)  Plaintiff continued to comply slowly while arguing about having to comply. (*Id*. at 200.)  Officer Cahill did not fire the FN-303 at this time because he felt that Plaintiff was complying, albeit slowly.  (*Id*. at 201.)  However, at some point, Officer

Cahill testified that Plaintiff sat down on his bunk and said, "F it, I'm done." (*Id*. at 202.) At this point, Officer Cahill shot Plaintiff with the FN-303 twice because he took it that Plaintiff was no longer complying. (*Id*. at 202-04; Ex. 37 at Washington 000277; Doc. No. 166.) The Officers removed Plaintiff's mattress and then Cahill fired two more shots at Plaintiff. (Cahill Dep. at 204.) Officer Cahill acknowledged that he did not consider Plaintiff to be an imminent threat to himself or others when he shot him. (Cahill Dep. at 202-05.)

*May 1, 2018*

On May 1, Plaintiff covered his camera in the middle of the night. (Doc. No. 193-16 (Ex. 42) at Washington000325.) Plaintiff responded "I'm sleeping" when asked to remove the covering. (*Id*.) Officer Cahill and Sergeant Olson were at Plaintiff's cell and either Officer Cahill or Sergeant Olson sprayed Plaintiff with a chemical agent. (Doc. No. 193-11 (Ex. 35) at Washington000819; Cahill Dep. at 213-14.) Officer Cahill acknowledged that he could see into his cell through his window and that he did not consider Plaintiff to be an imminent threat to himself or others. (Cahill Dep. at 213-14.)

*May 19, 2018*

On May 19, 2018, Plaintiff was displaying disruptive behavior for hours. (Doc. No. 193-16 (Ex. 42) at Washington000276; Doc. No. 166-18.) Plaintiff was warned to quiet down or lose his items. Plaintiff agreed but continued to make threatening comments. Sergeant Olson demanded Plaintiff's belongings. (*Id*.) Plaintiff passed his blanket and slowly began gathering other items. (*Id*.) Sergeant Olson sprayed MK-9S into Plaintiff's cell because Plaintiff was delaying. (*Id*.; Doc. No. 166-18.) Plaintiff

claims that he was refused decontamination, but Defendants claim it was Plaintiff who failed to comply.  (Ex. 42 at Washington000276.)

In addition to the incidents above of alleged uses of excessive force, Plaintiff highlights numerous interactions where Defendants either used force or threatened force against Plaintiff.[9]  For example, during incidents occurring on February 21, March 3, April 1, April 7, May 3, and May 14, Plaintiff alleges that officers threatened him with chemical spray or TASERs when he was either experiencing an obviously manic episode or while he was being compliant.  In addition, during incidents occurring on April 9, 15, 17, 18, 22, 29 and May 18, Plaintiff alleges that Officers used force, threats of force, or both when Plaintiff was experiencing obvious manic episodes.

Plaintiff filed a hand-written *pro se* complaint on September 11, 2018, challenging the conditions of his confinement.  (Doc. No. 1.)  At the time, Plaintiff was civilly committed at St. Peter Regional Treatment Center.  Plaintiff filed an amended *pro se* complaint on November 1, 2018.  (Doc. No. 5.)  Plaintiff obtained counsel on November 26, 2019 and filed a second amended complaint shortly thereafter (Doc. No. 54 ("SAC")).  The SAC asserts claims for unconstitutional conditions of Plaintiff's confinement, excessive force, failure to intervene, deliberate indifference to serious

---

[9]    In his opposition, Plaintiff discusses the above incidents as uses of excessive force. With respect to Plaintiff's claims for failure to intervene, Plaintiff includes a chart that documents additional uses of force and instances where force was threatened.  These instances, however, were not submitted in opposition to Defendants' motion on Plaintiff's excessive force claims, and therefore are not considered in the analysis of those claims.

medical needs, denial of his right to counsel and access to the courts, *Monell* liability, violations of Americans with Disabilities Act and Rehabilitation Act, battery, unauthorized use of force, negligence, intentional infliction of emotional distress, and a claim under § 1988 for attorney fees.

Plaintiff moves for partial summary judgment, asking the Court to find as a matter of law that Plaintiff suffered from a serious medical need, and that Commander Heinen, Nurse Dresel, Doctor Adams, Doctor Jensen, and Nurse Kaphing were final policymakers with respect to the particular areas over which they held the final authority for purposes of Washington County municipal liability. Defendants move to dismiss Counts I-VI and for summary judgment on all claims.

## DISCUSSION

### I.   Motion to Dismiss

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.[10]

A.     **Counts I through IV**

Defendants argue that Counts I through IV must be dismissed because Plaintiff has no meritorious claim for a deprivation of rights under the Fourteenth Amendment. Defendants submit that Plaintiffs' claims of unconstitutional punishment and excessive force, failure to intervene, deliberate indifference, and *Monell* claim, must be dismissed because they are asserted solely under the Fourteenth Amendment.

Defendants argue that Plaintiff was a convicted prisoner (not a pre-trial detainee) from the moment he arrived at the Jail, based on his guilty plea on charges for which he

---

[10]     Plaintiff argues that Defendants' motion to dismiss is untimely and improper given that Defendants waited over 18 months to bring the motion. Plaintiff maintains that Defendants had ample notice of his claims and asks the Court to consider these claims as part of the motion for summary judgment, particularly in light of the fact that extensive materials outside of the pleadings are in the record. The Court will indicate in this Order which claims it finds are more appropriately considered on summary judgment.

was sentenced on November 8, 2017.  Further, Defendants argue that excessive force and deliberate indifference claims brought by convicted prisoners are grounded in the Eighth Amendment, *see Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000), and that Plaintiff did not plead under the Eighth Amendment.

Plaintiff argues that Defendants misleadingly claim that he has not asserted claims under the Eighth Amendment and maintain that this argument is belied by the pleadings, discovery, the parties' litigation conduct, and the law.  Plaintiff points out that it is via the Fourteenth Amendment that he asserts various claims under the Fifth, Sixth, and Eighth Amendments, because it is the Fourteenth Amendment's due process clause that incorporates those protections and renders them applicable to the States.  *See, e.g.*, *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019); *East v. Lemons*, 768 F.2d 1000, 1001 (8th Cir. 1985).  Plaintiff submits that while the Fourteenth Amendment appears in the heading of the various claims in the SAC, the allegations in the Complaint invoke other applicable amendments.  Plaintiff also argues that his claims have uniformly focused on Defendants' unconstitutional actions and inactions and the conditions of his confinement during his 2018 detention at the Jail, and that he invokes various constitutional provisions that are applicable to Defendants through the Fourteenth Amendment.  Plaintiff maintains that Defendants were well aware of the nature and scope of his claims.

The Court agrees that Plaintiff has sufficiently pleaded the nature and scope of his claims under the Eighth Amendment.  Therefore, Defendants' motion as to these claims is denied.

**B.      Denial of Counsel and Access to Courts**

In Count V, Plaintiff alleges the denial of right to counsel and access to the courts against Officer Glassmaker, Commander Heinen, and Doe Defendants.  In Count VI, Plaintiff alleges a *Monell* claim against Washington County for the same.  In support, Plaintiff alleges that on two occasions, Plaintiff requested to make a phone call to his attorney and was denied, and separately that Commander Heinen implemented a "care plan" and policies that specifically restricted Plaintiff from making outgoing calls to his attorney.  Plaintiff asserts that these restrictions amounted to a violation of Plaintiff's Sixth Amendment right to counsel and his Fourteenth Amendment right of access to courts.  Defendants move to dismiss these claims for lack of standing and because the vagueness of the allegations do not constitute fair notice of the claims' contours.  The Court agrees that these claims are properly dismissed.

To plead the denial of counsel and access to courts, Plaintiff's allegations "must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).  A claim is "meritless" when a plaintiff fails to allege how he was prejudiced by the alleged acts. *Smith v. Boyd*, 945 F.2d 1041, 1043 (8th Cir. 1991).  Here, Plaintiff vaguely alleges that he was prevented from adequately challenging the fact and condition of his confinement in a reasonably timely manner.  However, the

vague reference to the two phone calls is insufficient.  The Court finds that Counts V and VI are properly dismissed.[11]

C.      **Claims against Washington County**

In Count IV, Plaintiff alleges Washington County is liable under *Monell* for the unconstitutional policies and customs at the Jail for, among other things, being deliberately indifferent to inmates' serious medical needs and of having a policy or custom of failing to provide timely mental-health and other medical screening or assessment and placing inmates.  Plaintiff alleges that, at all relevant times, Commander Heinen was a final policymaker in his capacity as the Administrator of the Jail and that his policies resulted in unconstitutional punishment of Plaintiff and deliberate disregard for his medical needs, plus deprivation of Plaintiff's rights and privileges.

Defendants argue that this claim must be dismissed because it cannot be maintained without a successful Fourteenth Amendment claim.  Indeed, a "municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs of City of New York*, 436 U.S. 658, 691 (1978).  And in general, for municipal liability to attach, there must be individual liability on an underlying claim.  *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005).  Defendants argue that Plaintiff's constitutional claims are all premised on inapplicable

---

[11]     The Court dismisses these claims with prejudice because Plaintiff has had adequate time to bolster the allegations of this claim.

and unsuccessful Fourteenth Amendment allegations.  The Court disagrees.  As explained

in Section I.A. above, the Court finds that Plaintiff has sufficiently pleaded claims under

the Eighth Amendment.  In addition, the viability of Plaintiff's *Monell* claim rests, at

least in part, on whether any of Plaintiff's constitutional claims survive summary

judgment, discussed below.

### D.     Failure to Intervene

In Count II, Plaintiff alleges that nineteen individual Defendants failed to

intervene.  Defendants argue that this claim fails because it requires a meritorious

underlying excessive force claim to survive.  As discussed more fully below, fact issues

remain with respect to certain instances of alleged uses of excessive force.  Therefore, the

Court denies Defendants' motion to dismiss Plaintiff's failure to intervene claims with

respect to any excessive force claims that remain in the case.

### E.     Disability Claims (Counts VII and VIII)

In Counts VII and VIII, Plaintiff assert violations of the Americans With

Disability Act, 42 U.S.C. § 12132 *et seq*. ("ADA"), and Rehabilitation Act of 1973,

29 U.S.C. § 701 *et seq.* ("Rehabilitation Act").  Plaintiff alleges that Washington County

denied "medication, services, programs, [and] activities" due to Plaintiff's disability.

(SAC ¶¶ 486-491.)  Defendants argue that these claims are properly dismissed because

they are based solely on medical treatment decisions.

The Court holds that Plaintiff's disability claims are properly dismissed.  First, to

the extent that these claims are based on medical treatment decisions, they are not

properly asserted as the basis of an ADA or Rehabilitation Act claim.  *See Burger v.*

*Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005).  Second, to the extent that these claims are based on Washington County's alleged denial of services, programs, or activities, Plaintiff has failed to specify a particular program or benefit to which he was denied meaningful access based on disability.  *See Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 888 (8th Cir. 2009).  Accordingly, the Court holds that Counts VII and VIII are properly dismissed.  Moreover, because Plaintiff has had ample opportunity to plead these claims and has not done so, the claims are dismissed with prejudice.

### F.     PLRA

Defendants argue that Plaintiff's Federal claims are subject to dismissal under the Prison Litigation Reform Act, 42 U.S.C. § 1997 *et seq*. ("PLRA") because Plaintiff failed to exhaust the required administrative remedies.  Plaintiff responds by arguing that the Defendants failed to properly plead exhaustion, the PLRA's exhaustion requirement does not apply to his claims because he was not a prisoner when he filed suit, and alternatively, that there is a factual dispute over whether the administrative remedies were available for Plaintiff.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

As an initial matter, the Court notes Plaintiff was under no obligation to plead exhaustion, as it is not an element of his claims.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA,

22

and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."); *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005).  The failure to exhaust administrative remedies is an affirmative defense.  *See Jones v. Bock*, 549 U.S. at 216.  Defendants, however, did not plead the failure to exhaust administrative remedies as an affirmative defense.  Because Defendants failed to properly plead exhaustion, they waived that defense and cannot raise it now.  Thus, Plaintiff's claims are not barred by the PLRA.

In addition, the PLRA exhaustion requirement applies only to individuals who are incarcerated or detained.  It "does not apply to plaintiffs who file § 1983 claims *after* being released from incarceration."  *Nerness v. Johnson*, 401 F.3d at 876 (emphasis added) ("[Plaintiff] was not subject to the PLRA's exhaustion requirement because he was not a prisoner or otherwise incarcerated when he filed his complaint.").  In *Jefferson v. Roy*, Civ. No. 16-3137, 2019 WL 4013960, at *2-3 (D. Minn. Aug. 26, 2019), the court considered the question of whether the PLRA's exhaustion requirement applied to the claims of an individual who was on parole when he filed the operative amended complaint, but who filed the original complaint while incarcerated.  Observing that this issue had not been addressed by the Eighth Circuit, the court found that the majority of circuits that have addressed the issue have concluded that the relevant time when determining the applicability of the PLRA was the date the lawsuit was filed.  *Id.* at *2.  In *Jefferson v. Roy*, the court held that the PLRA applied to the plaintiff's lawsuit, who was undisputedly incarcerated when he commenced the lawsuit.  *Id.* at *3.  That situation, however, is not present in this case.

Plaintiff filed suit on September 11, 2018.  (Doc. No. 1.)  At the time, he was no longer detained at the Jail.  Instead, he was at St. Peter Regional Treatment Center after being civilly committed in May 2018.  Defendants argue that because Plaintiff was civilly committed per a pending state criminal action, he is still properly considered a prisoner under the PLRA.  Plaintiff, however, argues that as a civilly committed plaintiff, he was not a prisoner under the PLRA.  The Court finds that the weight of authority supports the conclusion that Plaintiff was not a prisoner under the PLRA when he filed suit, as he was civilly committed at that time.  *See, e.g.*, *See Perkins v. Hedricks*, 340 F.3d 582, 583 (8th Cir. 2003) (holding that the exhaustion requirement does not apply to a civilly committed person); *Pendleton v. Sanders*, 565 F. App'x 584, 584 (8th Cir. 2014) (explaining that a civilly committed person is not a "prisoner" under the PLRA); *Ferch v. Jett*, Civ. No. 14-1961, 2015 WL 251766, at *1, 5 n.1 (D. Minn. Jan. 20, 2015) (finding that a person civilly committed after being found incompetent to stand trial was not a prisoner within the meaning of the PLRA); *Kolocotronis v. Morgan*, 247 F.3d 726, 728 (8th Cir. 2001) (holding the PLRA does not apply to an inmate held in a State hospital pursuant to a finding that he was not guilty for reason of insanity).  For this additional reason, the PLRA's exhaustion requirement does not apply to Plaintiff.

## II.     Summary Judgment

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank*

24

*of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**A.    Plaintiff's Motion for Partial Summary Judgment**

Plaintiff moves for partial summary judgment, seeking an order that, as a matter of law that:  (1) Plaintiff had a serious medical need; and (2) certain individuals were final policymakers for purposes of the attachment of municipal liability under.

**1.    Serious Medical Need**

Plaintiff argues that the Court should determine, as a matter of law, that he suffered from a serious medical need during the entirety of his incarceration in 2018.  This issue is relevant to Plaintiff's deliberate indifference claims.  In particular, to prevail on his deliberate indifference claims, Plaintiff must establish *both* that he suffered from a

medical need that was "objectively serious" *and* that an official was deliberately

indifferent to that need.  *See, e.g.*, *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009).

The subjective competent requires a plaintiff to show that the defendant actually knew of

*and* deliberately disregards this need.  *Id.*

Plaintiff argues that Defendants have admitted, and the record demonstrates, that

Plaintiff suffered and continues to suffer from a serious medical need.  In support,

Plaintiff points to the report of Defendants' expert Steven Helfand, wherein Helfand

stated: "It is not disputed that [Plaintiff] suffered from a Serious Mental Illness (SMI)

prior to his arrest and throughout his admission to the Washington County Jail beginning

on February 4, 2018."  (Helfand Expert Report at 30; Doc. No. 177 (Ex. 16) ("Helfland

Dep.") at 123-124 (including prominent diagnosis of Bipolar I Disorder).).  Plaintiff also

points to record evidence that Plaintiff has been diagnosed by multiple physicians with a

SMI (and in particular, Bipolar Disorder) and was prescribed mental-health medication,

as well as extensive medical records showing Plaintiff's history of Bipolar Disorder,

related hospitalizations, and civil commitments.  Indeed, Plaintiff underscores that a

court-appointed psychologist diagnosed Plaintiff with "Unspecified Bipolar Disorder"

and that upon Plaintiff's release from Jail, Dr. Kruse diagnosed Plaintiff with Bipolar I

Disorder with manic features.  (Kruse Decl. ¶ 14.)  Dr. Kruse noted that Plaintiff's manic

presentation was severe and obvious.  (*Id*. ¶ 16.)  Finally, Plaintiff argues that the

evidence in the record, such as his mental state upon entry into the Jail and his

deteriorating and erratic behavior (relentless yelling, pounding, and kicking, throwing

feces, sleepless rants, etc.) demonstrate that his mental illness was so obvious that even a layperson would see the need for medical attention.

Defendants, on the other hand, argue that when viewing the record in the light most favorable to them, there is a question of fact whether Plaintiff's condition at the time of his booking and incarceration had any diagnosis or obvious signs distinct from behavioral issues. Defendants point out that Plaintiff did not enter the Jail with medications and disputes the point in time at which his behaviors may have become clear symptoms of mental illness. In addition, Defendants point to evidence that while jail officers observed Plaintiff's disruptive behavior, numerous staff testified that they did not know Plaintiff's mental-health status. Finally, Defendants stress that the resolution of Plaintiff's deliberate indifference claims does not turn on the issue of serious medical need, but rather on whether individual Defendants were aware of, and were deliberately indifferent to, such a need.

The Court finds that, viewing the record in the light most favorable to Defendants, the evidence supports a finding that Plaintiff suffered from a serious medical need. In making this finding, the Court emphasizes that Plaintiff moves for summary judgment *only* on the first element of a deliberate indifference claim and this ruling is so limited. The Court finds, as to this single element, that there is no genuine issue of fact and Plaintiff is entitled to summary judgment on the limited finding that Plaintiff suffered from a serious medical need while in Jail. The Court makes no finding as to the remaining issues relevant to a deliberate indifference claim, namely the issues of knowledge and indifference. Those issues will be determined at trial.

27

### 2.    Policy Makers

Plaintiff also asks the Court to find, as a matter of law, that several individuals were final policymakers for purposes of municipal liability under 42 U.S.C. § 1983.  This issue is relevant to the issue of *Monell* liability.  "[A] municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for his conduct under the policy or custom."  *Webb v. City of Maplewood*, 889 F.3d 483, 486 (8th Cir. 2018).  This is because "an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  Not every decision by a municipal officer subjects the municipality to § 1983 liability.  Instead, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

As a general matter, Defendants urge the Court to be cautious in evaluating Plaintiff's request for a broad determination on final policymaking authority that could support *Monell* liability.  In particular, Defendants argue that while an unconstitutional government policy could be inferred from a single decision taken by a policymaker, municipal liability will only attach to the decision of a policymaker when a specific unconstitutional act is caused by the policymaker—specifically, there still must be an unconstitutional act.  In addition, Defendants underscore the distinction—recognized by

28

the Supreme Court—between final policymaking authority and final decision-making authority.  *See Pembaur*, 475 U.S. at 481-82 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.").[12] Defendants contend that the conduct of these individuals falls into the category of discretionary decision-making.

The Court has considered the parties arguments and declines, at this stage in the litigation, to deem the alleged officials (Commander Heinen, Nurses Dresel and Kaphing, and Doctors Mike Adams and Joel Jensen) to be final policymakers.  There has been no clear showing that the contested actions of these individuals are related to policymaking authority.  It appears that much of their conduct could reasonably fall into the category of discretionary decisions.  At trial, the Court will determine whether any of these individuals have policymaking authority, and if so, whether the actions to which Plaintiff objects relate to that authority.  Accordingly, this portion of Plaintiff's motion for summary judgment is denied.

---

[12]     Defendants argue that the provision of medical care by a provider is an example of where an individual's discretion regarding treatment may not give rise to municipal liability.  *See, e.g.*, *Washington v. Esch*, Civ. No. 17-6, 2017 WL 2312877, at *1 (D. Neb. May 24, 2017) ("Even assuming [the Defendant doctor] has discretionary authority regarding individual treatment plans, this does not make the County liable for her actions."); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 934-935 (N.D. Ill. 2014) (noting that plaintiff failed to provide evidence that the County intended to delegate policymaking authority to a jail nurse beyond her discretion to make day-to-day decisions regarding medical care).

### B.      Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the basis of qualified immunity.  The doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

To overcome the defense of qualified immunity, a plaintiff must show that:  (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of deprivation.  *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted).  The Court has discretion to decide which qualified immunity prong to consider first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In determining whether the constitutional right was clearly established at the time of the conduct, the Court must ask whether the contours of the applicable law were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violated that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (citation omitted).

### 1.      Plaintiff's Status

As an initial matter, the parties contest whether Plaintiff was a convicted prisoner or a pretrial detainee during his incarceration.  Plaintiff maintains that he properly pleaded Eighth and Fourteenth Amendment violations because he was a pretrial detainee

(at a minimum through the date of his contempt conviction in early March), but that he did not limit his constitutional claims to pretrial detainee status.  Defendants, however, submit that Plaintiff was a convicted prisoner at all times.  The distinction matters because constitutional protections vary depending on a detainee's status.  The Fourteenth Amendment prohibits all "punishment" of a pretrial detainee, while the Eighth Amendment prohibits "cruel and unusual punishment." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989) (citation omitted).

On November 8, 2017, Plaintiff pleaded guilty to disorderly conduct charges and was sentenced to 90 days in jail with 60 days suspended and a year of probation with conditions.  (Kelly Decl. ¶ 26, Ex. 25.)  On February 1, 2018, a warrant for a probation violation on that conviction was issued in Pine County.  (*Id.* ¶ 5, Ex. 4.)  That warrant was active, and noted by the Jail, when Plaintiff was booked on February 4, 2018 on a separate warrant.  On March 30, 2018, the warrant for the probation violation was quashed when Pine County accepted Plaintiff's time in the Jail as satisfaction of his sentence and he was discharged from probation.  Plaintiff argues that because he was detained on the unadjudicated aiding-and-abetting theft charge in addition to the Pine County Warrant, which Plaintiff claims was unadjudicated as well, he was a pretrial detainee.

After careful review of the record, the Court concludes that when Plaintiff arrived at the Jail, he was still serving the sentence of his November 2017 conviction and, having violated his probation in that case, had an active warrant pending.  Therefore, it is likely that he was a convicted prisoner. *See, e.g.*, *Myers v. Anoka Cty. Sheriff*, Civ. No. 09-528,

against him are properly dismissed.  However, Plaintiff has pointed to record evidence showing that Warneke was generally familiar with Plaintiff and that the Jail's medical staff was trying to manage his behavior, that Warneke participated in weekly meetings during which Plaintiff was discussed, and that Warneke reviewed use of force reports at the Jail (Warneke Dep. at 147, 163-66).  This evidence suffices to show Warneke's personal involvement.

In addition, Plaintiff appears to admit that he has no claim against Defendant Officer Dan Rein ("Officer Rein") and does not offer support for claims against him in his briefs.  (Peterson Dep. at 164-69.)  Nor does there appear to be facts supporting individual claims against Defendant Officer Garrett Kleinendorst ("Officer Kleinendorst").  Therefore, claims against Officers Rein and Kleinendorst are dismissed. Similarly, the record contains no facts connecting Officer John Roberto to the relevant incidents in this case.  Instead, it appears that Peterson was unhappy with Officer Roberto due to a 2016 incident (Peterson Dep. at 161-62) and that on one occasion in 2018, he noted that Plaintiff was "way too manic and volatile to distribute meds" (Doc. No. 193-14 at Washington0002).  This evidence is not enough to tie him to the allegations in the present case.  Therefore, claims against Officer Roberto are properly dismissed.

Defendants also move to dismiss claims against Kaphing on the grounds that Peterson did not know who she was.  (Peterson Dep. at 158.)  However, the record demonstrates that her actions are implicated in Plaintiff's claims.  Therefore, the Court declines to dismiss Kaphing as a defendant for lack of personal involvement.

Finally, Defendant argues that Plaintiff sued Officer De La Rosa, Officer Dyck, Sergeant Frantsi, Officer Glassmaker, and Officer Scheele for simply working at the jail. However, Plaintiff has pointed to evidence that these individuals were involved in certain incidents that are part of Plaintiff's claims and their role will be evaluated accordingly below.

### 3.      Excessive Force

Claims for excessive force brought by prisoners are analyzed under the Eighth Amendment. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). The Eighth Amendment protects inmates from unnecessary and wanton infliction of pain by correctional officers. *Johnson v. Hamilton*, 452 F.3d 967, 972 (8th Cir. 2006). The Court must determine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). In so determining, the Court considers the following factors: whether a particular use of force was reasonable and whether there was an objective need for force; the relationship between any such need and the force used; the threat reasonably perceived by the correctional officers; and any efforts by the officers to temper the severity of the force used; and the extent of the inmate's injuries. *See, e.g.*, *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (citing *Hudson*, 503 U.S. at 7), *called into question on other grounds by Pearson*, 555 U.S. at 236. In addition, the use of force must continuously be re-evaluated, and even if force is justified at one point, it may not be justified at a later time, even if only a few minutes later. *See Smith v. Conway Cnty. Ark.*, 759 F.3d at 860-62.

It is "well established" that a malicious and sadistic use of force by a prison official against a prisoner, done with the intent to cause injury, is enough to establish a violation of the Eighth Amendment's cruel and unusual punishment clause. *See Foulk v. Charrier*, 262 F.3d 687, 702 (8th Cir. 2001). And while force may be justified to make an inmate comply with a lawful prison regulation or order, such use is only justified if the inmate's noncompliance also poses a threat to other persons or prison security. *See Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993) (explaining that summary force has not been ratified as method of discipline where security concerns are not immediately implicated; finding the use of a stun gun to enforce an order to sweep a cell violated inmate's Eighth Amendment rights); *Smith v. Conway Cnty.*, 759 F.3d at 859-61 (finding that it was clearly established that the use of a taser on a nonviolent, but non-compliant inmate violated the inmates constitutional rights). It is also clearly established that correctional officers "do not have a blank check to use force whenever a prisoner is being difficult" and the "use of pepper spray will not be justified every time an inmate questions orders or seeks redress for an officer's actions." *See Treats*, 308 F.3d at 875 (*citing Hickey,* 12 F.3d at 759).

The following Jail policy provisions are relevant to Plaintiff's claims. First, regarding the use of restraint devices, Jail policy provides: "Restraint devices, such as restraint chairs, shall only be used on an inmate when it reasonably appears necessary to overcome resistance, prevent escape or bring an incident under control, thereby preventing injury to the inmate or others, or eliminating the possibility of property damage." (Doc. No. 107-11 (Ex. 32) at Washington007614.) Jail policy also provides

35

that chemical spray "should not be used . . . on any inmate who is under control with or without restraints."  (Doc. No. 193-4 (Ex. 25) at Washington007603.)

Plaintiff asserts that the following incidents involved uses of excessive force.

*February 19, 2018*

Plaintiff argues that Sergeant Klinkner and Officers Dyck, Cahill, Glassmaker, and De La Rosa used excessive force against Plaintiff.  In support, Plaintiff focuses on the use of a restraint chair despite the fact that he was not a threat to himself or others, was complying with their orders, and indicated that his hand was broken.  In addition, Plaintiff claims that the use of chemical spray on Plaintiff after he was fully restrained was excessive.

The record shows that three hours had passed since the time Plaintiff broke the sprinkler and by the time Plaintiff was removed from his cell, he crawled out on his own with his hands stretched out wide.  The officers patted Plaintiff down and determined that he was unarmed before he was placed and secured in the restraint chair.  Despite his compliance, and the determination that he was not armed, the officers continued to use force which, in turn, aggravated Plaintiff who angrily reminded the officers that his hand was broken.  Plaintiff began to threaten, curse, and spit at the officers.  Sergeant Klinkner then used chemical spray without warning on Plaintiff who was fully restrained in the chair.

The Court concludes that, viewing this evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude that there was no objective need for the degree of force used, that the officers could not reasonably have perceived a threat to

themselves or security, and that the officers failed to temper their uses of force, particularly in using the restraint chair and chemical spray after Plaintiff was restrained. In addition, it would be reasonable to conclude that the force was used maliciously and not in a good-faith effort to maintain or restore discipline.

Defendants point out that officers poured water over Plaintiff's face and took him to the shower after the use of chemical spray. While these actions could show that an officer lacked malice, it could also show perfunctory compliance with prison regulations or it could signal that the use of the chemical spray was an overreaction. *See Treats*, 308 F.3d at 874 (citation omitted). These are issues for trial. It remains to be seen if Plaintiff will prevail on this claim at trial. But for now, viewing this evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude that the use of force on February 19, 2018, including the use of the restraint chair and chemical spray while he was restrained in the chair, was excessive.

*February 23, 2018*

On February 23, 2018, Plaintiff removed a metal bar from the floor grate and a brick from the wall of his cell. Officer Scheele asserts that he saw Plaintiff slip something into his beltline. Officer Scheele asked Plaintiff to bring the piece of metal, but Plaintiff initially refused and, instead, pulled a loose brick out of his wall. Officer Scheele asked Plaintiff to stop and when Plaintiff refused, Officer Scheele used a chemical agent. Plaintiff gave up the brick but refused to turn over the piece of metal and told Office Scheele that he would have to come and get it from him and began to hit the glass window on his cell door. Officer Scheele asked Plaintiff to slide the metal under

the door, but Plaintiff refused, and Officer Scheele sprayed a chemical agent into Plaintiff's cell. Plaintiff turned over the metal piece, was handcuffed, searched, and taken to the shower.

The record demonstrates that Plaintiff was in possession of two objects and was damaging property. However, the record is not clear whether the officers actually deemed the object to be dangerous to Plaintiff or considered Plaintiff a danger to himself or others at that point in time. In addition, at one point Plaintiff did comply by handing over the brick. While Plaintiff may have continued to resist or stall in handing over the piece of metal, it is not clear that he was refusing or just complying slowly. Based on these facts, which must be viewed in the light most favorable to Plaintiff, there remains an issue of fact as to whether the chemical spray was used in a good-faith effort to maintain or restore discipline or if it was used maliciously against an inmate they considered difficult.

*February 25, 2018*

In the early morning on February 25, 2018, Jail staff decided to search Plaintiff's cell after Officer Cahill observed Plaintiff with pills. Officers Cahill and Sergeant Olson approached Plaintiff's cell and asked Plaintiff if he would "cuff up," but that Plaintiff did not respond. Officer Cahill then used a burst of chemical spray inside Plaintiff's cell. The officers contend that Plaintiff reached under his mattress and then lifted his hand to his face and grabbed some "white objects" and put them in the toilet, before allowing himself to be cuffed and removed from his cell.

The Court again concludes that fact issues remain as to whether the use of chemical spray was excessive.  Viewing the facts in the light most favorable to Plaintiff, there remains an issue of fact as to whether the chemical spray was used in a good-faith effort to maintain or restore discipline or if it was used maliciously against an inmate they considered difficult.

*March 24, 2018, May 1, 2018, May 19, 2018*

These incidents involve interactions where Plaintiff was either being disruptive in his cell or not complying fully with officers' demands.  For example, on March 24, Plaintiff was sprayed with chemicals and was slowly complying with demands to pass items from his cell but continued to argue with the officers.  On May 1, Plaintiff was asked to remove something covering his camera, but he responded "I'm sleeping."  And on May 19, Plaintiff was disruptive and slowly complied with directions to pass items out of his cell.  In each incident, officers used chemical spray.  In addition, during the incident on March 24, 2018, officers escalated the level of force and shot Plaintiff with an FN-303.  Officers involved acknowledged that Plaintiff was not believed to be an imminent threat to himself or others during these encounters, and yet they used chemical spray and the FN-303 while he was in his cell.  Because fact issues remain in each of these incidents regarding whether Plaintiff was complying—albeit slowly—and whether the officers used the chemical spray or the FN-303 out of malice or frustration and not because Plaintiff was a threat, summary judgment is denied.

####         4.         Failure to Intervene

Plaintiff argues that Defendants present on the scene during the above incidents failed to intervene to prevent the use of excessive force.  For liability for failure to intervene to attach, Plaintiff must show that:  (1) an officer observed or had reason to know that excessive force would be or was being used; and (2) that officer had both the opportunity and the means to prevent the harm from happening."  *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009).  Plaintiff submits that officers present during the incidents of alleged uses of excessive force discussed above, had the means and the opportunity to prevent the harm from occurring.  Plaintiff argues that there is at least a genuine issue of fact that each of the Defendants present saw the use of chemical spray or were able to anticipate force would be used, and that they had the means to prevent the force because they were physically present and possessed agency to intervene.  Plaintiff points out that Jail policy requires that they do so.  (Doc. No. 193-4 (Ex. 25) at Washington 007603) ("Any correctional officer present and observing another staff member using force that is clearly not within this policy is expected, when reasonable to do so, to intercede to prevent the use of such force.")

The Court finds that fact issues remain as to whether officers present during the alleged incidents of excessive force failed to intervene.  These incidents are those that occurred in 2018 on February 19, February 23, February 25, March 24, May 1, and May 19.  Therefore, Plaintiff's failure to intervene claims as to those incidents will be considered at trial.

5.     **Deliberate Indifference to Serious Medical Needs**[14]

It is well-established that the Eighth Amendment's prohibition on cruel and

unusual punishment protects prisoners from deliberate indifference to serious medical

needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Smith v. Jenkins*, 919 F.2d 90, 93 (1990).

"The principle extends to an inmate's mental-health-care needs." *Smith v. Jenkins*,

919 F.2d at 93. Deliberate indifference requires two evidentiary showings—one

objective and one subjective. *See, e.g.*, *Vaughn v. Gray*, 557 F.3d at 908. The objective

component requires a plaintiff to demonstrate that he had an objectively serious medical

need. *Id*. As discussed earlier, the Court finds that Plaintiff has made such a showing.

The Court therefore turns to the subjective component of the deliberate indifference

inquiry.

The subjective competent requires a plaintiff to show that the defendant actually

knew of, but disregarded, the plaintiff's serious medical need. *Id*. Deliberate

indifference is more than negligence but does not require a plaintiff to show a jail official

"purposefully cause[ed] or knowingly [brought] about a substantial risk of serious harm."

*Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011). Deliberate indifference may exist

through denial of, interference with, or delay in healthcare. *Estelle v. Gamble*,

---

[14]     Plaintiff names 29 individuals (19 named and 10 unnamed) in his deliberate
indifference claim. However, in his opposition to Defendants' motion for summary
judgment, Plaintiff only discusses the claims against Commander Heinen, Warneke,
Sergeant Olson, Sergeant Klinkner, Officer Capra, Sergeant Frantsi, Officer Cahill,
Officer Glassmaker, Nurse Leibel, Nurse Kaphing, and Officer Roberto. Therefore,
Plaintiff's claims for deliberate indifference are limited to those Defendants. In addition,
as discussed above, claims against Officer Roberto are dismissed.

429 U.S. at 104-05.  And while isolated negligence or malpractice is insufficient, "a

consistent pattern of reckless or negligent conduct is sufficient to establish deliberate

indifference to serious medical needs." *DeGidio v. Pung*, 920 F.2d 525, 533 (8th Cir.

1990).  In addition, actual knowledge may be demonstrated through "inferences based on

the obviousness of the risk." *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000).  Such

an inference may be reasonably drawn when an inmate displays serious symptoms, *see*

*Thompson v. King*, 730 F.3d 742, 749 (8th Cir. 2013), or via access to records, *see*

*Wise v. Lappin*, 674 F.3d 939, 941 (8th Cir. 2013).

Plaintiff has pointed to record evidence showing that he reported his SMI to Jail

staff and that his SMI was documented in correctional records. (Heinen Dep. at 104-05;

Kaphing Dep. at 33-35.)  Plaintiff asserts that Defendants had access to these records.  In

addition, the record is replete with examples of Plaintiff displaying symptomatic

presentations of Manic Behavior:  pounding on his cell doors (to the point of injuring

himself); other self-harm; screaming irrationally; abnormal speech patterns; irrational

and/or risk-taking behavior.  (Steward Report ¶¶ 2.2-2.4, 2.8.)[15]  Plaintiff asserts that Jail

policies demonstrate the risks of harm to the mentally ill at the Jail, and that Defendants

were aware that inmates with SMI were at risk of harm from increased discipline due to

difficulties complying with rules and the worsening of symptoms.  Plaintiff maintains

---

[15]     Plaintiff refers to "Manic Behavior" as being consistent with Bipolar Disorder
related mania, as explained by Plaintiff's expert Dr. Stewart.

that Defendants responded to his mental health conditions with "undue delay" which then caused a "snowball effect" of mental decompensation.

Plaintiff points to evidence that Commander Heinen was aware of Plaintiff's SMI via direct knowledge, access to Plaintiff's medical files, and direct observation. Despite this knowledge, Plaintiff argues that Commander Heinen did not consult medical or mental-health providers and failed to elevate Plaintiff's level of care, even after he was aware that there was nothing more that Jail medical staff could do for Plaintiff. In addition, the record contains evidence that Commander Heinen created "care plans" without consulting with a QMHP, and that these plans failed to consider Plaintiff's deteriorating mental health. Plaintiff asserts that the care plans were punitive in nature, penalizing Plaintiff for conduct that was the result of his mental illness, and that the care plans—and resulting deprivations—exacerbated Plaintiff's condition.

Plaintiff points to evidence that Nurse Leibel knew of Plaintiff's SMI, noting on February 14, 2018 that Plaintiff's "chief complaint" was "mental health." (Doc. No. 191 (Ex. 10) at Washington04686.) In her assessment, Leibel noted, in part, the following:



(*Id*.)  Plaintiff argues that Leibel's charting indicates that Plaintiff suffered from obvious mania.  (Leibel Dep. at 235-39.)  In addition, on March 15, 2018, Leibel noted that she saw Plaintiff while in segregation, where he had been cutting himself and smearing blood in his cell, where she warned him to stop "these behaviors."  (Doc. No. 194-15 (Ex. 64) at Washington0670.)  Plaintiff points to evidence that Leibel knew that Plaintiff's mental health needs exceeded the Jail's resources, that Plaintiff was not medication compliant, and that Plaintiff was at risk of injuring himself.  Yet, Leibel did not report Plaintiff's self-injuries or other behavior to a QMHP and continued to treat Plaintiff's symptoms as behavioral.  (Leibel Dep. at 226, 234-35, 251; Doc. No. 191 (Ex. 10) at Washington4659; Doc. No. 194-15 (Ex. 64) at Washington0670.)  Further, Plaintiff points to evidence that after Plaintiff's medication was discontinued in March 2018, Leibel did not take action (Leibel Dep. at 185), and on April 26, Leibel opposed transferring Plaintiff to Regions Hospital despite evidence that Plaintiff of his mania and worsening condition.  (Leibel Dep. at 283.)

The record also contains evidence that Kaphing knew of Plaintiff's SMI, and in particular his mental-health risk without medication.  (Kaphing 197, 226, 252.)  Despite this, Plaintiff maintains that Kaphing was deliberately indifferent during Plaintiff's intake in February 2018 by failing to adequately screen Plaintiff, review his medical records, and to refer him to a QMHP.

Defendants argue that they were not deliberately indifferent.  First, Defendants argue that they were not subjectively aware of Plaintiff's mental health condition because they did not know that Plaintiff suffered from an SMI and his behaviors were not

44

necessarily clear symptoms of a mental illness.  Second, Defendants argue that no

individual Defendant deliberately disregarded Plaintiff's mental health condition.

Instead, Defendants submit that they responded reasonably to Plaintiff's condition by

arranging medical care, attempting to transfer Plaintiff to a treatment facility, and

inquiring into whether Plaintiff was in the process of civil commitment.  Defendants

submit that Plaintiff was prescribed medication in Jail.  (Dresel Dep. at 100-103,

110-111; Kelly Decl. ¶¶ 45, 46, Exs. 44-45.)  In addition, Defendants point out that on

April 26, 2018, Plaintiff was transferred to Regions Hospital for a health and welfare

hold.  (Kelly Decl. ¶ 17, Ex. 16.)  While at Regions, his medical diagnosis was not

changed and Plaintiff was sent back to Jail.

        After careful review of the record, the Court concludes that fact issues remain as

to whether Commander Heinen, Nurse Leibel, and Nurse Kaphing were deliberately

indifferent to Plaintiff's medical needs.  There is record evidence that could lead a

reasonable factfinder to conclude that these Defendants were aware of Plaintiff's SMI but

failed to take adequate steps to assure that Plaintiff received an adequate level of care.

Commander Heinen was also responsible for Plaintiff's care plans while in Jail, and fact

issues exist as to whether those plans adequately considered Plaintiff's SMI and whether

they are contrary to Jail policy, fell below national standards, or otherwise failed to meet

Plaintiff's needs.  In addition, evidence in the record shows that Leibel knew of

Plaintiff's mental illness, repeatedly judged his symptoms as behavioral, failed to

sufficiently engage a QMHP in Plaintiff's care despite his deteriorating condition, failed

to act when Plaintiff's medications were discontinued, and opposed transferring Plaintiff

to Regions Hospital.  Further, there is evidence that Leibel may not have fully disclosed information regarding his condition to those treating him at Regions.  Finally, there is evidence that Kaphing failed to adequately screen Plaintiff, review his medical records, and refer Plaintiff to a QMHP.

Viewing the record in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Commander Heinen, Leibel and Kaphing deliberately disregarded Plaintiff's SMI.  Therefore, the Court denies Defendants' motion for summary judgment on Plaintiff's deliberate indifference claims against Commander Heinen, Leibel, and Kaphing.

However, the Court finds that no reasonable factfinder could conclude that the remaining individual correctional officers who are named in this count were deliberately indifferent to Plaintiff's medical needs.  While in hindsight, the correctional officers might have done more in response to Plaintiff's SMI, their response does not rise to the level of an Eighth Amendment violation.  Even assuming that Plaintiff can show that each named correctional officer had a subjective awareness of his SMI, the record shows that the correctional officers themselves were neither involved in the decisions of what or how much medication to prescribe Plaintiff, nor the development of Plaintiff's care plan. Therefore, the Court grants summary judgment insofar as the deliberate indifference claim is asserted against Defendants other than Commander Heinen, Leibel, and Kaphing.

### 6.     Conditions of Confinement

The conditions under which an inmate is confined are subject to scrutiny under the Eighth Amendment using the deliberate indifference standard. *Helling v. McKinney*, 509 U.S. 25, 31 (1993).[16]  Prison officials must provide humane conditions of confinement and are required to ensure that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted).  The Constitution, however, does not mandate comfortable prisons. *Id*. (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).  To prevail on his conditions of confinement claim, Plaintiff must establish that:  (1) a deprivation of minimal civilized measure of life's necessities; and (2) deliberate indifference by prison officials to those basic needs. *Rhodes*, 452 U.S. at 347.  "[D]eliberate indifference includes something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk." *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2001).

Plaintiff argues that the conditions of his confinement at the Jail were unconstitutional.  Plaintiff underscores evidence that he was placed in segregation in often-windowless cells for days at a time and for over 100 days in total.  While in segregation, he was denied socialization, exercise, sanitation, or adequate bathroom

---

[16]     While closely related, Plaintiff treats his claims for deliberate indifference to medical needs and conditions of confinement as separate constitutional claims. (*See* Doc. No. 187 at 32-51.) The facts relevant to this claim overlap significantly with Plaintiff's claims for deliberate indifference to medical needs.  Thus, evidence regarding individual officer's restriction of privileges and uses of discipline will all be relevant to Plaintiff's conditions of confinement claim.

facilities—sometimes without a sink or commode and only a hole with a broken grate for a toilet.  Further, even as his SMI worsened, Plaintiff claims that he was deprived of clothes, blankets, medications, phone usage, normal uniforms, sheets, toilet paper, medication, and other necessities, which only further exacerbated his SMI.  Plaintiff also points to evidence that additional restrictions were placed on his basic needs while segregated, and when he sought assistance, punitive measures were imposed.  Specifically, Plaintiff claims that he was denied necessities and subjected to additional and repeated periods of segregation without close medical supervision, all despite his obvious SMI and without a legitimate goal.  Plaintiff asserts that during his incarceration, he was subjected to overly restrictive and punitive care plans created by Commander Heinen and implemented, restarted, or supplemented punitively by Sergeants Klinkner and Olson and other defendants.  Plaintiff claims that none of the plans or restrictions adequately considered his deteriorating SMI.

For example, Plaintiff points to the April 17, 2018 "Care Plan" that was instituted by Commander Heinen as a punitive measure and disregarded Plaintiff's SMI.  (Doc. No. 193-15 at Washington789.)  That Care Plan reads:

> Brandon,
>     Your behavior continues to worsen with your acting out, destroying jail furnishings, possession of weapons, covering the camera and threats of violence against staff.  I have decided that I will no longer allow you to continue this type of destructive behavior in our facility.  Thus, I have started you once again on a care plan.  As your behavior improves to the expectations of a normal segregation inmate you will being to receive items and privileges back.  I will no longer tolerate destruction, pounding, spitting, dumping mop buckets and graffiti all over your cell.  You are very disruptive and you are doing this behavior on purpose.  I know this because

I have seen you act rational and adult like when you want to.  Here is your care plan.
1) Brandon Peterson care plan:  Today through this Friday at 0900.
- 1 Anti Suicide gown
- 1 Anti Suicide blanket
- 1 paper cup
- 1 shower only on Wednesday
- Attorney visit or call only if requested by the attorney
- Hygiene items he can use upon request and then give back to officer w/in 20 minutes
- No other items unless Sergeant deems necessary
- Peterson will be given a copy of the plan tonight.

(*Id.*)

After careful review of the record, the Court finds that fact issues remain as to whether the conditions of Plaintiff's confinement included deprivations sufficiently serious so as to warrant constitutional protection.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude, via direct evidence or reasonable inference, that Plaintiff was subjected to several conditions that –in combination – deprived him of life's necessities, constituted punishment for behavior that could be attributed to his SMI, and that prison officials in instituting discipline, punishment, or harmful and punitive care plans, were deliberately indifferent.  The Court recognizes that Defendants point to evidence that they claim shows that Plaintiff was kept separate from the general population for his safety, the safety of correctional officers and other inmates, as well as for violating Jail rules.  Defendants attempt to justify further restrictions and conditions on Plaintiff as necessary.  And the Court is well aware that the facts, as presented by Plaintiff, are contested and Defendants have a very different view of the record.  All of this evidence and any factual disputes will be relevant to the

ultimate determination regarding the conditions of Plaintiff's confinement at trial.

Accordingly, Defendants' motion for summary judgment on this claim is denied.

### 7.    Remaining Claims

Plaintiff has alleged additional claims, including Plaintiff's *Monell* claims and various state-law claims. First, Plaintiff's *Monell* claims are shaped by the remaining claims for various constitutional violations—excessive force, deliberate indifference, and conditions of confinement. In addition, Plaintiff's state-law claims, which appear to be coextensive with his federal claims, will remain in the case only to the extent that they parallel remaining federal claims. The Court believes that, considering the complexity of the case and the interrelation between claims, the best course is to defer ruling on any outstanding claims on summary judgment. That way the parties can read and digest this Order and, at a later date, comment on the status and scope of these claims. Because this case is set for a Bench trial, any additional issues can be raised at an early pre-trial hearing, if necessary.

## CONCLUSION

The Court cautions the parties that victory at this stage does not equal victory at trial. This is a difficult case with an uncertain outcome and inevitable cost to both sides. The Court hopes that the parties, in their mutual interest, will consider attempting to settle the matter to avoid a costly trial. The Court also notes that Plaintiff believes that summary judgment should be denied because the issue of Defendants' spoliation of evidence is still pending. The Court disagrees. The outstanding issues regarding spoliation, and any potential sanctions, do not impact the Court's decisions on summary

judgment.  The spoliation issues, and any resulting sanctions, will be considered at the pre-trial hearing.

## ORDER

Based on the files, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion to Dismiss and for Summary Judgment (Doc. No. [158]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.     Claims V and VI are **DISMISSED WITH PREJUDICE**.

      b.     Counts VII and VIII are **DISMISSED WITH PREJUDICE**.

      c.     Claims asserted against Defendants Sheriff Starry, Officer Dan Rein, Officer John Roberto, and Officer Garrett Kleinendorst are **DISMISSED WITH PREJUDICE** and those Defendants are **TERMINATED** as parties to this action.

      d.     Plaintiff's claims of excessive force are limited to incidents occurring on February 19, February 23, February 25, March 24, May 1, and May 19, 2018.

      e.     Plaintiff's claims of deliberate indifference to medical needs are **DISMISSED WITH PREJUDICE** insofar as they are asserted against individual defendants except Commander Roger Heinen, Stephanie Kaphing, and Melinda Leibel.

      f.     All other claims remain and Plaintiff's state-law claims remain insofar as they parallel the surviving Federal claims.

2.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. [174]) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

a.      Plaintiff is entitled to summary judgment on the limited finding that

Plaintiff suffered from a serious medical need.

b.      Plaintiff's motion is otherwise denied.

3.      This Order is temporarily Filed Under Seal.  The Parties shall have fifteen

(15) days to submit proposed redactions for a publicly available version of this Order.


Dated:  February 18, 2022                    s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge