# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brandon Robert Peterson,

    Plaintiff,

v.

Commander Roger Heinen, *in his individual capacity*; Sergeant Brandon Olson, *in his individual capacity*; Sergeant Nicholas Klinkner, *in his individual capacity*; Sergeant Troy Jorgenson, *in his individual capacity*; Washington County, MN; Sheriff Dan Starry; John Warneke, *Assistant Jail Administrator in his individual capacity*; Officer KCee Cahill, *in his individual capacity*; Sergeant Frank Capra*, in his individual capacity*; Officer Dan Rein, *in his individual capacity*; Sergeant David Frantsi, *in his individual capacity*; Officer Jennifer Glassmaker, *in her individual capacity*; Corporal Rebecca Dyck, *in her individual capacity*; Nurse Melinda Leibel, "*Mindy*" *in her individual capacity*; Officer Chad Gaikowski, *in his individual capacity*; Officer John Roberto, *in his individual capacity*; Officer Vincent Scheele, *in his individual capacity*; Officer Garrett Kleinendorst, *in his individual capacity*; Officer De La Rosa, *in his individual capacity*; Stephanie Kaphing, *in her individual capacity*; John Does 1-10, *in their individual capacities*,

    Defendants.

Civil No. 18-2640 (DWF/ECW)

**MEMORANDUM
OPINION AND ORDER**

## INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment after remand by the Eighth Circuit Court of Appeals. (Doc. No. 158.) For the reasons set forth below, the Court grants in part and denies in part the motion.

## BACKGROUND

The facts of this case have been set forth in prior orders by the Court and the Eighth Circuit Court of Appeals. (Doc. Nos. 220, 239, 244.) In short, Plaintiff Brandon Robert Peterson ("Plaintiff" or "Peterson") suffers from bipolar disorder and was incarcerated at the Washington County Jail (the "Jail" or "WCJ") from February 4, 2018 to May 24, 2018. Based on the conditions and events during his incarceration, Plaintiff brought various constitutional and state-law claims.

Relevant to the present motion, in an order dated February 18, 2022 (the "February 2022 Order"), the Court denied qualified immunity for the alleged use of excessive force and failure to intervene as to Sergeants Nicholas Klickner, Brandon Olson, and David Frantsi, as well as Officers Anthony De La Rosa, Rebecca Dyck, KCee Cahill, Jennifer Glassmaker, and Vincent Scheele. These claims related to incidents that occurred at WCJ in 2018 on February 19, February 23, February 25, March 24, May 1, and May 19. The facts of each incident are set out in the February 2022 Order and the Eighth Circuit Opinion at *Peterson v. Heinen*, 89 F.4th 628 (8th Cir. 2023). In the February 2022 Order, the Court also denied qualified immunity to Commander Roger Heinen, and Nurses Stephanie Kaphing and Melinda Leibel on Plaintiff's claim that they acted with deliberate indifference to medical needs and denied qualified immunity to

2

defendants on Plaintiff's conditions-of-confinement claim.  The Court deferred ruling on state-law and *Monell* claims.

On appeal, the Eighth Circuit Court of Appeals reversed portions of the February 22 Order and remanded the case for further consideration.  Relevant to the present motion, the Eighth Circuit reversed the denial of summary judgment as to all of the incidents of alleged excessive force *except* for the incident that occurred on May 19 and as to Plaintiff's failure to intervene and deliberate indifference claims.[1]  Based on the Eighth Circuit's ruling, Plaintiff's claim of excessive force asserted against Olson for his actions during the May 19 incident remains for trial.[2]  In addition, and relevant to the pending motions, the Eighth Circuit vacated the Court's denial of summary judgment on Plaintiff's conditions-of-confinement, state-law, and *Monell* claims, all of which are now before the Court on Defendants' motion for summary judgment.[3]

---

[1]     The Eighth Circuit also reversed the Court's denial of summary judgment and dismissed Sergeants Troy Jorgenson and Frank Capra and Officer Chad Gaikowski from this action.

[2]     Plaintiff alleges that on May 19, Olson used excessive force when he deployed chemical spray.  The record shows that before Olson used the spray, Olson had demanded Plaintiff's belongings because Plaintiff had been disruptive for hours.  Olson claims that Plaintiff refused to comply, justifying his use of the chemical spray.  Plaintiff's compliance, or lack thereof, creates a genuine issue of material fact.  *See Peterson*, 89 F. 4th at 640.

[3]     The Eighth Circuit did not disturb the Court's dismissals of Counts 5-8 or the dismissals of claims against Defendants Dan Rein, Garrett Kleinendorst, John Roberto, and Dan Starry.

While the Court has already laid out the relevant facts in the February 2022 Order,

the Court restates some relevant facts here:

> Plaintiff had been incarcerated at the Jail previously and Plaintiff asserts
> that Jail staff had provided Plaintiff with medication, including
> antipsychotics, mood stabilizers and anxiety medication. Plaintiff has
> pointed to evidence that some Defendants remembered Plaintiff. Further,
> Plaintiff had been civilly committed before his incarceration.
>
> On February 4, 2018, Plaintiff arrived at the Jail. [Officer Dyck] recalled
> that Plaintiff was stumbling, not able to stand on his own, and appeared to
> be on some kind of illicit drug. In addition, Plaintiff was placed in a cell
> without receiving a mental health screening.
>
> On February 7, 2018, [Kaphing] performed an "Intake" evaluation.
> Kaphing confirmed Plaintiff's self-reported mental health diagnoses and
> prior suicide attempts. Plaintiff denied taking medications, but reported a
> history of depression, anxiety, bipolar disorder, and "[Redacted]" which
> Kaphing interpreted as "[Redacted]." Kaphing noted that Peterson
> admitted to recently using "dope." Kaphing did not review Plaintiff's
> medical records or refer Plaintiff to a Qualified Mental Health Provider
> ("QMHP"), and instead documented that Plaintiff was "aware of how to
> contact medical."
>
> On February 12, 2018, Plaintiff was reprimanded by a corrections officer
> and Plaintiff grew agitated, yelled, and exposed his genitalia. Plaintiff was
> placed in a segregation unit.
>
> On February 14, 2018, Plaintiff fractured his hand by slamming it into the
> walls and door of his cell, and he injured his face while jumping from the
> top of his cell sink. That day, Jail nursing supervisor [Leibel], who had
> conducted a mental health assessment earlier that day, prescribed 100mg of
> Hydroxyzine, an anti-anxiety medication. The next day, Plaintiff was
> prescribed sertraline, a drug commonly used to treat depressive disorders.
> On February 16, 2018, Plaintiff requested and was prescribed . . . an
> antipsychotic. Then on February 19, 2018, Plaintiff was placed on high
> observation or special close watch based on behavior, including homicidal
> statements, belligerent self-harm, and weapon procurement.
>
> On February 20, 2018, [Heinen] contacted a Washington County Attorney
> to determine whether civil commitment proceedings had been initiated for
> Peterson. In that same email chain, Leibel indicated that the medical unit at

the Jail has "done all we can do to help him" and that [h]e won't take the meds he needs." [Heinen] and Leibel did not move Plaintiff to a higher level of care at this time.

On February 22, 2018, [Dresel], an Advanced Practice Registered Nurse and the Jail's only QMHP, conducted a psychiatric diagnostic evaluation on Plaintiff. [Dresel] recorded Plaintiff's mental health status and history of mental illness, prescribed medications, including antipsychotics, and scheduled a follow-up. Dresel prescribed trazadone, and either [Redacted] or an increased dosage of [Redacted].

On March 2, 2018, the County Attorney charged Peterson with criminal damage to property related to acts of destruction at the Jail on or about February 19-22, 2018 and contempt of court. That same day, Plaintiff was convicted of contempt of court and sentenced to 90 days in Jail.

On March 7, 2018, Plaintiff appeared in court on the property-damage charge, during which the Court ordered a Rule 20 psychological evaluation. On March 29, Dresel and Dr. Jensen discontinued Plaintiff's medications after Plaintiff reportedly snorted his pills.

. . .

A Court-appointed forensic psychologist, Dr. Jill Rogstad, conducted a court-ordered competency evaluation. In a report dated April 11, 2018, Dr. Rogstad reported a diagnosis of "Unspecified Bipolar Disorder" and recommended civil commitment for mental illness and chemical dependence.

On April 26, 2018, Plaintiff was transported to Regions Hospital for a "crisis evaluation." Leibel testified that Plaintiff was sent to the hospital to "see if they could do anything else that we had not done yet, and also to give staff a break." Leibel also testified that [Heinen] made the decision to send Plaintiff to Regions. At Regions, Plaintiff was diagnosed with antisocial personality disorder, manic behavior, and a fracture in his left hand. In addition, substance abuse disorders were noted. . . .

In addition, Plaintiff refused [Redacted] an antipsychotic medication. The Hospital Records also contain information provided by Jail staff, including Leibel. Leibel told hospital staff that Plaintiff did not always take his medication and because Plaintiff once snorted his medication, he was no longer receiving it in Jail. In addition, it was noted that medical staff at the Jail were not in favor of sending Plaintiff to the hospital and dismissed

Plaintiff as manipulative.  Upon discharge from Regions Hospital, Plaintiff was prescribed [Redacted] and [Redacted].  Plaintiff returned to Jail and to segregation.

On May 8, 2018, Washington County petitioned for Plaintiff to be civilly committed due to mental illness.  The court determined that Peterson was incompetent and suspended all ongoing criminal proceedings until Peterson completed civil commitment.

On May 24, Plaintiff was transferred to Anoka Metro Regional Treatment Center ("AMRTC") and committed due to mental illness by court order. The treating physician at AMRTC, Dr. Matthew Kruse, noted that Plaintiff had an extensive history of hospitalization for mental health and a criminal history, and that while Plaintiff was in jail, he was "disinhibited and aggressive," non-adherent with medication, engaged in self-harm, and expressed delusional beliefs.  Dr. Kruse diagnosed Plaintiff with Bipolar I Disorder with manic features and noted that he was unable to perform a comprehensive evaluation upon admission because of Plaintiff's "severely decompensated mental condition."  While at AMRTC, Plaintiff was prescribed additional medications, and at the time of discharge was on two anti-psychotics.  Plaintiff remained at AMRTC until August 16, 2018, when he was transferred to a Competency Restoration Program at the Minnesota Security Hospital.  Plaintiff was treated at St. Peter Regional Treatment Center until January 23, 2019.

(Doc. No. 220 at 3-8 (citations and footnotes omitted and with redactions).)

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## A.    Conditions of Confinement—Count 1

Plaintiff alleges that the conditions of his confinement at WCJ, when considered *in toto*, deprived him of clearly established constitutional rights. This claim is asserted against Heinen, Warneke, Olson, Klinkner, Cahill, Frantsi, Glassmaker, and Dyck.[4]

Plaintiff was placed in segregation for nearly 100 days, and while in segregation, he was confined to his cell for 23 hours a day, 7 days a week. In addition, Plaintiff asserts that while he was under "Care Plans," he was subjected to additional limitations, including the deprivation of ordinary privileges (out-of-cell time, toilet paper, certain articles of clothing, books, the ability to file grievances, pencils, phone calls, showers,

---

[4]    Count 1 was dismissed as asserted against Scheele and De La Rosa. (Doc. No. 258 at 1.a.)

access to the canteen, and social visits), and that on several occasions, Plaintiff's out-of-cell time was revoked and Plaintiff could not exercise, shower or socialize. In addition, Plaintiff points to evidence that, on several occasions, he was placed in an intake (or transport) cell that did not have a toilet, bed, or sink, that he was not always decontaminated after the use of chemical spray, and that, on occasion, he was denied medication and phone calls. Plaintiff further asserts that Defendants knew of his mental illness.

Defendants point to record evidence that before Plaintiff was incarcerated in 2018, he had been civilly committed several times and that he had received varied diagnoses. In addition, on February 12, 2018, Plaintiff was placed in disciplinary segregation because of significant behavior issues, and he remained in segregation for most of his 2018 incarceration until he was transferred to civil commitment on May 24, 2018. WCJ's contact physician prescribed Plaintiff an antipsychotic medication on February 16, 2018. As detailed in the Court's February 2022 Order, Plaintiff engaged in repeated acts of destructive and disruptive behavior. For example, Plaintiff made homicidal statements, engaged in self-harm, and attempted to procure items that could be used as weapons. In addition, Plaintiff repeatedly snorted or misused medication, covered his cell camera with toilet paper, damaged his sprinkler head, flooded his cell, resisted, threatened, cursed and spit at officers, removed a metal bar from a floor grate and a brick from his cell, refused to turn over objects when requested, attempted to rip his mattress, returned his dinner bag to staff full of his own feces, and generally displayed disruptive behavior. Defendants maintain that Plaintiff's behavior was the reason restrictions were

8

placed on Plaintiff during his stay, and in particular, to protect Plaintiff, other inmates, and the correctional officers.

Defendants maintain that qualified immunity bars Plaintiff's conditions-of-confinement claim. The doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986). To overcome the defense of qualified immunity, a plaintiff must show that: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of deprivation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Howard v. Kansas City Police Dep't.*, 570 F.3d 984, 988 (8th Cir. 2009)). In determining whether the constitutional right was clearly established at the time of the conduct, the Court must ask whether the contours of the applicable law were "'sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A plaintiff is not required to cite a case directly on point—it is enough if "controlling authority" or a "a robust 'consensus of cases of persuasive authority'" puts the "constitutional question beyond debate." *Id*. at 741-42 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

The Eighth Amendment prohibits "cruel and unusual punishments," and requires prison officials to provide humane conditions of confinement.  U.S. Const. amend. VIII; *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The conditions under which an inmate is confined are subject to scrutiny under the Eighth Amendment using the deliberate indifference standard.  *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 31-32 (1993).)  Prison officials must provide humane conditions of confinement and are required to "ensure that inmates receive adequate food, clothing, shelter, and medical care."  *Farmer*, 511 U.S. at 832; *see also Jackson v. Mike-Lopez*, Civ. No. 17-4278, 2018 WL 6696296, at *2 (D. Minn. Dec. 20, 2018).  "The Constitution 'does not mandate comfortable prisons . . . .'"  *Farmer*, 511 U.S. at 832 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

"The deliberate indifference standard has two components:  an objective component and a subjective component."  *Thomas-El v. Francis*, 99 F.4th 1115, 1117 (8th Cir. 2024).  The objective component is satisfied by a showing a deprivation that results "in the denial of 'the minimal civilized measure of life's necessities.'"  *Id*. (quoting *Farmer*, 511 U.S. at 834).  The subjective component requires a showing that "the official knows of and disregards an excessive risk to inmate health and safety."  *Id*. (quoting *Farmer*, 511 U.S. at 837).  "[D]eliberate indifference includes something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk."  *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2001) (alteration in original) (quoting *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005)).  "Whether a prison official had the requisite knowledge of a substantial risk is a question

of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.  In the context of a qualified immunity analysis, if the two prongs of the deliberate indifference standard are satisfied, the Court then considers whether the law clearly established the inmate's right vis a vis the alleged deprivation.

The parties have submitted competing views of the case law on the question of whether the conditions at WCJ deprived Plaintiff of his Eighth Amendment rights.  From the relevant authority, the Court discerns the following parameters of the law.  "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise . . . ." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (emphasis omitted) (using the example of a low cell temperature at night combined with a failure to provide blankets).  However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id*. at 305.

In *Rhodes v. Chapman*, the Supreme Court required a serious deprivation of the minimal civilized measure of life's necessities, not simply "restrictive and even harsh" conditions, to be unconstitutional.  452 U.S. at 347.  Such deprivations have included: deprivation of physical space via overcrowding combined with lack of out-of-cell time, *Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980) (explaining that it is unconstitutional to confine pretrial detainees to small, overcrowded spaces—less than 18

square feet per detainee—with no recreational activities for all but a few hours each week); deprivation of clothing, *Maxwell v. Mason*, 668 F.2d 361, 365 (8th Cir. 1981) (affirming district court's findings that confining an inmate to solitary confinement in only undershorts and no bedding constituted cruel and unusual punishment); and deprivations of sanitary conditions, *Whitnack v. Douglas County*, 16 F.3d 954, 957-68 (8th Cir. 1994) (recognizing that reasonably adequate sanitation and the ability to dispose of one's waste are basic identifiable human needs, but finding that the record does not show that "deplorable" conditions rose to the level of a constitutional violation given the brevity of confinement).

Courts have also found that long-term confinement in administrative segregation, and in particular of those suffering mental illness, may constitute cruel and unusual punishment. *See, e.g.*, *Williams v. Norris*, 277 F. App'x 647, 648 (8th Cir. 2008) (in due process analysis, finding nine years in administrative segregation "constitutes an atypical and significant hardship"); *Madrid v. Gomez*, 889 F. Supp. 1146, 1266 (N.D. Cal. 1995) (finding that extreme isolation and environmental deprivation over extended periods of time did not inflict cruel and unusual punishment on all inmates but *did* deprive mentally ill inmates "of a minimal civilized level of one of life's necessities"); *Ruiz v. Johnson*, 37 F. Supp.2d 855, 915 (S.D. Tex. 1999) (finding that prolonged placement of mentally ill prisoners in administrative segregation caused cruel and unusual suffering), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001); *Palakovic v. Wetzel*, 854 F.3d 209, 216, 226 (3d Cir. 2017) (finding that allegations that a mentally ill prisoner was placed in an extended stay in isolation states a plausible claim that plaintiff experienced inhumane

conditions of confinement); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1237 (M.D. Ala. 2017) ("The serious psychological harm stemming from segregation is even more devastating for those with mental illness.").

On the other hand, Defendants cite to authority to support a finding that, on the facts of this case, they did not violate any clearly established right of Plaintiff's via the conditions of his confinement. In *Crane v. Utah Department of Corrections*, 15 F.4th 1296 (10th Cir. 2021), the Tenth Circuit reviewed a plaintiff's conditions-of-confinement claim that involved 154 days of punitive isolation of a prisoner who suffered from a diagnosed mental illness (psychosis and major depressive disorder). *Id.* at 1301. The Tenth Circuit found that it is not clearly established that housing an inmate with a serious mental illness in solitary confinement constitutes cruel and unusual punishment. *Id.* at 1306-07 (holding that the general use of punitive isolation to discipline prisoners who happen to be mentally ill does not violate clearly established law).

> The cases share a common theme. They stand for the proposition that isolating mentally ill inmates in conditions that seriously and predictably exacerbate their mental illness is cruel and unusual when the official has subjective knowledge of both the mental illness and the impact of isolation. *Although these trial court decisions may portend future legal developments, they do not constitute clearly established law capable of overcoming qualified immunity here*.

*Id.* at 1306 (emphasis added).  The Court further explained that the plaintiff did not point to on-point decisions from any circuit court or the Supreme Court that hold punitive isolation of mentally ill inmates violates the Eighth Amendment.[5]

With respect to Plaintiff's claim that he was deprived of other necessities, such as clothing, Defendants cite to *Williams v. Delo*, 49 F.3d 442, 446 (8th Cir. 1995).  In *Williams v. Delo*, after an inmate attacked his wife during a prison visit, he was held in a strip cell for four days without clothes and with the water to his cell shut off.  *Id*. at 443-44.  He had "a light, a toilet, and a sink, but the mattress had been removed."  *Id*. at 444. He was given three meals a day.  *Id*. at 445.  The Eighth Circuit held that plaintiff failed to make a showing that he was denied "the minimal civilized measure of life's necessities" and "that prison officials were deliberately indifferent."  *Id*. at 447; *see also Stickley v. Byrd*, 703 F.3d 421, 423 (8th Cir. 2013) (finding under Fourteenth Amendment analysis, limiting access to toilet paper does not violate a clearly established right where inmate exhausted his supply of toilet paper before receiving his weekly allotment, particularly where plaintiff could shower).

---

[5]    Defendants also cite to Eighth Circuit cases that involved periods of segregation for administrative or disciplinary reasons that did not violate the Constitution.  *See Portley-El v. Brill*, 288 F.3d 1063, 1065-66 (8th Cir. 2002) (finding in due process analysis, 30 days in punitive segregation is not an atypical or significant hardship); *Rahman X v. Morgan*, 300 F.3d 970, 973-74 (8th Cir. 2002) (holding that 26 months in segregation and the resulting deprivations are not "sufficiently serious" to establish an Eighth Amendment violation); *Hemphill v. Delo*, 124 F.3d 208, 208 (8th Cir. 1997) (unpublished table decision) (finding in a due process analysis, 30 days of disciplinary segregation and 290 days of administrative segregation is not an "atypical and significant" hardship).

Defendants rely heavily on record evidence showing that Plaintiff was disruptive, threatening, and repeatedly damaged jail property. There is no dispute that Plaintiff stuffed clothing in his toilet and that he covered the camera in his cell with toilet paper. The record also demonstrates that after receiving a bag-meal, Plaintiff did not return a spoon and claimed to have flushed it down the toilet, and that Plaintiff damaged his cell in other ways, such as by removing a brick and metal grate. In addition, the record shows that Plaintiff often threatened, spit at, and resisted jail officers. Defendants maintain that they took measures to address Plaintiff's safety, as well as the safety of correctional officers and other inmates, and to address Plaintiff's violation of jail rules. For example, prison officials gave Plaintiff anti-suicide gowns that could not be easily torn and stuffed in his toilet. In addition, Plaintiff was provided toilet paper on a limited basis so that he would not be able to use it to cover his camera. And when Plaintiff became disruptive or if they were concerned about the possibility of self-harm (i.e., when he did not return utensils), prison officials would remove Plaintiff from his cell and place him temporarily in an intake cell.

Here, Plaintiff's conditions-of-confinement claim centers on the prolonged period of segregation, lack of out-of-cell time, deprivation of clothing, and adequate hygiene, all while he was suffering from a serious mental illness. The record however shows that Plaintiff was placed in segregation for legitimate penological reasons, namely for his safety, the safety of correctional officers, the safety of other inmates, and because Plaintiff repeatedly violated jail rules and engaged in unsafe and disruptive behavior. After careful review, and in keeping with the Eighth Circuit's finding on appeal that

Plaintiff's behavior implicated legitimate prison concerns, the Court concludes that the imposition of segregation in and of itself (either administrative or disciplinary) for the length of time here did *not* violate Plaintiff's Eighth Amendment rights considering the facts of Plaintiff's behavior in custody. The fact that Plaintiff suffers from a mental illness is certainly relevant and *could* alter that conclusion. But the fact that Plaintiff suffers from a mental illness does not *compel* a finding of unconstitutional conditions. *See, e.g.*, *Loving v. Roy*, Civ. No. 12-551, 2013 WL 4734017, at *7 (D. Minn. Sept. 3, 2013), *aff'd*, 573 F. App'x 607 (8th Cir. 2014 ) (citing *Haggins v. Minn. Comm'r of Corr.*, Civ. No. 10-1002, 2012 WL 983590, at *1-9 (D. Minn. Feb. 14, 2012) (finding that even where the prisoner suffers from "paranoid schizophrenia and schizoaffective disorder," 19 months of segregation did not support a finding of an atypical and significant hardship in violation of the due process clause), *report and recommendation adopted*, 2012 WL 983684 (D. Minn. March 22, 2012)). Moreover, while the record establishes that Plaintiff was deprived of certain items of clothing, blankets, medication, toilet paper, and other necessities, these items were restricted because of Plaintiff's behavior and for legitimate prison concerns.

Having carefully considered the evidence in the record and in light of the Eighth Circuit's remand, the Court finds that the record does not create a triable issue of fact as to whether Plaintiff suffered deprivations serious enough in the conditions of his confinement to support a constitutional claim. And even if Plaintiff could establish an Eighth Amendment violation based on the placement of time in segregation or the

deprivation of clothing or other necessities, any such right was not clearly established as the constitutional question was not "beyond debate."[6]

Accordingly, Defendants are entitled to qualified immunity on Plaintiff's conditions-of-confinement claim and their motion for summary judgment on this claim is granted.

### B.     *Monell* Claim—Count IV

Plaintiff alleges a *Monell* claim against Washington County.  A "municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978) (emphasis omitted).  A municipality may be held liable under § 1983 if it, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983; *see Monell*, 436 U.S. at 690-91.  Municipal liability exists "only where the municipality itself causes the constitutional violation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis omitted).

---

[6]     The Court is mindful that it must consider the claim against each individual defendant—namely the Defendants implicated by Plaintiffs' conditions-of-confinement claim— Frantsi, Heinen, Warneke, Glassmaker, Cahill, Olson, Klinkner, and Dyck. Because these individuals were involved in the events considered above, the Court determines that none of these individuals' actions alone rise to the level of an Eighth Amendment violation, and that in any event, their actions in imposing restrictions on Plaintiff to accomplish legitimate penological goals did not violate a clearly established right.

"[L]iability for a constitutional violation attaches only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 840 (D. Minn. 2021); *see also Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016).

To support a claim for municipal liability, a plaintiff must establish a predicate constitutional violation even if he has not shown that an official is personally liable. *See Whitney v. City of St. Louis*, 887 F.3d 857, 860-61 (8th Cir. 2019) (holding that the complaint fails to allege any constitutional violation arising out of a municipal policy); *Webb v. City of Maplewood*, 889 F.3d 483, 485-86 (8th Cir. 2018) (acknowledging that a municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for conduct under that policy or custom). In *Ivey v. Audrain County*, 968 F3d 845, 851 (8th Cir. 2020), the Eighth Circuit explained that a finding that no constitutional violation occurred would also result in a finding that no *Monell* liability attaches, but where officers are found to be immune only because they did not violate clearly established rights, then *Monell* liability could attach. And in *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002), the Eighth Circuit explained:

> We do not suggest that municipal liability may be sustained where there has been no violation of the plaintiff's constitutional rights as a result of action by the municipality's officials or employees. After all, a municipality can act only through its officials and employees. However, situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.

*Id.* at 986 (citation omitted).

Plaintiff argues that the Eighth Circuit's decision has not mooted Plaintiff's municipality liability claims under the following theories: (1) *Pembaur* liability based on decisions on the conditions of confinement and deliberate indifference to Plaintiff's serious mental illness; (2) WCJ's "unofficial municipal custom" of deficiencies in the custody and care of mentally ill inmates; and (3) failure to train officers relating to the custody and care of inmates. The Court considers these theories below.

        1.     *Pembaur* Liability

Plaintiff argues that there are genuine issues of material fact as to whether, under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), Washington County is liable for harming Plaintiff through its official policies that created unconstitutional conditions of confinement and deliberate indifference. *Pembaur* recognizes that municipal liability based on an "official policy" "may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480. Indeed, an official policy can be "inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *see also Pembaur*, 475 U.S. at 483. An official policy is "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters," *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999), and is "intended to, and do[es], establish fixed plans of action to be followed under similar circumstances consistently and over time," *Pembaur*, 475 U.S. at 480-81.

19

Under *Pembaur*, municipal liability only attaches to actual policymaking—which is "a deliberate choice to follow a course of action [] made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. at 483. Thus, even if Heinen is eventually found to be a "final policymaker" (and assuming he is for purposes of this motion)[7], the Court must determine whether Heinen engaged in actual official policymaking, as opposed to discretionary conduct, when creating the Care Plans.

Plaintiff argues that Heinen's creation of the Care Plans constituted official municipal policy that created unconstitutional conditions. The Court disagrees. In creating Plaintiff's Care Plans, Heinen addressed day-to-day operations at WCJ, and in particular evaluated how to address Plaintiff's significant behavioral and jail safety issues. Heinen also reached out to the county attorney to seek civil commitment for Plaintiff. These decisions were discretionary in nature. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *Brenner v. Asfeld*, Civ. No. 18-2383, 2019 WL 2358451, at *11-12 (D. Minn. June 4, 2019) (finding that an officer who failed to identify an inmate as a suicide risk and implement suicide prevention procedures was protected by official immunity under

---

[7]    Plaintiff correctly points out that the Court previously reserved for trial the question of whether Heinen is considered a "final policymaker" for the purposes of *Monell* liability. (Doc. No. 220 at 29.)

state law because the actions were discretionary); *Olson v. Ramsey County*, 509 N.W.2d

368, 371-72 (Minn. 1993) (finding that a child protection social worker's creation of

Case Plan is discretionary and protected by official immunity); *Balducci v. Mo. Dep't of

Corr.*, Civ. No. 21-4022, 2021 WL 4206623, at *4 (W.D. Mo. Sept. 15, 2021) (finding

that the creation of policies for prison security and inmate safety, including "corrective

actions," are discretionary).  Thus, the Court concludes that even if Heinen is an official

policymaker, his actions in creating Care Plans do not, as a matter of law, constitute

official policymaking.  *See Bolderson*, 840 F.3d at 985 (noting that the fact a policymaker

has discretion in the exercise of functions does not, without more, give rise to municipal

liability based on the exercise of that discretion).  Heinen's decisions related to creation

and implementation of the Care Plans created specifically for Plaintiff cannot be

considered official municipal policy for purposes of *Monell* liability.[8]

Plaintiff also argues that Washington County is liable for harming Plaintiff

through systemic policy deficiencies in the custody and care of mentally ill inmates that

amounted to deliberate indifference.  Whether a jail official acted with deliberate

indifference requires a two-prong analysis.  First, objectively, Plaintiff must establish that

he suffered from a serious medical need.  *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir.

2016).  Second, subjectively, Plaintiff must show that the defendants "actually knew of

but deliberately disregarded his serious medical need."  *Id.* (quoting *Scott v. Benson*, 742

---

[8]     In addition, as discussed above, Plaintiff has not made a showing that there is a
predicate constitutional violation based on the Care Plans.  For this additional reason, the
*Monell* claim based on the implementation of the Care Plans fails as a matter of law.

F.3d 335, 340 (8th Cir. 2014)).  This requires a showing of a something more than gross negligence, something "akin to criminal recklessness." *Id.* (quoting *Scott*, 742 F.3d at 340).

The Court already determined that Plaintiff suffers from a serious medical need, a finding that the Eighth Circuit did not disturb on appeal.  *Peterson*, 89 F.4th at 640.  The Court therefore considers whether Plaintiff can demonstrate that any of the Defendants knew of and disregarded that need.  Plaintiff submits that genuine issues of material fact exist both as to actions taken by individuals at WCJ and whether systemic deficiencies constitute deliberate indifference.  Plaintiff argues that fact issues remain as to whether Heinen, Dresel, Kaphing, and Doctor Joel Jensen committed constitutional violations via deliberate indifference, and also as to whether Heinen, Dresel and Kaphing were final policymakers and created systemic unconstitutional deficiencies.

In its February 2022 Order, the Court found that a reasonable factfinder could conclude that Heinen, Leibel, and Kaphing deliberately disregarded Plaintiff's serious medical need and reserved for trial the question of whether Heinen, Dresel, Kaphing and Jensen are "final policymakers" for purposes of *Monell* liability.  (Doc. No. 220 at 29, 45-46.)  The Eighth Circuit, however, held that Heinen, Leibel, and Kaphing were entitled to qualified immunity and stated "[a]ll told, neither *Gordon* nor *Buckley* nor *McRaven* shows that Commander Heinen's, Nurse Leibel's, or Nurse Kaphing's particular conduct violates the Eighth Amendment."  *Peterson*, 89 F.4th at 642.  Because there is no underlying constitutional violation to support the *Monell* claim as to the

actions of named Defendants Heinen, Leibel, and Kaphing, their conduct, therefore, does
not support a finding of deliberate indifference against Washington County.

The Court next considers the conduct of Jensen and Dresel, neither of whom are
named defendants in this lawsuit. Jensen and Dresel were Plaintiff's contracted medical
providers. Dresel conducted Plaintiff's initial psychiatric diagnostic evaluation. Plaintiff
argues that she was deliberately indifferent because she only met with him once. (Doc.
No. 251 at 22.) In addition, Plaintiff argues that Jensen and Dresel were deliberately
indifferent when they discontinued his medication on March 29, 2018. (*Id*.)

Municipal liability for the actions of these individuals will attach if they are found
to be decisionmakers with final authority to establish municipal policy. *Pembaur*, 475
U.S. at 481. Plaintiff has not made the requisite showing that either of these contracted
medical staff were policymakers for WCJ. Indeed, Defendants have cited to persuasive
authority to support a finding that Jensen's and Dresel's medical decisions in day-to-day
medical care of Plaintiff do not constitute policymaking. *See Washington v. Esch*, Civ.
No. 17-6, 2017 WL 2312877, at *1 (D. Neb. May 24, 2017) (holding nurse's
discretionary authority regarding individual treatment plans did not make the County
liable for her actions); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 935 (N.D. Ill. 2014)
(holding jail nurse's decisions in treating detainee medical conditions were "discrete
exercises of discretion that nearly all professionals make every day"). The Court
concludes that Jensen's and Dresel's medical decisions were discretionary in nature and
do not amount to official policymaking. Therefore, there can be no *Pembaur* municipal
liability for their actions.

2.      Unofficial Custom

Plaintiff also argues that there were systemic deficiencies at the Jail that were so widespread that they constitute an unofficial policy or custom.  Plaintiff points to evidence that he claims shows a pattern of inadequate health screenings at intake, inadequate hours for the contracted qualified medical health professionals, inadequate record keeping and failure to track mentally ill inmates, failure to take mental health into account when using force and segregation as punishments, and failure to provide adequate mental healthcare.  Plaintiff submits that he has demonstrated a persistent and continuing pattern of unconstitutional conduct relating to the custody and care of mentally ill inmates.

An unofficial custom is a "practice [that] is so widespread as to have the force of law."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).  An unofficial custom can be established through "a continuing, widespread, and persistent pattern of unconstitutional misconduct" that is "so pervasive among non-policymaking employees of the municipality that it effectively has the force of law."  *Bolderson*, 840 F.3d at 986.  To establish *Monell* liability based on an unofficial custom, Plaintiff must show a widespread pattern of constitutional violations, that Washington County had notice of the custom and acted with deliberate indifference, and that Plaintiff's injuries were caused by the custom.  *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 700 (8th Cir. 2016).

Here, Plaintiff has failed to make such a showing.  Plaintiff has not demonstrated an underlying constitutional violation to support the *Monell* claim.  Nor has he pointed to

24

sufficient record evidence to show a widespread pattern of constitutional violations. Indeed, Plaintiff has not made a showing that any of the alleged systemic deficiencies run afoul the Constitution or pointed to evidence of previous determinations that WCJ staff was deliberately indifferent to inmates' medical needs or constitutional rights with respect to health screenings, segregation, or the provision of health care in prison. In fact, the Eighth Circuit determined that there is no underlying constitutional violation to support a deliberate indifference claim. *Peterson*, 89 F.4th at 642. In addition, the record evidence does not show that the Jail's nurses systemically failed to review prior medical history during initial screenings, that the hours of the Jail's contracted qualified mental health professional negatively affected the provision of mental health care such that it violated the Constitution, or that WCJ officers systemically failed to chart Plaintiffs refusals to take medication. Further, Plaintiff argues that there is a widespread pattern at WCJ of failing to consider an inmate's mental health when disciplining or placing them in segregation. However, Plaintiff has not demonstrated a systemic pattern of doing so or that any such failure violated the Constitution.

For the reasons stated above, the Court concludes that Plaintiff has not carried his burden on summary judgment to show a continuing, widespread, and persistent pattern of unconstitutional conduct. The Court finds that there is no genuine issue of fact that would support an unofficial custom claim to support *Monell* liability.

### 3. Failure to Train

Finally, Plaintiff argues for *Monell* liability under a failure to train theory. Inadequate training "may serve as the basis for § 1983 liability only where the failure to

train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. Thus, failure to train or supervise can be established through a showing that: (1) the municipality's training was inadequate; (2) the municipality was deliberately indifferent to the rights of others in adopting the training practices; and (3) an alleged deficiency in the training actually caused the plaintiff's injury. *Pitts v. Ramsey County*, Civ. No. 17-4261, 2018 WL 3118437, at *10 (D. Minn. May 25, 2018). "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish" deliberate indifference necessary to trigger municipal liability. *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotations and citation omitted). But "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

Here, Plaintiff points to evidence that he claims demonstrates inadequate training with respect to mentally ill inmates, that the County was deliberately indifferent in adopting its inadequate training policies, and that the deficiencies in training harmed Plaintiff. Specifically, Plaintiff points to evidence that he claims shows that the jail staff and medical unit were not adequately trained on mental illness, that officers were not trained on how to provide access to mental health care, and that better training would have helped staff recognize his need for higher levels of medication and general psychiatric care.

Despite Plaintiff's citation to evidence that he claims demonstrates improper training, Plaintiff has not connected the asserted training deficiencies with an underlying constitutional violation. Without that, there can be no *Monell* claim. And even if training was inadequate, Plaintiff has not demonstrated that Washington County had notice that its procedures were inadequate and likely to lead to a constitutional violation.

Plaintiff's remaining arguments in support of its failure to train theory (that more mental health training would have changed the officers' use of chemical spray or segregation) are speculative. There is no showing that the use of chemical spray or segregation on a mentally ill inmate, without more, violates a clearly established right. Therefore, Washington County could not be on notice that it was unconstitutional to train its officers in the use of those methods. *See Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc) ("[A] municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established.").

For the reasons stated above, the Court grants Defendants' motion for summary judgment on Plaintiff's failure to train claim under *Monell*. Therefore, Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.

### C.    State-Law Claims

Plaintiff asserts state-law claims for assault, battery, unauthorized use of force, negligence, and intentional infliction of emotional distress claims. (Am. Compl., Counts 10-15.) These claims involve the actions of remaining Defendants Heinen, Olson, Klinkner, Warneke, Cahill, Frantsi, Glassmaker, Dyck, Scheele, De La Rosa,

Leibel, Kaphing, and Washington County.[9]  Defendants submit that official and vicarious official immunity bar state-law tort claims against these Defendants.  In the alternative, Defendants argue that even if the state-law tort claims are not barred by official immunity, they fail as a matter of law.

Official immunity shields public officials from state-law claims when their duties require the exercise of discretion, so long as the official has not committed a willful or malicious wrong.  *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992).  In the context of official immunity, "[m]alice 'means . . . the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'"  *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991 (quoting *Carnes v. St. Paul Union Stockyards Co.*, 205 N.W. 630, 631 (Minn. 1925)); *see also Brown v. County of Golden Valley*, 574 F.3d 491, 500-01 (8th Cir. 2009).

"Official immunity is intended 'to protect public officials from the fear of personal liability that might deter independent action.'"  *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (quoting *Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs*, 552 N.W.2d 711, 715 (Minn. 1996)).  "Whether official immunity applies requires the court to focus on the nature of the particular act in question." *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990).  While discretionary

---

[9]      Plaintiff asserts claims for assault, battery, and "unauthorized use of force" against "all defendants."  However, upon review, Kaphing, Leibel, Heinen, and Warneke were not involved in the use of force incidents.  Therefore, Counts 10-12 are properly dismissed as asserted against these defendants.

duties are immunized from personal liability, ministerial duties are not. *Rico*, 472 N.W.2d at 107. Ministerial duties are "absolute, certain[,] and imperative, involving merely execution of a specific duty arising from fixed and designated facts." *Id*. (quoting *Cook v. Trovatten*, 274 N.W.2d 165, 167 (1937)). Discretionary conduct requires individual professional judgment that "reflects the professional goal and factors of a situation." *Vasallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014). Whether an officials' duty is discretionary or ministerial is a question of law. *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 n.5 (Minn. 1999).

There is an exception to official immunity—it does not protect an official who commits a willful or malicious wrong. *Rico*, 472 N.W.2d at 106-07. "In the official immunity context, willful and malicious are synonymous." *Id*. at 107. A public official can defeat a claim of malice by showing one of three things: (1) that the conduct was objectively legally reasonable; (2) that the conduct was performed in good faith; or (3) that the right allegedly violated was not clearly established. *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 902 (8th Cir. 2020).

1.     Non-Medical Prison Officials

Plaintiff asserts state-law claims against Heinen, Warneke, Cahill, Frantsi, Glassmaker, Dyck, Scheele, De La Rosa, and Olson. The Court considers whether these officers are entitled to official immunity.

With respect to Heinen, the Court has already concluded that his creation and implementation of the Care Plans was discretionary. Again, Heinen developed the Care Plans, addressed Plaintiff's privileges, instituted restrictions (including segregation), and

sought civil commitment based on Plaintiff's behavior and security concerns. These decisions were all discretionary in nature. In addition, the Eighth Circuit dismissed the deliberate indifference claim against Heinen and, as discussed above, the restrictions placed on Plaintiff via Heinen's Care Plans did not violate a clearly established right. By extension, the Court also concludes that there is no support in the record to find that Heinen's conduct was willful or malicious. And for the same reasons, the Court finds that Warneke's actions, in participating in weekly meetings to discuss Plaintiff and in reviewing use of force reports, are also discretionary. Thus, the Court finds that Heinen and Warneke are entitled to official immunity.

Plaintiff's claims against Cahill, Frantsi, Glassmaker, Dyck, Scheele, and De La Rosa relate to their involvement in the uses of force on February 19, February 23, February 25, March 24, and May 1. Their decisions regarding the use of force and security measures were discretionary. *See, e.g.*, *Wealot v. Brooks*, 865 F.3d 1119, 1129 (8th Cir. 2017); *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015); *Kelly*, 598 N.W.2d at 665; *Teasley v. Forler*, 548 F. Supp.2d 694, 710 (E.D. Mo. 2008). In addition, the Eighth Circuit determined that officers' conduct in the uses of force on February 19, February 23, February 25, March 24, and May 1 was objectively reasonable or did not violate a clearly established right. Therefore, no reasonable juror could find that the officers' conduct was willful or malicious. *See Hayek v. City of St. Paul*, 488 F.3d 1049, 1056 (8th Cir. 2007).

Therefore, the Court concludes that Defendants Cahill, Frantsi, Glassmaker, Dyck, Scheele and De La Rosa are entitled to official immunity for the uses of force (and

related failure to intervene claims) that occurred on February 19, February 23, February 25, March 24, and May 1.[10]

The one use of force incident that remains in this action is the May 19 incident involving Olson. Defendants argue that even though there is a fact issue as to Olson's use of force during that incident, he is entitled to official immunity for the related state-law claims because his use of the chemical spray was discretionary and neither willful nor malicious. The Court agrees that the use of the spray was discretionary but finds that a fact issue remains as to whether his actions were malicious or willful. Therefore, the Court finds that Olson is not entitled to official immunity on this claim.

    2.    WCJ Medical Staff

The question of official immunity for medical decisions, like those made by Kaphing and Leibel, is more complicated under Minnesota law, which carves out certain decisions made by medical professionals from the official immunity doctrine. *See Terwilliger v. Hennepin County*, 561 N.W.2d 909, 913 (Minn. 1997) ("Nothing in our case law dictates that official immunity protects county doctors from every form of medical malpractice liability."). In *Terwilliger*, the Minnesota Supreme Court considered whether medical personnel at a county mental health facility, including a psychiatrist, were entitled to official immunity for their alleged negligence in treating a patient who

---

[10]    Olson is also entitled to official immunity to the extent that he was involved in these incidents.

later committed suicide. *Id*. at 910. The court ruled that the employees' treatment

decisions did not constitute the type of discretion protected by immunity. *Id*. at 913.

> In the case before us, the challenged conduct of the Mental Health Center's
> employees does not implicate the concerns of official immunity. . . . But
> decisions of this kind—no matter how difficult and no matter how much
> professional judgment is required—do not involve the discretion protected
> by official immunity; they only implement Hennepin County's established
> public policy of providing treatment for its mentally ill citizens. And
> unlike the policeman's split-second decision whether to engage in a high-
> speed chase, [the psychiatrist] and the other professionals involved based
> their decisions not only on what they observed of [the patient] but also on
> the patient's medical history and on consultations with [him].

*Id.* (citations omitted). The court emphasized that the county's mental health employees

made decisions based on the same considerations and subject to the same risks as private

practitioners who are subject to malpractice liability and concluded that extending

immunity would erect a shield against malpractice that is unavailable to private

practitioners. *Id.* Thus, the court made clear that the exercise of medical discretion is not

the kind of discretion official immunity is meant to protect. *See also Stodgell v. City of

Warroad*, Civ. No. 03-258, 2003 WL 22136081, at *6 (Minn. Ct. App. Sept. 16, 2003)

("That the ambulance attendants exercised discretion, however, is not in dispute. Rather,

the critical distinction here is that the ambulance attendants were exercising their medical

discretion, which is not subject to official immunity despite their municipal

employment.").

Defendants cite to *Bailey v. City of St. Paul*, 678 N.W.2d 697, 702-03 (Minn. Ct.

App. 2004) to support the application of official immunity. In *Bailey*, the court applied

official immunity to a government-employed ambulance crew. However, in doing so, the

court specifically distinguished the facts of its case from those of *Terwilliger*, explaining that the acts of the ambulance crew were more analogous to the acts of a police officer making split-second decisions on whether to engage in a high-speed chase than to the doctors and staff "who were able to take the time to gather the patient's medical information and reflect on appropriate treatment based on analysis of that information." *Bailey*, 678 N.W.2d at 792. Here, Kaphing and Leibel arranged for medical and mental health care for Plaintiff and referred him to a separate qualified mental health professional (whom Plaintiff has not sued). The Court finds that Kaphing's and Leibel's decisions regarding Plaintiff's care, while technically discretionary, are more akin to the doctors in *Terwilliger* because they had time to gather Plaintiff's medical information and reflect on appropriate treatment. They were exercising their professional judgment and medical discretion. Therefore, the Court concludes that their conduct is not subject to official immunity.

Defendants argue, in the alternative, that the state-law negligence claim asserted against Kaphing and Leibel fails as a matter of law. A plaintiff asserting a claim for medical negligence must prove the following elements: "(1) the applicable standard of care; (2) the defendant's departure from that standard of care; and (3) that the departure from the standard of care directly caused the patient's injury." *Erickson v. Pope County*, Civ. No. 19-3061, 2022 WL 17411091, at *44 (quoting *Smits v. Park Nicollet Health Servs.*, 955 N.W.2d 671, 678 (Minn. Ct. App. 2021)); *see also McRae v. Group Health Plan*, 753 N.W.2d 711, 717 (Minn. 2008) (setting forth elements of medical negligence).

Plaintiff has submitted evidence that Kaphing and Leibel were aware of, or should have been aware of, Plaintiff's mental illness and that he sustained injuries as a result of the lack of treatment of that illness. Not only did Plaintiff's correctional records contain evidence of his history of mental illness, but WCJ staff recorded several symptomatic presentations of manic behavior. Plaintiff submitted expert testimony detailing the risks to Plaintiff's health attendant to his serious mental illness and his decompensation while at WCJ. (Doc. No. 190-4.) Defendant argues that Plaintiff has failed to meet his burden to establish that Kaphing's and Leibel's actions caused his injuries, as opposed to other causes such as his pre-existing issues and the treatment decisions of others. The Court acknowledges that a jury may well find that Plaintiff has not established causation. But based on the record before it, the Court finds that there are genuine issues of material fact as to whether these Defendants departed from the standard of care and whether any such departure caused Plaintiff's injury. Therefore, the Court denies summary judgment as to the negligence claim against Kaphing and Leibel.[11]

### 3. Washington County

Official immunity also protects government entities from vicarious liability for actions that are entitled to immunity. *See, e.g., Hayek*, 488 F.3d at 1056. Here, Washington County is entitled to vicarious official immunity as to the state-law claims on

---

[11] To the extent that Count 15, which is named "Intentional Infliction of Emotional Distress" but appears to state a claim for "Negligent Infliction of Emotional Distress" is coextensive with the negligence claim against Kaphing and Leibel, it also survives summary judgment.

which the officials are entitled to official immunity. Therefore, Washington County is entitled to summary judgment on Plaintiff's state-law claims against: (1) Heinen and Warneke; and (2) Cahill, Frantsi, Glassmaker, Dyck, Scheele, De La Rosa and Olson insofar as they relate to the incidents on February 19, February 23, February 25, March 24, and May 1. However, because the Court has declined to apply official immunity to Olson for his actions on May 19, 2018 and to Kaphing and Leibel for their provision of medical care to Plaintiff as implicated in Counts 13 and 15, the Court denies Washington County summary judgment on those claims.

## CONCLUSION

The Court underscores that while Defendants are entitled to summary judgment on many of the claims discussed above, this case highlights serious issues that arise in the prison setting when housing mentally ill inmates. While many of Plaintiff's claims are legally untenable, particularly after the Eighth Circuit's decision and guidance, that does not mean WCJ's procedures for engaging with mentally ill inmates cannot or should not be reevaluated and improved. Considering this, and the fact that this case now involves a single incident on May 19 and a limited set of state-court claims related to the provision of mental health care in WCJ, neither of which are guaranteed (or even likely) to be victorious at trial, the Court feels that it is in the best interest of all parties to attempt to resolve this matter and work to make improvements where practical.

## ORDER

Based on the files, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

35

1.    Defendants' Motion to Dismiss and for Summary Judgment (Doc.

No. [158]) is **GRANTED IN PART** as follows:

a.    Defendants are entitled to summary judgment on Plaintiff's

conditions-of-confinement claim and Count 1 is **DISMISSED WITH**

**PREJUDICE**;

b.    Defendants are entitled to summary judgment on Plaintiff's *Monell*

claim and Count 4 is **DISMISSED WITH PREJUDICE**;

c.    Defendants are entitled to official immunity on Plaintiff's state-law

claims as they are asserted against Defendants Heinen, Warneke, Cahill, Frantsi,

Glassmaker, Dyck, Scheele and De La Rosa and Counts 10-15 are **DISMISSED**

**WITH PREJUDICE** insofar as they are asserted against them;

d.    All state-law claims asserted against Olson, *except* as they might

relate to the May 19, 2018 incident, are **DISMISSED WITH PREJUDICE**;

e.    Counts 10-12 are **DISMISSED WITH PREJUDICE** as they are

asserted against Kaphing, Leibel, and Warneke;

f.    Washington County is entitled to summary judgment on Plaintiff's

state-law claims against:  (1) Heinen and Warneke; and (2) Cahill, Frantsi,

Glassmaker, Dyck, Scheele, De La Rosa and Olson insofar as they relate to the

incidents on February 19, February 23, February 25, March 24, and May 1.

2.    Defendants' Motion to Dismiss and for Summary Judgment (Doc.

No. [158]) is **DENIED IN PART** as follows:

a.    Plaintiff's state-law claims for negligence (Count 13) and negligent

infliction of emotional distress (Count 15) as they are asserted against Kaphing

and Leibel remain for trial.

b.    Plaintiff's state-law claims related to Olson's actions during the

May 19, 2018 incident remain for trial.

c.    Washington County is not entitled to summary judgment on the

surviving claims against Olson for his actions on May 19, 2018, or claims against

Kaphing and Leibel related to their provision of medical care to Plaintiff.


Dated:  October 29, 2024                s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge